1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

2

3         CASE NO.:15-21031-CIV-ALTONAGA/O'SULLIVAN

4

5  LINDSEY HORNE,

6          Plaintiff,

7  vs.

8  CARNIVAL CRUISE LINES,

9          Defendant.

10  _____/

11

12              VIDEOTAPED DEPOSITION OF
              ROBERT G. WILLIAMS, JR.

13              Pages 1 through 190

14

15              Thursday, October 29th, 2015
              1:00 p.m. - 5:20 p.m.

16              Gerson & Schwartz, P.A.
              1980 Coral Way

17              Miami, Florida  33145

18

19

20              Stenographically Reported By:
                  JONNA FOSTER
                  Court Reporter

21

22

23

24

25

Page 2

```
 1              APPEARANCES:
 2  On behalf of the Plaintiff:
        GERSON & SCHWARTZ, P.A.
 3      1980 Coral Way
        Miami, Florida  33145
 4      (305)371-6000
        ngerson@gslawusa.com
 5      BY: NICHOLAS I. GERSON, ESQ.
 6
 7
    On behalf of the Defendant:
 8      MASE LARA
        2601 South Bayshore Drive
 9      Suite 800
        Miami, Florida  33133
10      (305)377-3770
        rlara@maselara.com
11      BY: RICHARD D. LARA, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2  Deposition of ROBERT G. WILLIAMS, JR.     Page
 3  Direct Examination by Mr. Gerson            5
    Cross Examination by Mr. Lara             181
 4
 5
 6              PLAINTIFF'S EXHIBITS
 7  Number        Description            Page
 8   1            Notice                 186
 9   2            Affidavit              186
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      Deposition taken before Jonna Foster, Court
 2  Reporter and Notary Public in and for the State of
 3  Florida at Large in the above cause.
 4              - - - - - - -
 5      THE COURT REPORTER:  Today's date is
 6  October 29th, 2015.  I am Jonna Foster, court
 7  reporter with US Legal Support.  We are here in
 8  the matter of Lindsey Horne v. Carnival Cruise
 9  Lines, in the United States District Court of
10  the Southern District of Florida, case number
11  15-21031-CIV-ALTONAGA/O'Sullivan to take the
12  deposition of the Corporate Representative of
13  Carnival Corporation d/b/a Carnival Cruise
14  Lines.
15      The Corporate Representative of Carnival
16  Corporation d/b/a Carnival Cruise Lines will
17  now be sworn.
18      Do you swear the testimony you are about
19  to give will be the truth, the whole truth, and
20  nothing but the truth?
21      THE WITNESS:  Yes.
22  THEREUPON,
23              ROBERT G. WILLIAMS, JR.,
24  having been first duly sworn, was examined and
25  testified as follows:
```

Page 5

```
 1              DIRECT EXAMINATION
 2  BY MR. GERSON:
 3      Q   Good afternoon.
 4      A   Good afternoon.
 5      Q   My name's Nick Gerson and I'm here to take
 6  your deposition if you figured that out already.
 7  Sir, you understand that you are here pursuant to a
 8  notice of taking deposition under Federal Rule
 9  30(b)(6)?
10      A   Yes.
11      Q   You understand that you're here as the
12  corporate representative on behalf of Carnival
13  Corporation, Carnival Cruise Lines?
14      A   Yes.
15      Q   Okay.  You understand that your answers
16  are binding on the corporation and in essence you
17  are Carnival Corporation for topics that have been
18  designated for today?
19      A   Yes.
20      Q   Okay.  I'd like to show you a copy of
21  the -- this notice, sir, which we'll mark as
22  Exhibit 1, and with exception of the time, which is
23  stated at 10:00 o'clock a.m., it's obviously 1:00
24  o'clock, a little after 1:00 o'clock now, have you
25  ever seen this notice before?
```

Page 6

1    A    Yes.
2    Q    Okay.  And there's -- you're familiar with
3  the topics in the notice that for which you have
4  been designated?
5    A    Yes.
6    Q    Okay.  What is your position, sir?
7    A    I'm the Senior Manager of Investigations
8  of Carnival Cruise Security Services Department.
9    Q    And just for the record, I'm sorry if I
10  didn't ask you, please state your full name and
11  position for the record.
12    A    Robert F. Williams, Jr.
13    Q    And your position is?
14    A    Senior Manager of Investigations with
15  Carnival Cruise Lines Security Services Department.
16    Q    Senior Manager Investigator Services
17  Carnival Cruise Lines.
18    A    Senior Manager of Investigations Carnival
19  Cruise Lines Security Services Department.
20    Q    Okay.  Have you ever had -- held any other
21  job titles?
22    A    Yes.
23    Q    What job titles have you also held for
24  Carnival Cruise Lines?
25    A    I was a staff investigator.

Page 7

1    Q    Uh-huh.
2    A    Supervisor.  Manager.
3    Q    Go on.
4    A    Then senior manager.
5    Q    How long have you been a senior manager
6  for investigative services?
7    A    Senior manager of investigations, I
8  believe about three or four years.
9    Q    Have you ever held a job title as senior
10  security manager?  Is that the same thing?
11    A    It's the same thing.
12    Q    You've been a senior security manager for
13  Carnival for the last three years, four years?
14    A    Four years, five years, somewhere in that
15  area.  I'm not sure.
16    Q    Okay.  And as a senior manager of
17  investigations tell me what your duties and
18  responsibilities are.
19    A    To oversee the staff investigators in our
20  office and to assist with the investigations and the
21  allegations that are reported to liaison with law
22  enforcement.
23    Q    Anything else?
24    A    Well, to give testimony.
25    Q    Have you ever served as a corporate

Page 8

1  representative?
2    A    Yes.
3    Q    Or let me reask the question.  Have you
4  ever given a deposition as a corporate
5  representative on behalf of Carnival?
6    A    Yes.
7    Q    How many times?
8    A    Counting this one, maybe two or three
9  other times.
10    Q    And what were the nature of those other
11  instances or other times?  What types of cases were
12  they?
13    A    I don't recall the cases per se, but there
14  was litigation against Carnival Cruise Lines.
15    Q    When you say that you don't recall per se,
16  have you given a deposition in the last year?
17    A    I don't believe I have.
18    Q    Have you given a deposition in the last
19  two years?
20    A    I may have.  I don't know.
21    Q    Okay.  So as you sit here today you don't
22  know whether or not you've given a deposition on
23  behalf of Carnival in any capacity in the last two
24  years?
25    A    That is correct.

Page 9

1    Q    Where were you working two years ago?
2    A    Carnival Cruise Lines.
3    Q    And then you were working in the same
4  position?
5    A    Yes.
6    Q    Okay.  Were you also corporate
7  representative, designated a corporate
8  representative in both of those other depositions?
9    A    I believe I was.
10    Q    And isn't it true that in those other --
11  the other times that you've been designated as a
12  corporate representative, those have been cases
13  involving allegations of rape and sexual assault on
14  a passenger or crew member?
15         MR. LARA:  Objection.
16    A    I don't recall.
17    Q    (By Mr. Gerson) You don't recall?
18    A    No.
19    Q    Well, can you tell me, were you
20  represented by the same law firm that is
21  representing you or Carnival in this case?
22    A    On some occasions, yes.
23    Q    Okay.  You remember who the lawyers were?
24    A    One of them was Mr. Lara.
25    Q    Okay.  And Mr. Lara is seated next to you?

Page 10

1      A     That's correct.
2      Q     And you don't remember how long ago that
3  was?
4      A     I have no idea.
5      Q     Okay.  And do you remember -- well, is it
6  just two or three times or could it have been more
7  times that you've been designated as a corporate
8  representative?
9          MR. LARA:  Objection.
10     A     I'm going to say two or three times,
11  somewhere in the proximate of those -- that number.
12         THE COURT REPORTER:  I'm sorry.
13         (There was a brief interruption.)
14     Q     (By Mr. Gerson) Okay.  Mr. Williams, who
15  do you report to?
16     A     I have Michael Panariello is the director
17  of security and Dominick Froyo, the vice-president.
18     Q     So Michael Panariello is the director of
19  security; right?
20     A     Correct.
21     Q     And when you say Michael Panariello, isn't
22  it true that you report to the director of security
23  and then the director of security then reports to I
24  guess the vice-president of security operations; is
25  that accurate?

Page 11

1      A     That's the organizational chart.  That's
2  not necessarily how the reporting goes.
3      Q     Okay.  But Michael Panariello would be
4  someone above you on the -- on the organizational
5  chart?
6      A     That's correct.
7      Q     And how long has Michael Panariello been
8  above you on the organizational chart?
9      A     I'd say probably approximately three
10  years.
11     Q     Okay.  So for the most of your employment
12  with Carnival, Michael Panariello has been your
13  director; correct?
14     A     For the last three years.
15     Q     For the last three years.  Okay.  And tell
16  me, what is your educational background?
17     A     I have an Associates Degree from Erie
18  Community College.
19     Q     Associates Degree from?
20     A     Erie Community College in Buffalo, New
21  York.
22     Q     Erie Community College, okay.
23     A     In Criminal Justice.
24     Q     Okay.
25     A     I have a Bachelors of Science Degree in

Page 12

1  Criminal Justice from Buffalo State College.
2      Q     Okay.
3      A     I'm a graduate of the Hampton Roads Police
4  Academy in Hampton, Virginia.
5      Q     Okay.
6      A     I'm a graduate of the Erie County Central
7  Police Services Academy in Buffalo, New York.
8      Q     Okay.
9      A     Graduate of the FBI National Academy,
10  Quantico, Virginia.
11     Q     Graduate of the FBI National Academy?
12     A     National Academy, right.
13     Q     Have you ever served in the FBI?
14     A     I was never an agent, no.  I served on an
15  FBI task force.
16     Q     Okay.  And have you ever applied to be in
17  the FBI?
18     A     No.
19     Q     Okay.  Have you -- what did you say, a
20  graduate of the FBI National Academy?
21     A     That's correct, in Quantico, Virginia.
22     Q     Okay.  And when did you graduate from
23  there?
24     A     1993.
25     Q     And tell me what does that -- what does

Page 13

1  that entitle you to as far as credentials or
2  qualifications?  To someone who doesn't know much
3  about this FBI National Academy, how would you
4  describe it?
5      A     It's an elite school where handpicked
6  officers throughout the world are selected to attend
7  an 11 week course and the curriculum includes
8  anything from criminal investigation, interview and
9  interrogation techniques, forensic science, self
10  defense, firearms training.  It's accredited by the
11  University of Virginia.
12     Q     Okay.  And you said that it was a select
13  group of officers from around the world?
14     A     Correct.
15     Q     Okay.  Who selected you?
16     A     My chief of police selected me and then I
17  was selected by the FBI, Buffalo field office.
18     Q     And who in the FBI field office?
19     A     I don't recall who was there at the time.
20     Q     And this was an 11 week program?
21     A     Yes.
22     Q     And did you get some sort of
23  certification --
24     A     Yes.
25     Q     -- or -- yeah, what's it called?

Page 14

1    A    Diploma or certificate of attendance.
2    Q    Certificate of attendance.  That means
3    that you completed the program?
4    A    Yes.
5    Q    Did you have to take a test?
6    A    Several, included are Bachelors and Master
7    Degree Programs.
8    Q    Okay.  And this was in approximately
9    1990 --
10   A    3.
11   Q    '93.  And did you say that you went to the
12   police academy?
13   A    Yes.
14   Q    Did you ever -- does that mean you served
15   as a police officer?
16   A    Yes.
17   Q    Okay.  How long were you a police officer
18   for?
19   A    I was a police officer, my career spanned
20   from March of 1979 to January of 2003.
21   Q    And was that a -- were you -- tell me
22   how -- why did you stop working in the police
23   department?
24   A    I retired.
25   Q    Okay.  And then in 2003 you started doing

Page 15

1    what?
2    A    I worked as a senior inspector for -- for
3    the Seneca Nation of Indians.
4    Q    Senior inspector for who?
5    A    Seneca Nation of Indians.
6    Q    Okay.  And what is that?
7    A    That was I was assigned to the Seneca
8    Niagara Gaming Casino, Niagara Falls, New York.
9    Q    You're senior investigator for --
10   A    Inspector.
11   Q    Excuse me.  I can't even read my writing.
12   Senior inspector for Seneca Native of Indians, is
13   that what it says?
14   A    Seneca Nation of Indians.
15   Q    Nation of Indians.  And where was that?
16   A    Niagara Falls, New York.
17   Q    Niagara falls.  That was a casino?
18   A    Correct.
19   Q    So since that was an Indian reservation
20   you weren't required to follow any federal -- or you
21   weren't required to follow any state laws since this
22   was on an Indian property; correct, Indian
23   reservation?
24   A    With respect to what?
25   Q    Well, with respect to civil liability.

Page 16

1        MR. LARA:  Objection.
2    A    I don't know.  That was not in my -- in my
3    scope of employment, civil liability.
4    Q    (By Mr. Gerson) Okay.  Fair enough.  How
5    long were you an investigator or inspector for?
6    A    One year.
7    Q    And what happened?  Why'd you leave?
8    A    I went to work for Delaware North
9    Companies.
10   Q    Delaware North Companies?
11   A    Right.
12   Q    And what did you do for -- what was
13   Delaware North Companies?
14   A    Delaware North Companies I was employed as
15   the director of security at the fair ground, gaming
16   and racing facility.
17   Q    And how long were you the director of
18   security there?
19   A    Approximately one year.
20   Q    I imagine that was in Delaware?
21   A    No.
22   Q    No.  Okay.  Where was --
23   A    It was in Hamburg, New York.
24   Q    Hamburg, New York.  And how long were you
25   the director of security, one year?

Page 17

1    A    One year.
2    Q    And what happened?
3    A    I was terminated.
4    Q    What were you terminated for?
5    A    I had a disagreement with the general
6    manager on how security operation should have been
7    run.
8    Q    You had a -- you were terminated because
9    you had a disagreement as to how security should
10   have been run?
11   A    Correct.
12   Q    Okay.  Can you tell me what your -- what
13   were they not doing that you felt they should be
14   doing?
15   A    The gaming floor of a casino has to -- all
16   egress and entry points -- entry points to a casino
17   gaming floor have to have some type of security
18   personnel present to ensure the -- there's no minors
19   or any people that have been banned from the casino
20   entering the gaming floor.
21        At one point in time, it was during
22   the -- believe it was during the New Years Eve time
23   of the year, the general manager pulled all the
24   security officers off of the entry points, onto the
25   gaming floor.

Page 18

```
 1       Q    And why did they do that?
 2       A    He wanted to allocate them to -- I believe
 3  it was more to the public service type -- and it was
 4  budgetary and -- budgetary concerns and public
 5  service -- I believe it was public service concerns.
 6  I don't recall the exact reasons.
 7       Q    So as the director of security for -- it
 8  was the Delaware --
 9       A    North Companies.
10       Q    -- Delaware North Companies, Delaware
11  North Companies operated casinos?
12       A    They operate gaming facilities.
13       Q    Gaming facilities?
14       A    Like racinos.
15       Q    Okay.  Gaming facilities.  And as the
16  director of security you got into a disagreement
17  with senior management over the lack of number of
18  security officers that were used to monitor ingress
19  and egress on this -- on the gaming floors?
20       A    It was the allocation of security
21  personnel resources.
22       Q    Okay.  And when you say the allocation of
23  security personnel, you mean the number of security
24  personnel and the way they were deployed?
25            MR. LARA:  Objection.
```

Page 19

```
 1       A    Correct.
 2       Q    (By Mr. Gerson) Okay.  And did you feel
 3  that they were understaffed?
 4       A    I don't know if it was understaffed.  I
 5  don't recall exactly if it was understaffed.  It's
 6  just that they were not at the areas to prevent
 7  unauthorized entry onto the gaming facility floor.
 8       Q    Okay.  So you mean that they didn't have
 9  assigned posts?
10       A    Correct.
11       Q    Okay.  And you would agree as a former
12  director of security that assigned posts are
13  important for providing reasonable security for a
14  property?
15       A    Depending on the property and depending on
16  the circumstances.
17       Q    Did you have, based on your knowledge,
18  training and experience in law enforcement and as
19  the director of security for this gaming facility
20  you were -- you believed that security was
21  inadequate here and because of that you had a
22  disagreement?
23       A    I didn't say it was -- it was not -- it
24  was adequate, it's just that allocation was
25  misplaced.
```

Page 20

```
 1       Q    Okay.  Did the gaming facility that you
 2  were the dir -- oversaw, the director -- as the
 3  director of security, did it have a -- a written
 4  security plan in place?
 5       A    Yes.
 6       Q    And there were just no manned posts for
 7  the security officers in the -- where you felt they
 8  should be manned?
 9       A    At that particular time.
10       Q    Okay.  And were you responsible for -- or
11  strike that.  So you would agree that -- well, why
12  is that important?
13       A    It's impor --
14       Q    Why are manned posts important?
15            MR. LARA:  Objection.
16       A    Well, again, I think it depends on -- on
17  what you're securing and the situation at hand.  As
18  far as why are manned posts important with respect
19  to a gaming facility, again, I'll state that you do
20  not want unauthorized or underaged people entering
21  the gaming facility which would affect the security
22  of the facility or the gaming license.
23       Q    (By Mr. Gerson) And now was your -- your
24  view of the allocation of security personnel at this
25  gaming facility, was that based on your prior
```

Page 21

```
 1  knowledge of incidents in those particular areas?
 2       A    What do you mean by incidents?
 3       Q    Well, you -- you apparently felt -- you
 4  had a disagreement with your -- with senior
 5  management over the, you said the allocation of
 6  security personnel and that there were no manned
 7  posts at the gaming facility; right?
 8       A    For that specific period of time.
 9       Q    Okay.  And how did you know or what was
10  the basis for your belief that there should be
11  security personnel allocated in areas where they
12  weren't?
13       A    Basically on the -- the -- my past
14  experience at Seneca Niagara Gaming Casino and the
15  plans that were developed within the facility for
16  this gaming facility.
17       Q    As part of your duties and
18  responsibilities as security director did you review
19  incident reports of prior crimes and incidents that
20  had occurred on the premises?
21       A    Yes.
22       Q    Okay.  And is that something that you did
23  on a regular basis?
24       A    Yes.
25       Q    And based on that information did that go
```

Page 22

1  into your planning for the security needs of the
2  gaming facility?
3       A    Well, to be quite frank with you, there
4  was very limited security issues, so the plan was
5  set up before reviewing of any incidents and there
6  were very few incidents on the gaming facility floor
7  or in the facility itself to change anything.
8       Q    Okay.  But the security officers that
9  you -- that were being utilized at this gaming
10 facility had written assigned posts and locations
11 that they were specifically supposed to be located
12 at all times; right?
13      A    Some of them.
14      Q    Some of them?  Not all of them, but there
15 were some would maybe be assigned to one game room
16 and another assigned to another game room, is that a
17 fair description?
18      A    They were assigned at the point of entry
19 onto the gaming -- to get onto the gaming floor
20 itself.  And their purpose was to check for
21 identification, make sure that the persons entering
22 the gaming floor were 18 or over and also to check
23 to make sure that persons entering the gaming floor
24 were not banned from entering the gaming floor.
25      Q    How large was this facility?

Page 23

1       A    It was pretty decent size.  I don't know
2  the square footage.
3       Q    Approximately how many square feet?
4       A    I couldn't even tell you.  I have no idea.
5       Q    Okay.  Did you ever have one person to
6  monitor the entire gaming facility -- or strike
7  that.  Did you ever have one security officer that
8  was responsible for patrolling the entire gaming
9  facility?
10      A    I don't recall at this time what the
11 actual allocation of manpower was, but there were
12 times, slower times during the day that one officer
13 would have been walking around.
14      Q    Okay.  But that -- you would have one
15 officer walking around and other officers at fixed
16 positions?
17      A    Yes.
18      Q    Okay.  And by fixed positions, I mean,
19 this is where you stand and this is -- you're not
20 supposed to be beyond -- go beyond say 50 feet or
21 200 feet, something along those lines, is that
22 accurate?
23      A    The fixed positions were at the entry
24 points to the gaming facility.
25      Q    Okay.  And now were you responsible for

Page 24

1  hiring?
2       A    Yes.
3       Q    All right.  And what were the
4  qualifications that you were -- you sought in
5  security officers or how would you describe the
6  security personnel at the gaming facility?
7       A    We had everything, everyone from without
8  prior law enforcement experience to captains on
9  police departments to zone sergeants with the state
10 police.  It was a -- mix of individuals.
11      Q    Okay.  Now, let's go to your duties and
12 responsibilities at Carnival.  You were hired as an
13 investigator; is that correct?
14      A    Correct.
15      Q    And do you work shoreside or do you work
16 on the ship?
17      A    My primary responsibility is shoreside.
18      Q    Okay.  And can you explain to me how
19 someone like yourself, a -- a security
20 manager/investigator works along side security
21 personnel on a ship when an event like a rape or
22 sexual assault is reported?
23      A    When an alleged rape or sexual assault is
24 reported -- was reported on board the ship?
25      Q    Yeah.

Page 25

1       A    When it's on -- reported on board the
2  ship, security officers will initiate an
3  investigation and then based on their investigation
4  will notify an investigator.  Well, let me -- well,
5  with respect to alleged sexual assaults and rapes
6  they will notify an investigator in the security
7  services department.
8       Q    Okay.  And what is the -- isn't it true
9  that the ship has security personnel to perform
10 investigations when there's been an incident
11 reported like a rape or sexual assault?
12      A    When an alleged rape or sexual assault is
13 reported on a ship, ship security does initiate an
14 investigation, correct.
15      Q    Okay.  And so the ship's security
16 initiates an investigation and so if the ship
17 security initiates an investigation can you please
18 explain why you are also brought in to investigate?
19      A    We are brought in, we're notified of the
20 allegation and then we assist and liaise with ship
21 security regarding the investigation.
22      Q    And explain to me how you liaise with ship
23 security in regards to an investigation.
24      A    We would find out the elements of the
25 allegation and then we would advise them of certain

Page 26

1   steps to take depending on what -- what the crime
2   is.
3       Q    When you say you would advise them of
4   certain steps to take, what type of steps would you
5   need to advise your security officers to take when
6   someone has been reported to have been the victim of
7   a rape or sexual assault?
8       A    When there's been an allegation of a rape
9   or sexual assault we want to make sure that just to
10  call, and so everybody's on the same page, that the
11  ship is, you know, obviously shown due care to the
12  victim, has taken the initial steps to the who,
13  what, why, how, where of the investigation.
14      Q    Okay.  So Carnival has a procedure in
15  place to make sure that everyone on the vessel is on
16  the same page as far as their investigation is
17  concerned?
18      A    Within the -- we liaise security on the
19  ship and the staff captain.
20      Q    Okay.  And when you say "we", you mean
21  people who are in the same position as yourself?
22      A    People in the security services
23  department.
24      Q    Okay.  And so you communicate.  When
25  someone says that they've been raped on a cruise

Page 27

1   ship, when are you -- when is the -- when is ship --
2   when is carnival shoreside, your department,
3   supposed to be notified?
4       A    There's no set time.  When the allegation
5   is made there's no set time that they have to notify
6   us.
7       Q    Okay.  There's no rule or procedure in
8   Carnival's system about when the shoreside
9   investigators like yourself are supposed to be
10  notified that an incident occurs?
11      A    We should be not -- well, we're notified
12  basically once the ship has determined the elements
13  of the allegation.
14      Q    Okay.  And when you say that the ship has
15  determined the elements of the allegation, what do
16  you mean by that?
17      A    Once ship's security -- as I said before,
18  they initiate investigation based upon the reported
19  allegation --
20      Q    Uh-huh.
21      A    -- so once they conduct a preliminary
22  investigation with respect to the who, what, why,
23  how, where, and get some background information with
24  respect to that, then they'll call us.
25      Q    Okay.  And are you, as the senior manager

Page 28

1   of investigations, do you have any specialties of
2   any particular crimes that you are involved in?
3       A    I don't understand what you're saying.
4       Q    Sure.  How many people are in your
5   position?
6       A    One.
7       Q    You're the only manager in investigation?
8       A    Senior manager investigations, yes.
9       Q    Then do you have lower level investigators
10  that work shoreside?
11      A    We have a supervisor and then to include
12  the supervisor I believe we have four other
13  investigators.
14      Q    Okay.  And who are they?
15      A    Steve Riley's a supervisor.
16      Q    Uh-huh.
17      A    Greg Tomasich is a staff investigator.
18      Q    Uh-huh.
19      A    Salvatore Garafalo is a staff investigator
20  and John Butchko is a staff investigator.
21      Q    Okay.  And they all report to you?
22      A    Yes.
23      Q    And then you report to Mike Panariello?
24      A    As I said before, on the organizational
25  chart Mike and Dominick are above me.  As far as

Page 29

1   reporting specifics, it depends.  I'll either report
2   to Mike or Dominic Froyo.
3       Q    You report to both of them usually, don't
4   you?
5       A    What do you mean usually?
6       Q    Well -- well, let's say when -- in this
7   case, for instance, you understand that my client
8   was raped on a Carnival ship, do you not?
9           MR. LARA:  Objection.
10      A    Allegedly raped.
11      Q    (By Mr. Gerson) Okay.  So Carnival's
12  position is that Ms. Horne was not raped, but was
13  only allegedly raped, is that Carn --
14          MR. LARA:  Objection.
15      Q    (By Mr. Gerson) -- Carnival's official
16  position?
17          MR. LARA:  Objection.
18      A    Ms. Horne made an allegation that she was
19  raped.  With respect to if she was raped or not, I
20  do not know.
21      Q    (By Mr. Gerson) Okay.  So Carnival denies
22  then that Ms. Horne was in fact raped on the
23  Sensation?
24          MR. LARA:  Objection.
25      A    I didn't say that.

Page 30

1    Q    (By Mr. Gerson) Okay.  What are you --
2    what is Carnival saying?
3         MR. LARA:  Objection.
4    A    I am saying that Ms. Horne made an
5    allegation that she was raped on board the Carnival
6    Sensation.  I do not know if she was raped or not.
7    Q    (By Mr. Gerson) Okay.
8    A    There was a law enforce -- it was
9    presented to law enforcement.
10   Q    Okay.  Let me ask you this, you already
11   told me that when an incident like Ms. Horne's is --
12   occurs, you are apparently contacted once there's
13   been some sort of preliminary investigation;
14   correct?
15   A    Correct.
16   Q    And isn't it true that in some of those
17   instances you are sent an e-mail?
18   A    Yes.
19   Q    Okay.  And those e-mails you liaise on
20   with the chief security officer on the ship?
21   A    Some of them, yes.
22   Q    Okay.  And you know who John Manuel is?
23   A    Yes.
24   Q    Okay.  And you get a lot of your
25   information from -- well tell -- tell me, who's

Page 31

1    John Manuel?
2    A    He's the chief security officer on the
3    Sensation.
4    Q    Okay.  And do you -- do you rely on the
5    information that John Manuel reports to you?
6    A    I rely on the information as reported to
7    John Manuel that he reports to me.
8    Q    Okay.  And do you have any reason to
9    dispute the information that is reported to
10   John Manuel and which is then reported to you?
11        MR. LARA:  Objection.
12   A    The information that is reported to me has
13   to be completely investigated.
14   Q    (By Mr. Gerson) Okay.  Did you communicate
15   with John Manuel with regard to the investigation of
16   the rape and assault of Lindsey Horne?
17   A    To the alleged rape and assault of
18   Lindsey Horne, yes, I did.
19   Q    Okay.  And did you communicate with him
20   over e-mails?
21   A    Yes, there was e-mails.
22   Q    Okay.  And what did the e-mails -- do you
23   recall what the e-mails were?
24   A    I believe the e-mails were with respect to
25   documentation that Chief Security Officer Manuel

Page 32

1    forwarded to me.
2    Q    Okay.  Is it part of the procedure within
3    Carnival that as part of the investigation that the
4    chief security officer speak with the ship
5    doctor when a -- someone is -- presents to the
6    medical infirmity and has reported that they've been
7    raped or sexually assaulted?
8    A    Can you rephrase that?
9    Q    Sure.
10        MR. GERSON:  Can you read the question
11   back, please?
12        (The pending question was read by the court
13   reporter.)
14   A    Yes, the chief will talk to the doctor.
15   Q    (By Mr. Gerson) Okay.  That's routine
16   practice and procedure?
17   A    Yes.
18   Q    And that's something that your employees
19   are -- that's something that a chief security
20   officer is trained to do?
21   A    Well, the chief as part of the
22   investigation will talk to the medical department,
23   yes.
24   Q    Okay.  And then once that occurs the chief
25   security officer would then go back and report to

Page 33

1    you what the ship doctor tells him?
2    A    Yes.
3    Q    Okay.  And just so I'm clear, Carnival
4    disputes that Lindsey Horne was raped on
5    September the 3rd, 2014?
6         MR. LARA:  Objection.
7    A    Just so I'm clear --
8    Q    (By Mr. Gerson) Uh-huh.
9    A    -- I never said that.  I said
10   Lindsey Horne made an allegation that she was
11   sexually assaulted and raped.
12   Q    Okay.  Based on Carnival's investigation
13   of this incident, was there any evidence that
14   Lindsey Horne was forceably raped?
15        MR. LARA:  Objection.
16   A    The investigation was turned over to law
17   enforcement.  I don't know the results of the law
18   enforcement investigation.
19   Q    (By Mr. Gerson) Well, didn't Carnival
20   conduct an investigation?
21   A    Yes.
22   Q    Okay.  And as part of Carnival's
23   investigation did Carnival determine that there was
24   any evidence of rape?
25        MR. LARA:  Objection.

Page 34

```
 1      A    Carnival investigation, statements were
 2   taken pursuant to the investigation and I believe,
 3   according to the statements, there were varying
 4   accounts of what happened.  I do not know if
 5   Lindsey Horne was sexually assaulted or raped or
 6   not.
 7      Q    (By Mr. Gerson) So Carnival doesn't know
 8   whether or not Lindsey Horne was sexually assaulted
 9   or raped?
10      A    Correct.
11      Q    And it's your testimony here on behalf of
12   Carnival that Carnival does not know whether or not
13   Lindsey Horne was sexually assaulted or raped?
14           MR. LARA:  Objection.
15      A    Correct.
16      Q    (By Mr. Gerson) Okay.  And what about
17   whether or not Lindsey Horne was victim of an
18   aggravated assault, does -- does Carnival dispute
19   that Lindsey Horne was a victim of an aggravated
20   assault?
21           MR. LARA:  Objection.
22      A    I don't know what your definition of an
23   aggravated assault is.
24      Q    (By Mr. Gerson) Well, you went to, what'd
25   you say, the National Academy --
```

Page 35

```
 1      A    Uh-huh.
 2      Q    -- of The FBI?
 3      A    Uh-huh.
 4      Q    FBI National Academy?
 5      A    Uh-huh.
 6      Q    So --
 7      A    Yes.
 8      Q    -- as one of the selected members for this
 9   certification why don't you go and tell me what the
10   definition of aggravated assault means.
11           MR. LARA:  Objection.
12      A    Well, if you want the definition pursuant
13   to the CVSSA under Title 18 --
14      Q    (By Mr. Gerson) Uh-huh.
15      A    -- say aggravated assault which requires
16   serious bodily injury.
17      Q    Okay.  Was Lindsey Horne the victim of
18   serious bodily injury?
19      A    I don't believe so.
20      Q    Okay.  So Carnival doesn't believe that
21   Lindsey Horne was the victim of serious bodily
22   injury?
23           MR. LARA:  Objection.
24      A    I'm not a doctor, Mr. -- Mr. Gerson.
25      Q    (By Mr. Gerson) I understand that.
```

Page 36

```
 1      A    I don't --
 2      Q    But do you need to be a doctor to be able
 3   to determine whether or not someone's been the
 4   victim of an aggravated assault?
 5      A    You have to see physical injury.
 6      Q    Okay.
 7      A    Serious bodily injury.
 8      Q    Okay.  As part of Carnival's investigation
 9   of this incident was there any evidence of serious
10   bodily injury on Lindsey Horne?
11           MR. LARA:  Objection.  Go on.
12      A    Visible serious bodily injury, I don't
13   believe there was.
14      Q    (By Mr. Gerson) Okay.  What did Carnival
15   do to investigate what happened?
16      A    When?
17      Q    Well, let me ask you this.  Was there any
18   evidence of serious bodily injury on any of the
19   other occupant -- or strike that.  Was there any
20   evidence of serious bodily injury on Airika Tashiro?
21      A    I don't believe there was.
22      Q    Okay.  Was there any evidence of serious
23   bodily injury on Kayla Baugh?
24      A    We're talking under Title 18 --
25      Q    Well, I'm just asking you generally, sir,
```

Page 37

```
 1   was there any evidence -- you know what a serious
 2   bodily injury is; right?
 3      A    Yes.
 4      Q    Okay.  So let me -- so it's your
 5   testimony, Carnival, that based on your
 6   investigation of the accident, which is the first
 7   topic of today's deposition for which you've been
 8   designated to speak of or about, it's Carnival's
 9   position that there was no evidence of serious
10   bodily injury on Lindsey Horne; right?
11      A    Correct.
12      Q    There was no evidence of serious bodily
13   injury on Airika Tashiro?
14      A    Correct.
15      Q    And there was no evidence of serious
16   bodily injury on Kayla Baugh?
17      A    Correct.
18      Q    And --
19      A    Visible.
20      Q    Visible, right.  There were photographs
21   taken; right?
22      A    Correct.
23      Q    And you -- I'm sure since you're the
24   senior manager of investigations you reviewed those
25   photographs as part of your investigation in this
```

Page 38

1  case; correct?
2      A    Correct.
3      Q    And isn't it true that Carnival took its
4  own photographs as they are trained to do by
5  corporate?
6      A    They're trained to do it by our
7  department, yes.
8      Q    Okay.  And so you would have reviewed
9  those photographs; right?
10     A    Yes.
11     Q    And you would have reviewed the medical
12 records; right?
13     A    I don't believe I reviewed the medical
14 records.
15     Q    Okay.  So what did Carnival do other than
16 take statements to investigate what happened?
17     A    Well, as you've just said, photographs
18 were taken.
19     Q    Uh-huh.
20     A    The cabin was secured.
21     Q    Uh-huh.
22     A    Witness statements were taken.  The
23 evidence was collected.
24     Q    Okay.
25          MR. GERSON:  Let's go off the record for

Page 39

1  two seconds, okay?
2          THE WITNESS:  Sure.
3          MR. LARA:  Sure.
4          (There was a brief recess.)
5      Q    (By Mr. Gerson) Okay.  So tell me, sir, as
6  the representative for Carnival Corporation, what --
7  how would you describe what transpired on
8  September 3rd, 2014?  Based on the investigation and
9  everything that Carnival knows, what is Carnival's
10 position as far as what happened?
11         MR. LARA:  Objection.
12     A    Well, based on the investigation it is
13 somewhat unclear what happened.
14     Q    (By Mr. Gerson) Well, we know that
15 Carnival has taken the position that there was no
16 evidence of serious bodily harm on anyone; right?
17     A    There were injuries, but no serious bodily
18 harm.
19     Q    Okay.
20     A    No serious bodily injuries.
21     Q    When you say there were injuries, you said
22 there were no visible injuries?
23     A    No serious visible injuries.
24     Q    What's a serious visible injury?
25     A    Proactive contusion, amputations,

Page 40

1  lacerations requiring sutures.
2      Q    Okay.  Is forceable rape a serious bodily
3  injury?
4          MR. LARA:  Objection.
5      A    I don't know.  Depending on what the
6  injuries are.
7      Q    (By Mr. Gerson) Did Ms. Horne claim that
8  she was forceably raped?
9      A    I believe with respect to Ms. Horne, she
10 alleged that a penis was inserted into her vagina.
11     Q    Okay.  And did she allege that she was
12 also held down against her will by two African
13 American males?
14     A    I don't recall her exact wording in her
15 statement.
16     Q    Okay.  Well, what does Carnival recall
17 about what Ms. Horne alleges happened to her since
18 we're here in a lawsuit that's been filed by her for
19 rape or as a result of a rape?
20          MR. LARA:  Objection.
21     A    With -- just with respect to Ms. Horne's
22 allegation?
23     Q    (By Mr. Gerson) Yes.
24     A    I believe she stated that she was up at
25 the pizzeria with her friends and during the course

Page 41

1  of that evening her friends went one way and she
2  went back to her cabin.  And she's alleging when she
3  got to her cabin two Afro American males pushed her
4  into her cabin.
5      Q    And what did she allege happened to them
6  when she pushed them -- when they pushed their way
7  into her cabin?
8          MR. LARA:  Objection.  Go ahead.
9      A    She alleged that one of the males inserted
10 his penis into her vagina.
11     Q    (By Mr. Gerson) Okay.  And where did she
12 allege it occurred?
13     A    In her cabin.
14     Q    Okay.  And where in the cabin?
15     A    If I recall Ms. Horne's statement, the
16 best of my recollection, I believe it occurred in
17 the bathroom.
18     Q    Okay.  And when were you -- when was
19 Carnival first notified of the incident?
20          MR. LARA:  Objection.
21     A    Carnival, which part of Carnival?
22     Q    (By Mr. Gerson) Okay.  When was your
23 department notified of the incident involving
24 Ms. Horne?
25     A    I believe I received a call about 6:15

Page 42

1  a.m.

2      Q    Okay.  And who called you?

3      A    It was the staff captain, Cosmo Santoro,

4  and Chief Security Officer, John Manuel.

5      Q    Okay.  And you reviewed -- let me -- let

6  me -- let me ask you this.  You were notified at

7  about 6:30 p.m.?

8      A    Give or take, yes.

9      Q    The following day?  6:30 p.m.?

10      A    No, 6:30 a.m.

11      Q    6:30 a.m., excuse me.  Okay.  And as part

12  of Carnival's procedures statements were taken; is

13  that correct?

14      A    Correct.

15      Q    Okay.  And is there any -- your -- your --

16  your officers are trained to take statements?

17      A    Yes.

18      Q    Okay.  And who trains them?

19      A    The security services department, Carnival

20  Security Services Department.

21      Q    Okay.  So that would be your department?

22      A    Yes.

23      Q    And that would include Mr. Panariello?

24      A    He's in the training, yes.  Our department

25  holds the training, conducts the training.

Page 43

1      Q    Your department conducts the training?

2      A    That's correct.

3      Q    Okay.  Who from Carnival conducts the

4  training with statements, with respect to

5  investigations such as this one?

6      A    I have.

7      Q    Okay.  And what are your officers

8  trained -- tell me, what is the -- how do you train

9  someone to take a statement?  What do they -- what

10  are they supposed to do?

11      A    Initially is do a verbal communication,

12  talk to the alleged victim.  Find out the elements

13  of the allegation with respect to the who, what,

14  where, why, when, how.

15      Q    Uh-huh.

16      A    And after a verbal communication, then it

17  could be memorialized by the alleged victim to

18  writing in a written statement.

19      Q    Okay.  And are your officers -- are the

20  statements that are -- when someone is asked to

21  provide a statement are they just given a form and

22  told to fill it out?

23      A    That's not the way they're trained as I

24  just said.

25      Q    Okay.  Explain to me.  Maybe I didn't

Page 44

1  understand.

2          MR. LARA:  Objection.

3      A    As I said before, prior to the written

4  statement being taken, verbal communication between

5  the security officer taking the written statement

6  and the alleged victim takes place where that

7  security officer will speak to the alleged victim

8  with regards to the elements of the crime, the who,

9  what, why, where, when and how, talk to that alleged

10  victim.  And then after the conversational part of

11  that interview takes place a written statement is

12  provided to that person.

13      Q    (By Mr. Gerson) Okay.  Are your officers

14  trained to coach people who provide statements into

15  using particular words?

16          MR. LARA:  Objection.

17      A    Absolutely not.

18      Q    (By Mr. Gerson) Okay.  Why is that?

19          MR. LARA:  Objection.

20      A    If we're coaching somebody to take a

21  statement it's not the person's statement.  We want

22  the person, the alleg -- the alleged victim,

23  suspect, whoever we're taking the statement from, we

24  want the person's own words, own statement.

25      Q    (By Mr. Gerson) So you would agree it

Page 45

1  would be -- how -- well, how would you describe an

2  instance where a security officer says why don't you

3  use the words -- why don't you use these words as

4  opposed to the words that you've used?

5          MR. LARA:  Objection.

6      A    Again, I don't understand what you're --

7  what you're saying.

8      Q    (By Mr. Gerson) Sure.  If a security

9  officer told a witness to use the word friendly, how

10  would you -- and the word -- and the witness never

11  used the word friendly, and was just told to use the

12  word friendly, what would you -- how would you

13  describe that?

14          MR. LARA:  Objection.

15      Q    (By Mr. Gerson) As far as a violation of

16  procedures, you already said absolutely not, so what

17  would you -- what would you do in that case?

18      A    The officer would be trained and is

19  trained to have the verbal conversation and then

20  present the written statement to that victim,

21  alleged victim, and for her to memorialize that

22  statement in her own words.  That's --

23      Q    Okay.  So it would be completely improper

24  for a security officer to tell a witness to use

25  words other than the ones that she chooses?

Page 46

1    A    If she's changing -- as far as -- what are
2  we talking about, friendly as opposed to --
3    Q    I'm talking about in general, sir.  I was
4  just giving you an example.
5    A    Yes.  If the conversation would not
6  portray an accurate recollection of the alleged
7  victim's account of the incident, yes.
8    Q    Okay.  Are your office -- does your
9  officers train witnesses to use names of people in
10 their statements for which they don't really know
11 the person's names?
12       MR. LARA:  Objection.
13   A    They're not trained, no.
14   Q    (By Mr. Gerson) Okay.  Is that something
15 that they should do?
16       MR. LARA:  Objection.
17   A    Again, what do you --
18   Q    (By Mr. Gerson) Well, so if -- let me make
19 sure, and you keep looking over at counsel and, you
20 know, I understand, and I just want to make sure
21 that we all know and we understand.  You would
22 agree, sir, Carnival would agree, that it is
23 improper for a security officer to coach a witness
24 into how to write a statement and that would include
25 what words to use and what names to include in their

Page 47

1  statement?
2    A    Well, with respect to the names, if
3  there's several persons allegedly involved in this,
4  for identification purposes, if the alleged victim,
5  witnesses or suspects knew the persons by name, and
6  the security officer said, are you talking about
7  Nick, so there's a clear -- identification purposes,
8  but the written statement of the victim should be in
9  the victim's -- alleged victim's own words.
10   Q    So if the -- if the victim did not know
11 the names of someone that assaulted them, it would
12 be improper for a security officer to say, well, you
13 mean this person, and then have them write in their
14 name?
15   A    If I point and say, you mean Rick, and she
16 puts in her statement, Rick, I -- I don't know if
17 that's prompting a victim, alleged victim.
18   Q    What do you mean?
19   A    If there's an interview being conducted
20 and there's several people involved in that, and the
21 alleged victim is giving her account of the
22 statement and she says, this guy over here, and
23 there's several people standing there, and you say,
24 oh, you mean, Rich, and she says, oh, yes, Rich, and
25 she puts her name in, I mean, for ident -- for

Page 48

1  identification purposes, I mean, it's still the
2  victim's -- that's the example you gave me, it's
3  still the victim's words.
4    Q    Okay.  So you're telling me it's okay for
5  your security officers to instruct witnesses to
6  identify people by name even though they don't know
7  their names?
8    A    What I'm telling you is the victims put
9  the written statement in their own words.
10   Q    Okay.  So they should -- so just so we're
11 clear, it would be a violation of Carnival's
12 policies and procedures if a security officer were
13 to put words in a witness's mouth and then tell them
14 to put it in their statement?
15       MR. LARA:  Objection.
16   A    If it was not the alleged victim's words
17 or if to memorialize it, I wouldn't say it's a
18 violation, I would just say that it's -- it's a --
19 it's not protocol to put words in a victim's mouth.
20   Q    (By Mr. Gerson) Okay.  Would you agree
21 that protocol is important for a criminal
22 investigation?
23   A    Yes.
24   Q    You would agree that following protocol
25 and getting accurate statements from witnesses is

Page 49

1  important to criminal investigations on land or at
2  sea?
3    A    Yes.
4    Q    Okay.  And Carnival does everything that
5  they can to ensure that investigations that occur on
6  their ships are conducted and completed with
7  integrity?
8    A    Yes.
9    Q    Okay.  And let's talk about the -- you're
10 familiar with the training and the background of
11 security officers on this particular ship?
12   A    Yes.
13   Q    Okay.  The chief security officer -- let's
14 start from -- start from the top.  The chief
15 security officer on this particular vessel was
16 John Manuel?
17   A    Yes.
18   Q    Isn't it true John Manuel has no law
19 enforcement background?
20   A    I'm not aware of that.
21   Q    Okay.  When you say you're not aware of
22 it, what are you aware of what Mr. Manuel did prior
23 to his employment With carnival?
24   A    I believe Mr. Manuel, I believe he served
25 in the military.

Page 50

1    Q    Okay.  When you say you believe he served
2  in the military, are you -- are you certain about
3  that?
4    A    No, I'm not.
5    Q    Okay.  I'd like you to take a look at
6  Number 44 of today's notice.
7    A    Uh-huh.
8    Q    I'd like you to read into the record what
9  that says.
10    A    "All security and security qualifications
11  for all crew members, including security officer,
12  safety officer and crew members that provided
13  security on the subject vessel on the date of the
14  incident."
15    Q    Okay.  Would you agree that Mr. Manuel
16  falls into one of those classifications of security
17  and security --
18    A    Yes.
19    Q    -- personnel?
20    A    Yes.
21    Q    Okay.  And as you sit here today, you
22  don't know what Mr. Manuel's qualifications are, do
23  you?
24         MR. LARA:  Objection.  Go ahead, you can
25    answer.

Page 51

1    A    I said I believe he served in the -- I
2  believe it was the Navy, the Indian Navy.
3    Q    (By Mr. Gerson) Okay.  When you say you
4  believe he served in the Indian Navy -- Navy, tell
5  me what is the basis of that belief.
6    A    Prior conversations I've had with him.
7    Q    Okay.  What is your understanding of what
8  Mr. Manuel's qualifications are?  Tell me what they
9  are.
10    A    I don't -- I don't know.
11    Q    Well --
12    A    I believe -- all I can say is, Mr. Gerson,
13  to the best of my recollection I believe he served
14  in the Indian Navy.
15    Q    Okay.  How long did he serve in the Indian
16  Navy for?
17    A    As I just stated, I do not know.
18    Q    What -- tell me -- let's -- starting with
19  Mr. Manuel, tell me what all of his security
20  qualifications are.
21    A    Well, with respect to the hiring process
22  he was -- went through a manning agency in India.
23  And with respect to -- then he was interviewed by a
24  representative at Carnival Cruise Line Security
25  Services Department and part of the interviewing

Page 52

1  process would be the qualifications, would either be
2  prior law enforcement, prior military or something
3  to the effect of hotel security or bank security,
4  corporate security.
5    Q    Okay.  Has Mr. Manuel ever worked in law
6  enforcement?
7    A    I don't know.
8    Q    Has Mr. Manuel ever worked in hotel
9  security?
10    A    I don't know.
11    Q    Okay.  Why don't you know?
12         MR. LARA:  Objection.
13    A    I don't.
14    Q    (By Mr. Gerson) Don't you understand that
15  one of the reasons why you're here today is to talk
16  about the security and security qualifications for
17  all crew members that were working aboard the
18  Sensation on the day of this incident?
19    A    Yes.
20         MR. LARA:  Objection.
21    Q    (By Mr. Gerson) Yes?
22    A    Yes.
23    Q    So why are you unable to tell me what they
24  are?
25         MR. LARA:  Objection.

Page 53

1    A    I can't tell you what they are.  I can
2  tell you the hiring process that they go through,
3  the -- the interview process that they go through
4  and the training they go through.  I do not know
5  their prior history.
6    Q    (By Mr. Gerson) Do you know who
7  Anil Misquitia is?
8    A    Yes.
9    Q    Do you know what Mr. Misquitia's security
10  qualifications are and prior experience is?
11    A    I believe he worked in hotel security.
12    Q    Okay.  Are you aware of whether or not
13  Mr. Misquitia -- well, strike that.  Do you know
14  what Mr. Misquitia's job title was?
15         MR. LARA:  Objection.
16    A    Yes, assistant chief security officer.
17    Q    (By Mr. Gerson) And as the assistant chief
18  security officer did Mr. Mesquitia have any
19  qualifications or experience in law enforcement
20  prior to working for Carnival?
21    A    As I stated, I believe he worked in hotel
22  security.
23    Q    Okay.  And so Carnival's qualifications or
24  standards for qualifications for security officers
25  are that they just have either law enforcement or

Page 54

1  they work in hotel security?
2      A    No.
3      Q    Okay.  What else?
4      A    Prior law enforcement, prior military or
5  working in some type of corporate security such as
6  hotel security, bank security, airport security.
7      Q    Okay.  So prior law enforcement, prior --
8      A    Military.
9      Q    -- military.  Uh-huh.
10     A    And prior private security such as hotel
11  security, bank security, airport security.
12     Q    Okay.  How many years of experience do
13  you -- does Carnival require that security officers
14  have?
15     A    I believe it's a minimum of three to five
16  years, in that area.
17     Q    Well, three to five years is a big
18  difference.  Is it three or is it more on the five
19  side?
20     A    Three to five.
21     Q    Can you tell me whether or not any
22  security officer aboard the Sensation had any
23  experience in law enforcement?
24     A    No.
25     Q    So isn't it true that there are no

Page 55

1  security officers that were working on Sensation
2  that had any experience in law enforcement?
3      A    If I just told you I don't know I can't
4  answer that question.
5      Q    So you don't know what the answer is to
6  Number 44, do you?
7           MR. LARA:  Objection.
8      A    With respect to the qualifa --
9  qualifications, I know their training qualifications
10  they go through and the hiring qualifications.
11     Q    (By Mr. Gerson) Okay.  Do you know whether
12  or not Rakesh Chaven has any training in law
13  enforcement?
14     A    As I've answered before, no.
15     Q    Okay.  Does -- so you don't know one way
16  or another?
17     A    No.
18     Q    Okay.
19     A    Correct.
20     Q    You don't know whether or not -- whether
21  or not -- let's go look through --
22          MR. LARA:  While you're looking at that, I
23      just want to say move to strike any of your
24      commentary regarding the direction the
25      deponent was looking earlier.  Wasn't a

Page 56

1  question and in any event I have never once
2  glanced in his direction during this
3  deposition.
4           MR. GERSON:  Oh, I didn't say that you
5  did.  I understand.  There's a video, that's
6  why.
7           MR. LARA:  I'm not in the video, that's
8  why I'm stating for the record.
9           MR. GERSON:  No, I know.  Go off the
10  record for one second while I find this.
11          (There was a brief recess.)
12          MR. GERSON:  Okay.  Back on the record.
13     Q    (By Mr. Gerson) Mr. Williams, do you --
14  are you familiar with the security officers who were
15  working on the Sensation on the day of this case --
16  on the date of accident in this case?
17     A    Some of them.
18     Q    Okay.  Do you know who Rama Blori is?
19     A    No.
20     Q    No?  Do you know what Rama Blori's
21  security qualifications are?
22     A    No.
23     Q    Do you know whether or not Rama Blori has
24  any prior law enforcement, prior military or prior
25  experience in hotel security?

Page 57

1      A    No.
2      Q    Are you -- does the same thing go for
3  Marianne Reyes?
4           MR. LARA:  Objection.
5      A    Let me -- let me qualify this.  As I said
6  prior, I don't know their specific qualifications
7  with respect to their prior employment history.  But
8  our security officers are either prior law
9  enforcement, prior military or some type of private
10  prior -- prior private security.
11     Q    (By Mr. Gerson) Okay.  When you say some
12  sort of private security, do you mean that they work
13  for a security company or do you mean that they work
14  in security for a company?
15     A    It could be both.  It could be hotel
16  security, it could be airport security, business
17  security.
18     Q    Okay.  Well, do you -- does Carnival
19  require any of its security officers to hold any
20  security licenses as part of the condition for
21  employment with Carnival?
22          MR. LARA:  Objection.
23     A    I'm not aware of that.
24     Q    (By Mr. Gerson) Okay.  So Carnival is not
25  aware of any requirement that its security officers

Page 58

1   maintain or hold any security licenses, whether it's
2   a class D or some other security license that may be
3   available in the United States?
4       A    You're talking -- you're talking US
5   security license?
6       Q    Yes.
7       A    No.
8       Q    Does Carnival require security officers to
9   carry -- to have any licenses with respect to
10  security?
11      A    Well, with respect to sec -- as far as --
12  I don't understand what you mean by license.
13      Q    Sure.  You know what a security license
14  is; right?
15      A    Yes.
16      Q    Okay.  Do you know what the requirements
17  are for being a security officer in a security
18  company in the State of Florida?
19      A    No.
20      Q    Okay.  Are you aware of any
21  requirements -- or strike that.  Does Carnival have
22  any requirements other than prior law enforcement,
23  prior military or prior experience working in hotel
24  security for its security officers?
25      A    Clean criminal history.  Proficient in

Page 59

1   English.  Proficient in writing English.  There are
2   some prior certif -- certificates they need prior to
3   being hired by Carnival with respect to the maritime
4   operations.  And then once they get hired by
5   Carnival in the security position they're trained.
6       Q    What are the certificates that your
7   security officers are required to hold?
8       A    I think it's the -- I believe it's the
9   security watch training, safe keeping for security
10  on the vessels.  STCW I believe it is.
11      Q    And what does STCW stand for?
12      A    I thinks it's the Standards of training
13  and watch keeping, I believe they have to have that.
14      Q    Okay.  And who conducts the training?
15      A    That's done over in -- they get that prior
16  to coming with Carnival.
17      Q    And what does Carnival do to ensure --
18  well, strike that.  What do you mean they get it
19  before coming over to Carnival?
20      A    There are certain certificates they have
21  to have prior to being hired by Carnival Cruise
22  Lines that they must produce.
23      Q    Are those kept in the personnel files for
24  each of the security officers?
25      A    Yes.

Page 60

1       Q    Okay.  And as you sit here today as the
2   corporate representative for Carnival, you don't
3   know who the security officers that were working on
4   the ship were, do you?
5       A    I know the ones that were involved in --
6   some of the ones that were involved in the incident.
7       Q    Okay.  Who were the ones that were
8   involved in the incident?
9       A    I know that Chief Security Officer Manuel.
10      Q    Okay.
11      A    Assistant Chief Security Officer
12  Anil Misquitia.
13      Q    Uh-huh.
14      A    And I believe it was Rakesh.
15      Q    Yeah.
16      A    That's the three I know.
17      Q    You don't know of any others?
18      A    Not without refreshing my memory.
19      Q    Okay.  And you don't know what Rakesh's --
20  that's Chaven; right?
21      A    Yes.
22      Q    You don't know -- what is your
23  understanding of Mr. Chaven's role in this case?
24      A    I believe he was initially the person from
25  security that was initially reported to.

Page 61

1       Q    Okay.  And -- all right.  You don't know
2   what his qualifications are?
3           MR. LARA:  Objection.
4       A    No.
5       Q    (By Mr. Gerson) You don't know whether or
6   not he has any prior law enforcement experience?
7       A    As I said before, I don't know.
8       Q    Why doesn't Carnival have more stricter
9   qualification requirements for its security
10  officers?
11          MR. LARA:  Objection.
12      A    I don't know what -- I don't understand
13  what you mean.
14      Q    (By Mr. Gerson) Okay.  Why doesn't
15  Carnival have -- require more qualifications other
16  than either prior law enforcement or either prior
17  military or either prior -- prior hotel security?
18          MR. LARA:  Objection.
19      A    Well, those -- those three facets you just
20  spoke about were all -- all law enforcement related.
21  In addition to that, they have to have a clean
22  background record.  They have to be proficient in
23  written and oral communications in English.  And
24  then once they're on board the vessel they have an
25  intensive training program.

Page 62

```
1       Q    (By Mr. Gerson) Okay.  When you say "once
2   they're aboard" -- well, let me ask you this, of the
3   security officers that you just told me about,
4   Manuel who is chief security officer, Misquitia
5   who's chief -- assistant chief security officer, and
6   Rakesh Chaven, you're not aware of whether or not
7   any of those personnel had law enforcement
8   background; correct?
9       A    As I said before, I do not.
10      Q    Okay.  Would you agree that there's a big
11  difference in someone who receives law enforcement
12  training as opposed to someone who serves as a
13  security officer in a hotel --
14           MR. LARA:  Objection.
15      Q    (By Mr. Gerson) -- in India?
16           MR. LARA:  Objection.
17      A    I don't know the training requirements
18  with respect to what law enforcement or security
19  train with in India.
20      Q    (By Mr. Gerson) Okay.  So Carnival doesn't
21  really know what the extent of training --
22      A    I'm saying as far -- let me finish.
23      Q    Sure.
24      A    As far as the difference between security
25  training and law enforcement training.
```

Page 63

```
1       Q    Okay.  So Carnival doesn't know what the
2   difference in training is for security officers who
3   have prior hotel experience as a security officer in
4   India as opposed to someone with prior law
5   enforcement training?
6       A    What I'm saying is, I don't know as far as
7   what additional training the security officers have
8   taken with respect to their position versus with law
9   enforcement.
10      Q    Okay.  Did you do anything to review the
11  security qualifications for the crew members and
12  security officers that were providing security on
13  the day of this incident?
14      A    As I said, what I did was I went over our
15  qualifications with respect to the qualifications as
16  to prior military, prior law enforcement, prior
17  security history and with respect to the hiring
18  process.
19      Q    Are you involved in the hiring process at
20  all?
21      A    No.
22      Q    Okay.  Who is?
23      A    Michael Panariello.
24      Q    So Michael Panariello is the one who
25  determines whether or not a security officer is
```

Page 64

```
1   qualified to be a security officer or some other
2   higher level of security?
3       A    Michael Panariello is responsible for the
4   interview process and the hiring process of security
5   officers.
6       Q    Okay.  Michael Panariello is also the
7   person who's responsible for determining the post
8   assignments for security officers; correct?
9       A    What are you talking about?
10      Q    Sure.  You were just telling -- telling me
11  that Michael Panariello is the person that hires and
12  I guess you didn't -- well, does the hiring?
13      A    Correct.
14      Q    Okay.  So he's the one who determines the
15  qualifications from the security personnel and
16  whether or not they meet Carnival standards?
17      A    Ultimately, yes.
18      Q    Okay.  And so far as Carnival's concerned,
19  the only standards that you have -- well, it sounds
20  like there's a -- there's somewhat of a range
21  because you've got prior law enforcement, prior
22  military or prior hotel security?
23           MR. LARA:  Objection.
24      A    Hotel security, air force security.
25      Q    (By Mr. Gerson) Okay.
```

Page 65

```
1       A    Corporate security.
2       Q    So if someone works in security in a Days
3   Inn they're qualified to be security on a Carnival
4   ship?
5           MR. LARA:  Objection.
6       A    No.  They have to pass the interview
7   per -- period, interview stages with
8   Michael Panariello.
9       Q    (By Mr. Gerson) I didn't say you would
10  hire them.  I just said they're qualified to -- for
11  the position and then -- because you said the prior
12  qualifications.
13      A    Right, to qualify that they're qualified
14  to go into a pool of candidates to be --
15      Q    Okay.
16      A    -- considered for employment with Carnival
17  Cruise Lines.
18      Q    All right.  So the minimum standards for
19  Carnival are that someone to work as a security
20  officer on a ship is that you work -- you have three
21  to five years working for a hotel?
22           MR. LARA:  Objection.
23      A    I believe it's three to five years for a
24  hotel in hotel security.
25      Q    (By Mr. Gerson) Right.
```

Page 66

```
1      A    That's one of the criteria, yes.  And then
2  there's --
3      Q    Okay.  That's a minimum qualification?
4      A    To be put into a candidate pool.
5      Q    To apply to be a security officer on a
6  Carnival ship the minimum qualification is three to
7  five years working security in a hotel?
8      A    One of the qualifications, yes.
9      Q    Okay.  And does it matter where the hotel
10 is located?  Can it be any hotel?
11     A    A hotel secur -- yes.
12     Q    Okay.  So I worked in a hotel in India and
13 I was a security officer, that would mean that I
14 meet the minimum qualifications to be considered for
15 the position?
16         MR. LARA:  Objection.
17     A    One of the minimum qualifications.
18     Q    (By Mr. Gerson) Okay.  Tell me what the
19 rest of the minimum qualifications are.
20     A    As I said before, command of the English
21 language, written English language, verbal
22 communication in English.
23     Q    Uh-huh.
24     A    Clean criminal background history.
25     Q    What else?
```

Page 67

```
1      A    And then that would put them into the
2  candidate's pool and then Mr. Panariello --
3  depending on the list of potential candidates,
4  Mr. Panariello will fly to India or the Philippines
5  and interview these people.
6      Q    What part of India?
7      A    He'll usually -- the interviews will be
8  conducted usually in Mumbai.
9      Q    Okay.  And why Mumbai?
10     A    It's a central point where he flies into,
11 but the candidates potentially could come from all
12 over India.
13     Q    Okay.  When you say the candidates can
14 come from all -- from potential areas in India, does
15 Carnival have any preference as to territories
16 within India that it selects its security officers?
17     A    I believe Mike has criteria for certain
18 areas.  I know there's certain areas that have
19 historically been better.
20     Q    Okay.  Tell me about that.
21     A    I'm just saying that there's -- Mike gets
22 the candidates, goes through a manning agency.  The
23 manning agency will do the preliminary checks and
24 then put a candidate's list together for Mike so
25 when he goes out these candidates will be available
```

Page 68

```
1  to him.
2      Q    So Carnival is aware that there are
3  certain regions within India that have more
4  qualified security officers --
5         MR. LARA:  Objection.
6      Q    (By Mr. Gerson) -- as opposed to others?
7      A    I didn't say that.  What I said was that
8  there are areas that I believe historically have
9  given more -- have more, maybe just by sheer volume
10 of population in that area, that have produced more
11 candidates.
12     Q    Hasn't Carnival been advised in the past
13 of recruiting security officers from particular
14 regions as opposed to others?
15         MR. LARA:  Objection.
16     A    That would have to go through with Mike as
17 to -- as far as -- that would be through our
18 corporate security, any warnings or anything they
19 would have put out on that.
20     Q    (By Mr. Gerson) Well, if we're going back
21 to topic 44, which you've already told me you don't
22 know what the security qualifications are of
23 Carnival crew members that were working on the ship?
24         MR. LARA:  Objection.
25     A    I told you the basic qualifications of the
```

Page 69

```
1  crew members.
2      Q    (By Mr. Gerson) But you don't know what
3  they -- what the specific qualifications were for
4  each crew member?
5      A    For each crew member, that's correct.
6      Q    And Carnival -- you're not aware of what
7  other qualifications Carnival has other than the --
8  that they work in hotel security for a period of
9  three to five years?
10         MR. LARA:  Objection.
11     A    Law enforcement, military, hotel security
12 or some type of corporate security, private
13 security.
14     Q    (By Mr. Gerson) Okay.  Are you --
15     A    Can I get a glass of water, please?
16     Q    Sure.
17         MR. LARA:  Are you -- are you in a place
18 that we can take a break?
19         MR. GERSON:  Do you need a break?
20         MR. LARA:  I don't, but he asked for one
21 before, the last time we were off the record.
22         MR. GERSON:  I mean, I thought by getting
23 him some water I was taking a break, but that's
24 fine.
25         MR. LARA:  He said he wanted a break.
```

Page 70

1    MR. GERSON:  Yeah.  No, that's fine.
2    MR. LARA:  Well, we got an hour and a half
3  or more.
4    (There was a brief recess.)
5    Q    (By Mr. Gerson) Okay.  Mr. Williams, did
6  you review the security logs for the day of this
7  incident?
8    A    With respect to?
9    Q    The security logs for the activities of
10  the crew members who provided security at the time
11  of this incident.
12    A    Yes.
13    Q    Okay.  And what security logs did you
14  review?
15    A    The summary watch reports I believe they
16  were.
17    Q    And how many summary watch reports did you
18  review?
19    A    I don't recall how many there were.
20    Q    Okay.  Did you review the summary watch
21  reports for Mr. Chaven?
22    A    I looked at them, yes.
23    Q    And what did they show?
24    MR. LARA:  Objection.
25    A    I believe they showed that he responded or

Page 71

1  was called and responded to the guest services or
2  guest services called him regarding a disturbance in
3  the hallway.
4    Q    (By Mr. Gerson) Okay.  And so the security
5  logs showed that Mr. Chaven responded after there
6  was an altercation or disturbance, as you put it, in
7  the hallway, was that the hallway of where
8  Lindsey Horne was?
9    A    I believe so, yes.
10    Q    Okay.  Did anyone else -- did any other
11  security officers' security logs show any activity
12  that has any relationship to this case?
13    MR. LARA:  Objection.
14    A    I don't recall.
15    Q    (By Mr. Gerson) Did you review the
16  security log for Marianne Reyes?
17    A    I did, yes.
18    Q    Okay.  And was there anything in
19  Ms. Reyes's security log that indicated that she
20  responded to the scene?
21    A    Again, I don't recall.  I reviewed these
22  logs, but -- but I do not recall without something
23  to refresh my memory.
24    Q    Okay.  Did you bring the security logs
25  with you?

Page 72

1    A    I didn't bring anything with me.
2    Q    Okay.  And why is that?  Did you not know
3  that you were also supposed to bring documents that
4  you reviewed?
5    A    No, I did not.
6    Q    Okay.  So you didn't bring any of the
7  documents that you -- you reviewed and you're not
8  familiar with the security qualifications for each
9  of the crew members that were working on the ship?
10    MR. LARA:  Wait, before you answer that.
11    If you'll orient me, Mr. Gerson, as to what
12    documents you're saying he was supposed to
13    bring.  From looking at the notice, Exhibit 1,
14    I don't see it.
15    MR. GERSON:  81.
16    MR. LARA:  Just a moment.  Well, what
17    you're asking him is to speak about the
18    documents he --
19    MR. GERSON:  No, the deposition's noticed
20    duces tecum.
21    MR. LARA:  The document states on the
22    front page --
23    MR. GERSON:  Right here.
24    MR. LARA:  -- to bring the documents
25    listed in Schedule A.  Schedule A are areas of

Page 73

1  inquiry.
2    MR. GERSON:  Well, the last that this
3  would include 81, which would be included.  So
4  if it was an oversight --
5    MR. LARA:  Well, let's be clear.  He
6  wouldn't be bringing that in the first place
7  because we object to it.  Any documents that
8  reviewed and relied upon in preparation -- in
9  preparation of the deposition notice, he didn't
10  prepare the deposition notice, that's number
11  one.  Number two, there's no schedule
12  identifying documents.
13    MR. GERSON:  Okay.  I'll -- I'm not going
14  to get into word games with you.  The record
15  speaks for itself.
16    MR. LARA:  Well, I'm not done speaking
17  into the record.
18    MR. GERSON:  Oh, okay.
19    MR. LARA:  Number three, any documents he
20  would have reviewed in preparation for his
21  deposition constitute work product.
22    MR. GERSON:  Not any.
23    MR. LARA:  So we -- we move for protection
24  in any event to the extent that you would seek
25  that in an amended notice or a subsequent

Page 74

1    request and reserve the right to file a written
2    motion -- motion in connection with that.
3         What he is here to do, as I stated to you
4    before, is to provide answers to the
5    interrog -- into the areas of inquiry that are
6    identified.  And although I provided them to
7    you in highlighted format, we can also state it
8    on the record which ones he's here for
9    testimony.
10        MR. GERSON:  Okay.  Thank you for that.
11        Q    (By Mr. Gerson) Mr. Williams, you as part
12   of the investigation, Carnival -- or strike that.
13   Carnival performed some sort of investigation into
14   this incident, did they not?
15        A    No.  No.  This allegation, yes.
16        Q    Okay.  And when you say "allegation", just
17   so we understand, what do you mean by allegation?
18        A    The allegation.
19        Q    What is an allegation?
20        A    A report that a -- a complaint or a report
21   that an incident occurred, but not necessarily that
22   it was proven to have any confirmation to it.
23        Q    Okay.  And so Carnival's position is that
24   there's no proof of confirmation that Lindsey Horne
25   was forceably raped; right?

Page 75

1         MR. LARA:  Objection.
2         A    Carnival's position is that
3    Ms. Lindsey Horne made an allegation that she was
4    allegedly sexually assaulted and raped.
5         Q    (By Mr. Gerson) Okay.  As part of the
6    investigation was a rape kit performed?
7         A    Yes.
8         Q    Okay.  And isn't it true that prior to the
9    cruise ship -- well, are you familiar with the
10   Cruise Ship Vessel Safety and Security Act of 2010?
11        A    Yes.
12        Q    Isn't it true that prior to the CVSSA
13   Carnival was not required to keep a rape kit on its
14   vessels?
15        A    I don't know what the medical department's
16   protocol was with respect to that.  The rape kits
17   are maintained under the medical department.
18        Q    Okay.  Are you familiar with the CVSSA?
19        A    Yes.
20        Q    What is it?
21        A    The Cruise Vessel Safety and Security Act
22   of 2010 signed by President Obama on
23   July 27th, 2010.
24        Q    And Carnival follows that law?
25        A    Yes.

Page 76

1         Q    Okay.  What changes has Carnival made in
2    response to the CVSSA?
3         MR. LARA:  Objections.  Objection.
4         A    Could you be more specific?
5         Q    (By Mr. Gerson) No.
6         MR. LARA:  Objection again.
7         Q    (By Mr. Gerson) I can't.  Tell me any
8    changes that you're aware of, as the corporate
9    representative for Carnival, that it has made in
10   response to the CVSSA of 2010?
11        A    What do you -- install peepholes.
12        MR. LARA:  Objection.
13        A    We installed peepholes in the cabin doors.
14   Railing heights were raised to, I think it was
15   42 inches.  Ahoust -- acoustical haling devices were
16   on the ships.  And -- and some of these are changes
17   and some of these were already on the vessel.
18        With respect to the crime reporting,
19   criminal allegation log, was implemented.  And with
20   respect to sexual assaults, the -- certain medicines
21   were -- and I think, again, I don't know if this was
22   on -- I'm sure it was on the ship prior to this, but
23   pursuant to the CVSSA they require, and these are
24   requirements of the CVSSA, let me stipulate that
25   this is what the CVSSA requires, anti-retroviral

Page 77

1    drugs and certain viral medications with regards to
2    sexual assaults.
3         Certified physicians with emergency
4    room training or -- or specified training.  Sexual
5    assault kits and medical staff available to perform
6    these kits.  A secure and private way for an alleged
7    victim to communicate with family members,
8    attorneys, outside counsel, sexual assault crisis
9    centers.
10        Q    Okay.  So before the -- before congress
11   passed the Cruise Ship Vessel Safety and Security
12   Act of 2010, Carnival didn't do any of these things,
13   did they?
14        A    I did not say that.
15        Q    Okay.  Well, my question was all changes
16   that were made in response to the CVSSA.  So
17   right -- let's just take a look at number 76 and
18   just so I want to be clear, sir, because you're here
19   pursuant to this notice and number 76.  Go ahead and
20   read that into the record and tell me what that
21   says.
22        A    "All changes made in response to the
23   Cruise Ship Safety and Security Act of 2010."
24        Q    Okay.
25        A    And if you read back my answer, I believe

Page 78

1  I said that some of these were already in place --
2      Q    Okay.
3      A    -- prior to the CVSSA.
4      Q    Okay.  I'd like to know which ones were --
5  what changes were made in response to the CVSSA of
6  2010, not what was already in place.
7           MR. LARA:  Objection.
8      A    I believe that more peepholes were
9  installed on doors.
10     Q    (By Mr. Gerson) Where?  What doors?
11     A    Crew and crew cabin doors.  That there
12 was -- railing heights on some ships were raised to
13 I believe it's 42 inches.  The crime allegation log
14 was a document that was to be completed in response
15 to certain criminal acts.
16     Q    What criminal acts?
17     A    All crimes occurring onboard the vessel
18 with the exception of thefts under $1,000.
19     Q    Okay.  Is Carnival, when -- when you --
20 you brought up the crime allegations log, so what is
21 a crime allegations log?
22     A    It's basically a cover sheet that's
23 maintained and is made accessible to the US Coast
24 Guard or law enforcement conducting in the course of
25 their duties.

Page 79

1      Q    Okay.  And in the crime allegations log
2  you're supposed to attach a copy of the ship
3  incident report if there is one?
4      A    Crime allegation report is in the ship
5  incident report, yes.  They go together.
6      Q    Now, the ship security incident report is
7  supposed to be attached to the crime allegation log
8  and then provided to the FBI; correct?
9      A    It's provided upon request.
10     Q    Okay.  When you say "it's provided upon
11 request", is the crime allegations log provided upon
12 request or is that something you're supposed to
13 provide pursuant to federal law?
14     A    A ship incident report is provided to law
15 enforcement.
16     Q    Every time that there is a rape or sexual
17 assault a copy of the ship incident report is
18 provided to law enforcement; right?
19          MR. LARA:  Objection.
20     A    Yes.
21     Q    (By Mr. Gerson) Okay.
22     A    That too.
23     Q    That's required under the law; correct?
24     A    No, it's not required under the law.
25     Q    Okay.  So it's your testimony though that

Page 80

1  every time that there is a rape or sexual assault, a
2  report of alleged serious violations of US law,
3  Carnival provides a copy of the ship's security
4  incident report to law enforcement?
5           MR. LARA:  Objection.
6      A    You're speaking about two different forms,
7  Mr. Gerson.  There's a ship's security incident
8  report and then there's the report of alleged
9  violations of US law which is a serious violations
10 report.
11     Q    (By Mr. Gerson) Okay.  When are you
12 supposed to provide a report of alleged serious
13 violations of US law?
14     A    Those reports are filed and completed when
15 a violation of one of the named violations of Title
16 18 named in the CVSSA are alleged to have occurred.
17     Q    Okay.  So every time there's an alleged
18 sexual assault or rape that's occurred, Carnival is
19 required to provide a copy of the ship's incident
20 report to law enforcement; correct?
21     A    We file that to the FBI and US Coast
22 Guard.
23     Q    You are required to do that under federal
24 law; correct?
25          MR. LARA:  Objection.

Page 81

1      A    No.  The ship's security incident report
2  is not required to be forwarded to them.  In lieu of
3  the ship's security incident report a synopsis of
4  the incident can be forwarded to them.
5      Q    (By Mr. Gerson) Okay.  So either -- so
6  it's your testimony that either -- well, what is --
7  what is your -- what is Carnival's position as far
8  as what documents can be provided in lieu of the
9  security incident report?
10          MR. LARA:  Objection.
11     A    I don't understand what you're saying.
12     Q    (By Mr. Gerson) Sure.  You just told me
13 that as the corporate representative for Carnival
14 that every time that there's been a reported -- a
15 report of alleged serious violation of US law such
16 as an assault or rape, a homicide, a death, a
17 missing US national, a kidnapping or an assault with
18 serious bodily injury or sexual assault or rape,
19 that Carnival is not required to provide with law
20 enforcement a copy of the ship's security incident
21 report?
22          MR. LARA:  Objection.
23     Q    (By Mr. Gerson) Is that what you're
24 telling me?
25     A    What I'm telling you is that's one of the

Page 82

```
1   venues that can be used.
2        Q    Okay.  So you're telling me that Carnival
3   has the option under the law to send something else
4   to law enforcement other than the security incident
5   report?
6             MR. LARA:  Objection.
7        A    What I'm telling you is that the ship's
8   security incident report is available, it will be
9   completed and forwarded attached pursuant to the
10  serious violation report.
11            If there is an incident that is
12  reported late and there is no ship incident report
13  onboard the vessel, in that situation a synopsis of
14  the -- of the allegation can be forwarded with the
15  serious violation report in lieu of the ship's
16  security incident report.
17       Q    Okay.  So if -- if there's a report of
18  alleged serious violation of the US law, such as
19  homicide, death, missing US national, kidnapping,
20  assault with serious bodily injury, rape or sexual
21  assault, Carnival is required to provide a copy of
22  the ship's security incident report if there is one?
23       A    Or they can get a synopsis.  Our policy --
24  I believe you asked me before, unless I
25  misunderstood you, what our policy was.  Our policy
```

Page 83

```
1   is if the ship's security incident report is
2   available, it will be forwarded to it.  It is not
3   law.  There's nothing in CVSSA that mandates a ship
4   security report be issued.
5        Q    Fine.  So you're tell -- it's your
6   testimony that Carnival's policy is every time that
7   there's a sexual assault or a rape that's been
8   alleged to have been -- have occurred on a Carnival
9   cruise ship and a security incident report is
10  generated, that it's the policy of Carnival to send
11  it to law enforcement and that could be either the
12  FBI, state police or both?
13            MR. LARA:  Objection.
14       A    First of all, the serious violation report
15  specifically goes to the national command center in
16  SIOC, which is the coast guard and the FBI.
17            Again, we as a practice, if
18  available, will send the ship's security incident
19  report to those two organizations.  There's nothing
20  in the CVSSA that mandates a ship security incident
21  report be sent to them.
22       Q    Let me ask you --
23       A    In lieu of that, a synopsis of the
24  incident, of the allegation, can be attached and
25  sent with the serious violation report.
```

Page 84

```
1        Q    Okay.  So you're telling me that every
2   time that there's a rape or sexual assault and
3   there's a security incident report that's generated,
4   that Carnival, as a matter of its own policy,
5   forwards that ship security incident report to the
6   United States Coast Guard and the FBI?
7             MR. LARA:  Objection.
8        A    The report itself, yes.
9        Q    (By Mr. Gerson) Okay.  And the report
10  includes the witness statements and all the factual
11  information from the investigation?
12            MR. LARA:  Objection.
13       A    I did not say that.
14       Q    (By Mr. Gerson) Okay.  So are you telling
15  me that Carnival hand picks what information it
16  wants to send to members of law enforcement when
17  there has been a report of a rape and sexual
18  assault?
19            MR. LARA:  Objection.
20       A    I'm telling you Carnival Cruise Lines
21  sends the ship security incident report attached to
22  a serious violation report if there is a ship
23  security incident report available.
24       Q    (By Mr. Gerson) Okay.  And you're telling
25  me that a ship's security incident report does not
```

Page 85

```
1   include the witness statements?
2        A    Those are supporting documentation to that
3   report.
4        Q    Are you -- is it your testimony, sir, as
5   corporate representative for Carnival, that the
6   witness statements are not included in the ship's
7   security incident report?
8        A    What I'm telling you as a Carnival
9   representative, the ship security incident report is
10  a stand alone document that has supporting
11  documentation to include witness statements, suspect
12  statements and any other documentation that was
13  generated during the investigation.
14       Q    Okay.  So it's included in the ship's
15  security incident report?
16       A    It's a supporting document.  The ship --
17  we can go on and on.  I think I've answered this --
18       Q    I agree.
19       A    -- enough.  The ship --
20       Q    Well, I don't.
21       A    The ship's security incident report, I can
22  show it to you if you'd like, is a stand alone
23  document that is signed at the end by the captain or
24  the mast -- or the staff captain.  That is a stand
25  alone document, the ship's security incident report.
```

Page 86

1   That ends there.  Anything after that report would
2   be supporting documentation.
3       Q    And so you're telling me that that
4   supporting documentation is not provided to law
5   enforcement?
6       MR. LARA:  Objection.
7       A    I didn't say that.
8       Q    (By Mr. Gerson) Okay.  So what are you
9   saying?
10      A    I am saying --
11      MR. LARA:  Objection.
12      A    I am saying for the fourth or fifth time
13  that pursuant to the serious violation report that
14  is sent to SIOC and the NCCC, which is the FBI and
15  the US Coast Guard.  If we have a ship security
16  incident report, the ship security incident report
17  is attached and sent with the SVR.
18      Q    (By Mr. Gerson) Okay.  And so, and it's
19  your testimony that the ship's security incident
20  report does not include the witness statements?
21      MR. LARA:  Objection.
22      A    I'm saying the ship's security incident
23  report is a stand alone document.
24      Q    (By Mr. Gerson) Okay.  Sir, you were the
25  lead investigator in this case, were you not?

Page 87

1       A    Uh-huh.
2       Q    Yes?
3       A    Yes, that's correct.
4       Q    Were you -- are you the lead investigator
5   in most of the rapes and sexual assaults that are
6   allegedly committed on Carnival vessels?
7       A    No.
8       Q    Okay.  How many rapes and sexual assaults
9   have you personally responded to as part of your
10  duties and responsibilities as an employee of
11  Carnival?
12      MR. LARA:  Objection.
13      A    I have no idea.
14      Q    (By Mr. Gerson) Well, when you say you
15  have no idea, is it more than one?
16      A    Yes.
17      Q    Is it more than two?
18      A    Yes.
19      Q    Is it more than three?
20      A    Yes.
21      Q    Is it more than four?
22      A    Yes.
23      Q    Is it more than five?
24      A    Yes.
25      Q    Is it more than six?

Page 88

1       A    Yes.
2       Q    Is it more than seven?
3       A    Yes.
4       Q    Is it more than eight?
5       A    Yes.
6       Q    Is it more than nine?
7       A    We're talking -- and what's my position,
8   as a --
9       Q    Any position.
10      A    We can go on here all day.  I would say
11  roughly, over ten years of employment with Carnival
12  Cruise Lines, I would say maybe 20.
13      Q    Okay.  How about the last year?
14      MR. LARA:  Objection.
15      A    Again, Mr. Gerson, I don't know how many
16  in the last year.
17      Q    (By Mr. Gerson) How many in the last two
18  years?
19      MR. LARA:  Objection.
20      A    If I don't know in the last year I
21  certainly don't know in the last two.
22      Q    (By Mr. Gerson) Okay.  How many in the
23  last three years?
24      MR. LARA:  Objection.
25      A    I have no idea.

Page 89

1       Q    (By Mr. Gerson) Well, you remember in the
2   last ten years, but you don't remember in the last
3   three years?
4       MR. LARA:  Objection.
5       A    I said probably 30.  Between 30 maybe,
6   minimum start, approximately, I don't -- 20, 30, I
7   don't know.
8       Q    (By Mr. Gerson) 20, 30 in the last ten
9   years?
10      A    I would say approximately.
11      MR. LARA:  Objection.
12      Q    (By Mr. Gerson) When did you start working
13  for Carnival again?
14      A    2005.
15      Q    So and out of those 20 and 30 incidents do
16  you know how many of those have resulted in a
17  successful conviction?
18      MR. LARA:  Objection.
19      A    I don't have that offhand, no.  I don't
20  know.
21      Q    (By Mr. Gerson) Are you aware of any?
22      A    We've had -- I'm aware of one.
23      Q    When was that?
24      A    It may have been 2012, 2013.
25      Q    So for all the rapes and sexual assaults

Page 90

1   that have been reported to the -- to law
2   enforcement, if there was an incident report and
3   attachments, those would have all been sent to law
4   enforcement; correct?
5          MR. LARA:  Objection.
6       A   They would have either been sent to them
7   or given to them.
8       Q   (By Mr. Gerson) Okay.  Have you ever
9   investigat -- have you -- in the 20 and 30
10  investigations, have you ever not been asked by
11  FB -- the FBI to provide them with a copy of the
12  shipboard incident report and the statements that
13  were taken?
14         MR. LARA:  Objection.
15      A   I don't recall.
16      Q   (By Mr. Gerson) You can't think of one
17  time that they -- the FBI hasn't asked for your
18  file, your investigative file with respect to a
19  serious violations like a sexual assault or rape on
20  a ship, have you?
21      A   Well --
22         MR. LARA:  Objection.
23      A   -- let me say from 2010 on, any
24  allegation, and prior to that, there was a
25  memorandum of understanding with the FBI, I believe

Page 91

1   it was in 2007, where we reported crimes that
2   mimicked the crimes noted in the CVSSA where they
3   were notified.
4       Q   (By Mr. Gerson) Okay.  So --
5       A   So -- go ahead.
6       Q   So since 2010 you're not aware of any
7   crime that has been reported to the FBI for which a
8   security -- that the FBI didn't ask for a copy of
9   the shipboard incident report and statements?
10         MR. LARA:  Objection.
11      A   Not that I'm aware of.  There may have
12  been, but not that I'm aware of.  But we would
13  always -- we would furnish that pursuant to -- let
14  me just get this straight.  Pursuant to the CVSSA we
15  telephonically notify the FBI and then that form is
16  sent at a later time.
17      Q   (By Mr. Gerson) Okay.  Now, you mentioned
18  some changes that were made in response to the CVSSA
19  were peepholes?
20      A   Yes.
21      Q   Okay.  Where were the peepholes placed?
22      A   I believe they were placed in the crew
23  cabins.
24      Q   And why was that done?  Why -- do you know
25  why that was required?

Page 92

1       A   For security purposes.
2       Q   What type of incidence was that pro -- was
3   that required in response to?
4          MR. LARA:  Objection.
5       A   I don't know if it was required for any
6   incidences, just a safety measure.
7       Q   (By Mr. Gerson) Okay.  And what kind of --
8   well, what is Carnival's understanding as to why the
9   Cruise Ship Vessel Safety and Security Act of 2010
10  was put into place?
11         MR. LARA:  Objection.
12      A   It was in response to, I believe some
13  cong -- congressional hearings or inquiries that
14  generated the CVSSA being implemented into law.
15      Q   (By Mr. Gerson) And what crimes were there
16  that were being complained about that in -- that
17  initiated the CVSSA?
18         MR. LARA:  Objection.
19      A   I don't know what crime specifically was
20  being or allegations of a crime were being -- were
21  being specified in the hearings, but there were sets
22  of crimes that were documented in the CVSSA.
23      Q   (By Mr. Gerson) So prior to the enactment
24  of the CVSSA, isn't it true that Carnival was made
25  aware of crimes such as rape and sexual assaults

Page 93

1   that were occurring on its vessels and for which
2   were going unreported?
3          MR. LARA:  Objection.
4       A   As I said before, Mr. Gerson, 2007 there
5   was a memorandum of understanding with the FBI.
6   Carnival Cruise Lines reported sexual -- alleged
7   sexual assaults, homicide and the -- and the crimes
8   that are documented in the CVSSA to the FBI.
9       Q   (By Mr. Gerson) Okay.  Does Carnival
10  consider a rape or a sexual assault a breach of
11  security?
12         MR. LARA:  Objection.
13      A   No.
14      Q   (By Mr. Gerson) Why not?
15         MR. LARA:  Objection.
16      A   Breach of security would be someone that
17  has -- has -- something that has breached the
18  security threshold of the vessel or the port.
19      Q   (By Mr. Gerson) Okay.  So it's -- it's
20  your testimony that a rape or sexual assault can
21  never be the result of a breach of security?
22         MR. LARA:  Objection.
23      A   I don't even know where you're going with
24  that.  Can you explain that?
25      Q   (By Mr. Gerson) Well, do you know what a

Page 94

1  breach of security is?
2      A   Yes.
3      Q   What is a breach of security?
4          MR. LARA:  Objection.
5      A   I just explained.
6      Q   (By Mr. Gerson) Let me ask you another
7  way.  Would you agree that security is designed to
8  protect passengers?
9          MR. LARA:  Objection.
10     A   Security is designed to give our
11 passengers a reasonable expectation of security.
12     Q   (By Mr. Gerson) Okay.  And what is
13 Carnival's position as to what a reasonable
14 expectation of security is?
15         MR. LARA:  Objection.
16     A   I think with respect to reasonable would
17 be that our guests could come upon our vessel with a
18 reasonable feeling that they're going to have an
19 enjoyable cruise.
20     Q   (By Mr. Gerson) Okay.  And do you think
21 it's reasonable for Carnival to have a sufficient
22 number of security personnel to protect its
23 passenger -- passengers?
24         MR. LARA:  Objection.
25     A   Carnival does have a sufficient number of

Page 95

1  security officers to give our passengers, our guests
2  and crew a reasonable expectation of security.
3      Q   (By Mr. Gerson) Okay.  What is -- what are
4  the ratios that Carnival follows with respect to
5  passengers and security officers that are on duty?
6          MR. LARA:  Objection.
7      A   Again, can you be more specific?
8      Q   (By Mr. Gerson) No.
9      A   I don't understand your question then.
10     Q   Okay.  So Carnival -- so you don't know?
11         MR. LARA:  Objection.
12     A   I didn't say that.
13     Q   (By Mr. Gerson) Okay.
14     A   I said I don't understand.
15     Q   Well, tell me -- tell me everything that
16 Carnival does to ensure that its passengers are safe
17 from crime.
18         MR. LARA:  Objection.
19     A   We have an adequate number of security
20 officers on the vessel.  They're well trained.  In
21 addition to that, other crew members have training
22 with respect to patrolling the ship and to learn to
23 look for -- am I moving around too much --
24 suspicious activity, policies and procedures in
25 place to ensure reasonable safety of our guests.

Page 96

1      Q   (By Mr. Gerson) Does Carnival take
2  seriously recommendations made by its security
3  personnel on its ships?
4          MR. LARA:  Objection.
5      A   Yes.
6      Q   (By Mr. Gerson) Okay.  Why is that
7  important?
8          MR. LARA:  Objection.
9      A   It's important?  Well, they're -- they're
10 out there -- are you talking about the shipboard
11 people?
12     Q   (By Mr. Gerson) Yes.
13     A   Well, they have -- they're out there and
14 working the day to day, you know, they're boots on
15 the ground out there and we do take their
16 recommendations into consideration.
17     Q   Okay.  And as the corporate representative
18 for Carnival are you aware -- is Carnival aware of
19 the recommendations that have been requested by
20 security officers for the last three years?
21         MR. LARA:  Objection.
22     A   With respect to what?
23     Q   (By Mr. Gerson) With respect to having
24 more security personnel on its ships.
25         MR. LARA:  Objection.

Page 97

1      A   That has been -- that has been mentioned,
2  yes.
3      Q   (By Mr. Gerson) Okay.  It's been mentioned
4  for a long time, hasn't it?
5      A   I don't know how long.
6      Q   Well, it's been mentioned for the last
7  three years, hasn't it?
8          MR. LARA:  Objection.
9      A   I don't know.
10     Q   (By Mr. Gerson) Okay.
11     A   All I can tell you it's been mentioned.
12     Q   Well, where has it been mentioned?
13     A   We've had at the -- at the training, I've
14 been present when they've mentioned it during the
15 training.  That's basically my -- my primary
16 knowledge of that.
17     Q   Okay.  So at the training security
18 officers have voiced a concern and expressed a
19 desire in having more security officers on all of
20 Carnival's ships?
21         MR. LARA:  Objection.
22     A   It's part of their wish list, they're --
23 of a wish list, yes.
24     Q   (By Mr. Gerson) Okay.  And what is
25 Carnival's position as to why it hasn't followed

Page 98

1  through with those wish lists?
2      MR. LARA:  Objection.
3      A   Well, Carnival has followed through with
4  that wish list with respect to certain times of the
5  year additional security personnel have been placed
6  on ships to assist the -- the present security
7  officers.
8          There's different types of cruises
9  where additional security have been put on to
10 supplement the -- the normal security detachment.
11     Q   (By Mr. Gerson) Okay.  Tell me what
12 vessels has Carnival increased the number of
13 security officers on its ships in the last three
14 years?
15     MR. LARA:  Objection.
16     A   I don't know the -- the specific ship, but
17 I know that there's been increased security presence
18 on ships during school break or Thanksgiving break,
19 Christmas break, certain charters.
20     Q   (By Mr. Gerson) Okay.  But you're --
21 Carnival hasn't uniformly decided to increase the
22 number of security officers fleet wide, has it?
23     MR. LARA:  Objection.
24     A   That is correct.
25     Q   (By Mr. Gerson) Okay.  And you are aware

Page 99

1  that the security officers at these annual meetings
2  have been requesting more coverage; right?
3      MR. LARA:  Objection.
4      A   Some of them, yes.
5      Q   (By Mr. Gerson) Okay.  And they've
6  expressed more coverage because they don't have
7  enough security personnel to do their jobs; right?
8      MR. LARA:  Objection.
9      A   I don't know why they've requested it.
10 They've requested additional security to -- I don't
11 know the exact reason, but to assist them.
12     Q   (By Mr. Gerson) Okay.  And isn't it true
13 that Carnival has taken the position that it's not
14 in Carnival's budget?
15     MR. LARA:  Objection.
16     A   I think what is Carnival's position is
17 that a review of the current security forces on our
18 vessels has shown that there's an adequate number of
19 security officers on our vessels to ensure that our
20 guests have a secure environment when they are --
21 during their cruise.
22     Q   (By Mr. Gerson) Okay.  And so -- so
23 Carnival disagrees with the requests that are being
24 voiced by the security officers at these annual
25 meetings that they need more coverage?

Page 100

1      MR. LARA:  Objection.
2      A   I don't know if disagreement is the word
3  for it, but --
4      Q   (By Mr. Gerson) Well, how would Carnival
5  describe it?
6      MR. LARA:  Objection.
7      A   Carnival looks at the manpower on the
8  ships as being adequate to ensure a reasonable --
9  reasonably safe environment for our guests and crew.
10     Q   (By Mr. Gerson) Okay.  And what is the
11 basis for that?
12     MR. LARA:  Objection.
13     A   I think that the incidents occurring
14 onboard the vessel are -- are relatively low.  The
15 allegations of -- of incidents on the vessels are
16 low.  The ship security officers perform daily
17 duties in a very professional and efficient manner.
18     Q   (By Mr. Gerson) Okay.  What is Carnival
19 doing to evaluate the security needs of its ships on
20 an annual basis?
21     MR. LARA:  Objection.
22     A   We take a look at -- well, basically we
23 look at the -- the number of incidents and make a
24 determination that -- based on that.
25     Q   (By Mr. Gerson) Okay.  The allegations

Page 101

1  that have been made in this case, this isn't the
2  first time that Carnival's been made aware that a
3  passenger has been forced into her cabin and raped,
4  is it?
5      MR. LARA:  Objection.
6      A   I don't know.
7      Q   (By Mr. Gerson) Okay.  Well, have you,
8  sir, ever been personally involved in any
9  investigation where a passenger claims that she was
10 forced into her room and raped?
11     A   Not that I recall.
12     Q   Not that you recall?
13     A   Not that I recall.
14     Q   Okay.  What does Carnival do to evaluate
15 the number of rapes that have occurred in -- on a
16 Carnival ship in the last three years?
17     MR. LARA:  Objection.
18     A   Again, what do you mean?
19     Q   (By Mr. Gerson) Sure.  How many -- or is
20 Carnival aware of the number of sexual assaults and
21 rapes that have occurred in the last three years?
22     MR. LARA:  Objection.
23     A   What's your definition of a sexual assault
24 and --
25     Q   (By Mr. Gerson) What is Carnival's

Page 102

1  definition of a sexual assault?
2       MR. LARA:  Objection.
3       A    We follow Title 18, 2241, 2242, 2243 and
4  2244 A and C, under Title 18 as our definition of a
5  sexual assault.
6       Q    (By Mr. Gerson) Okay.  So tell me, what is
7  Carnival's definition of a sexual assault?
8       A    Basically any incident that -- it's based
9  more or less or under the Uniform -- Title 18 and
10 Uniform Crime Reporting Change Rate for 2013 to any
11 penetration of a vagina or anus or mouth by
12 basically any -- any item, any -- and Title 18 is --
13 also includes skin to skin contact of the genitalia
14 of a person who's not obtained the age of 16 years
15 old.
16      Q    Now, you mentioned before that prior to
17 the CVSSA of 2010 that Carnival wasn't required to
18 file a criminal allegations log; is that correct?
19      A    Correct.
20      Q    Okay.  And they weren't required to have
21 peepholes on all the cabin doors; is that correct?
22      A    There was no requirement.
23      Q    Okay.  But there is a requirement now;
24 right?
25      A    Correct.

Page 103

1       Q    And so Carnival -- after the federal law
2  went into effect, the CVSSA, Carnival was required
3  to make sure that peepholes were included on all
4  cabin doors; correct?
5       A    Correct.
6       Q    And one of the reasons why peepholes were
7  required for all cabin doors was to require the
8  cruise line to provide more safety for its
9  passengers; right?
10      MR. LARA:  Objection.
11      A    I think it was just so people can see who
12 is -- who are outside their cabin.
13      Q    (By Mr. Gerson) So there was a problem --
14 there was a need to have -- to provide more security
15 for passengers so they can see who was outside of
16 their cabin and who wasn't?
17      MR. LARA:  Objection.
18      A    I don't know if there was a need to --
19      Q    (By Mr. Gerson) Okay.
20      A    -- but that's what the law says.
21      Q    Okay.  Well, what is Carnival's position
22 as to why that CVS -- why the CVS -- CVSSA went into
23 effect?
24      MR. LARA:  Objection.
25      Q    (By Mr. Gerson) Does Carnival disagree

Page 104

1  with the findings that provided the frame work for
2  the CVSSA with respect to rape and sexual assaults
3  that were occurring on cruise ships?
4       MR. LARA:  Objection.
5       A    Carnival follows the law.  Congress had
6  several hearings.  They implemented the --
7  implemented the law that was signed into law by
8  President Obama in July 27th, 2010 and Carnival
9  Cruise Lines follows the law.
10      Q    (By Mr. Gerson) And what -- what happened
11 at those hearings?
12      MR. LARA:  Objection.
13      A    I don't know, I wasn't present.
14      Q    (By Mr. Gerson) Isn't it true that
15 passengers got up before congress and told their
16 stories about how they were the victims of rape and
17 sexual assault on cruise ships?
18      MR. LARA:  Objection.
19      A    I believe there was allegations that were
20 presented.
21      Q    (By Mr. Gerson) Were there also people who
22 stood up before congress and told members of
23 congress as well as representatives from Carnival
24 that family members were going missing?
25      MR. LARA:  Objection.

Page 105

1       A    I wasn't there.  I don't know what was
2  said.
3       Q    (By Mr. Gerson) Okay.  So the CVSA --
4  CVSSA went into effect when?
5       A    July 27th, 2010.
6       Q    Okay.  And in response to the CVSSA
7  Carnival had to provide peepholes on every door;
8  right?
9       A    Correct.
10      Q    Okay.  Did they -- and they had to report
11 allegations of serious crimes, such as rape, sexual
12 assault, kidnapping, missing person, death and
13 homicide, that had to have been -- they were
14 required to report it to the FBI; correct?
15      MR. LARA:  Objection.
16      A    Per the law we were required to report it,
17 but there was requiring provisions in place that
18 Carnival reported these incidents to the FBI prior
19 to the Cruise Vessel Safety and Security Act of
20 2010.
21      Q    (By Mr. Gerson) And isn't it also true
22 that Carnival, in response to the CVSSA, was then
23 required to allow the FBI to board the ship and
24 conduct an investigation?
25      MR. LARA:  Objection.

Page 106

1    A    The CVSSA requires notification to the
2    FBI. And again, as I said prior, Carnival Cruise
3    Lines always cooperated with law enforcement,
4    whether it be the FBI or the same for local law
5    enforcement, with the investigation of a criminal
6    incident.
7    Q    (By Mr. Gerson) Let me ask you this, does
8    Carnival -- you also work in the surveillance
9    department, is that an accurate statement?
10   A    No.
11   Q    Okay.  Are you familiar with CCTV cameras?
12   A    Yes.
13   Q    Does Carnival maintain CCTV cameras on its
14   cruise ships?
15   A    Yes.
16   Q    In response to the CVSSA was Carnival
17   required to provide CCTV cameras on its vessels?
18   A    Carnival had CCTV cameras on its vessels
19   prior to the CVSSA.  CVSSA requires -- as it stands
20   now, requires that CV -- CCTV documents an incident
21   and I believe it's that make -- make evidence
22   available to law enforcement.
23   Q    Okay.  And what type of evidence is --
24   does the CVSSA require Carnival to make available to
25   law enforcement?

Page 107

1    A    With respect to CCTV?
2    Q    Yes.
3    A    Any recordings that would assist law
4    enforcement in evidence that an allegation occurred.
5    Q    Is -- does -- is Carnival required to have
6    CCTV cameras in the passenger corridors?
7    A    There's nothing in the CVSSA that dictates
8    as to where CCTV is to be implemented at this time.
9    Q    Okay.  Have there been requests by
10   security officers in the past to have CCTV cameras
11   in the passenger corridors?
12   A    Yes.
13   Q    And does Carnival have CCTV cameras in the
14   corridors of its ships?
15   A    No.
16   Q    Why not?
17        MR. LARA:  Objection.
18   A    Carnival feels right now there's
19   adequate -- adequate security in place to provide
20   our guests with a reasonable expectation of
21   security.
22   Q    (By Mr. Gerson) Okay.  So Carnival does
23   not have CCTVs in place because it does not feel
24   that it is required to provide passengers a
25   reasonable expectation of security?

Page 108

1        MR. LARA:  Objection.
2    A    I didn't say that.
3    Q    (By Mr. Gerson) Okay.  What are you
4    saying?
5        MR. LARA:  Okay.  Objection.  Nick, what
6    kind of question is that?
7    Q    (By Mr. Gerson) Go ahead.  Hold on.  No,
8    you said that's not what you're saying, so continue
9    and tell me what you're saying.
10       MR. LARA:  Objection, asked and answered.
11   Q    (By Mr. Gerson) You can answer, sir.
12   A    You seem to have a way of twisting my --
13   my answers around.  What I said is there was no CCTV
14   in the corridors.  Carnival maintains an adequate
15   security to ensure our guests a reasonable
16   environment of -- of safety.
17   Q    Okay.  But your security officers are
18   requesting that you have the CCTV cameras in the
19   passenger corridors?
20       MR. LARA:  Objection.
21   A    They have requested that.
22   Q    (By Mr. Gerson) Okay.
23   A    They've also requested more pay and
24   they've requested several other things.
25   Q    Okay.  What other -- what other security

Page 109

1    measures have they requested, other than having CCTV
2    cameras in the passenger corridors and having more
3    security coverage?
4        MR. LARA:  Objection.
5    A    I don't recall.
6    Q    (By Mr. Gerson) Why doesn't Carnival
7    provide CCTV cameras in the passenger corridors?
8        MR. LARA:  Objection.
9    A    Again, I answered this before.  Security
10   measures that Carnival has on the ships right now
11   and our security with -- with our security officers
12   provides a reasonable environment of security for
13   our guests.
14   Q    (By Mr. Gerson) How does Carnival
15   determine what is reasonable security measures and
16   what is unreasonable security measures?
17       MR. LARA:  Objection.
18   A    We get number of the incidents, as I
19   mentioned before, on our vessels.  Feedback from our
20   guests.  Feedback from our security officers.  And
21   our guests are -- we expect our -- our guests to
22   enjoy our -- their cruise.
23   Q    (By Mr. Gerson) Okay.  Of the 30 rapes and
24   sexual assaults that you've testified that you're
25   aware of, would you -- wouldn't you agree that a

Page 110

1  majority of those, if not all of them, have occurred
2  in passenger state rooms?
3          MR. LARA:  Objection.
4      A   The approximate number of 30.  A vast
5  majority, yes.
6      Q   (By Mr. Gerson) Okay.  And out of the vast
7  majority of those prior incidents a certain number
8  of those have also included instances where
9  passengers have claimed that they've been forced
10 into their cabins and raped; correct?
11         MR. LARA:  Objection.
12     A   I'm not aware of that, no.
13     Q   (By Mr. Gerson) Okay.  In some of those
14 instances isn't it true that crew members have
15 entered passenger's rooms and raped them?
16         MR. LARA:  Objection.
17     A   I'm trying to remember if we've had -- I
18 don't know if they're raped, allegedly raped, but
19 there's been allegations of sexual assault, a rape.
20     Q   (By Mr. Gerson) Okay.
21     A   -- under the new definitions, allegations.
22     Q   So what is Carnival doing to improve its
23 security measures on its vessels?
24         MR. LARA:  Objection.
25     A   What are we doing to improve them?

Page 111

1      Q   (By Mr. Gerson) Yeah.
2      A   Well, right now we're -- we've done a
3  security assessment onboard the vessels.  And with
4  respect to placement of CCTV cameras and within a, I
5  don't know the exact time table, additional cameras
6  are going to be placed on the ships.
7      Q   Okay.  So it's your -- so Carnival, it's
8  your testimony that you're now going to provide
9  security cameras in the passenger corridors of all
10 Carnival ships?
11         MR. LARA:  Objection.
12     A   I don't know if they're going in the
13 corridors, but there are going to be additional
14 cameras.
15     Q   (By Mr. Gerson) Well, where are those
16 cameras going to be included?
17     A   I think some of them are going to be in
18 the corridors and they're going to be in various
19 locations aboard the vessels.
20     Q   Okay.  And the security assessment that
21 you just spoke of, are these documented in the
22 security assessment?
23         MR. LARA:  Objection.
24     Q   (By Mr. Gerson) You said that Carnival had
25 done a -- completed a security assessment and it is

Page 112

1  now going to include security cameras on -- in the
2  corridors of its vessels?
3          MR. LARA:  Objection.
4      A   I didn't say corridors.  I said I believe
5  they're going to be in the corridors with additional
6  cameras about the ship, yes.
7      Q   (By Mr. Gerson) Okay.  So you're not aware
8  of any specific improvements to or you're not aware
9  of any specific changes to include security cameras
10 in the corridors on Carnival ships?
11     A   The initial assessment was to put the
12 cameras -- you can put the cameras in the corridors.
13 So I'm assuming that -- I believe that they're going
14 to put them in the corridors and various other
15 places around the ship.
16     Q   Who conducts the assessment?
17     A   I conducted it for --
18     Q   All right.
19     A   -- internal for our department.  And we
20 have other departments within Carnival that are
21 going from the ship to ship.
22     Q   All right.  And when did you conduct this
23 assessment?
24     A   I believe it was last year.  Maybe a year
25 and a half ago, two years ago.

Page 113

1      Q   So two years ago you conducted a -- a sec
2  -- a security assessment of all of Carnival ships?
3          MR. LARA:  Objection.
4      A   Maybe not two years ago.  Maybe with -- a
5  year, year and a half ago, give or take.
6      Q   (By Mr. Gerson) Well, which is it?
7      A   I don't know.  I'm telling you, maybe a
8  year and a half, year, year and a half, two years.
9  I -- I don't know.
10     Q   Year and a half, two years.  So somewhere
11 a year and a half, two years ago, you conducted a
12 security assessment on all Carnival ships?
13     A   Correct.
14     Q   That included the Sensation?
15     A   Correct.
16     Q   Okay.  And you determined by the
17 assessment or in the assessment that it would be a
18 good idea to include security cameras in the
19 passenger corridors?
20         MR. LARA:  Objection.
21     A   They were put in -- I put them in the
22 hallways, yes, in the corridors.
23     Q   (By Mr. Gerson) Well, you -- you included
24 that, that they should -- that was something that
25 was incorporated in the assessment?

Page 114

1    A    Yes.
2    Q    Okay.  Is that security assessment
3  something that was done in -- in connection with the
4  vessel security plan?
5        A    It was done in anticipation of the NPRM
6  that the coast guard was proposing for enhanced CCTV
7  cameras pursuant to the CVSSA.
8        Q    So for the last year, year and a half, two
9  years, the coast guard has told Carnival that it
10  needs to -- it needs to add more security cameras to
11  its vessels?
12        MR. LARA:  Objection.
13        A    That's not what I said.
14        Q    (By Mr. Gerson) Okay.
15        A    I said it was a coast guard notice of
16  proposed rule making that I believe was issued in
17  April of this year and it's one of the -- it's
18  nothing that's -- nothing that is in law right now
19  requiring cameras in corridors.
20        Q    Understood.  But your -- it's your
21  testimony that the coast guard has issued a notice
22  of proposed, what did you say it was called?
23        A    Rule making, NPRM.
24        Q    Notice of proposed rule making that
25  Carnival include security cameras in the corridors

Page 115

1  of its ships, of the passenger corridors?
2        A    Pursuant to the CVSSA, not Carnival
3  specifically.  It's CVSSA related and I believe it's
4  cameras where crew and guests have a common access.
5        Q    Okay.  And this would be -- so now the
6  coast guard is -- filed this or made this notice for
7  proposed recommendation?
8        A    Rule making.
9        Q    Rule making, excuse me.  Notice of
10  proposed rule making and you think that's been going
11  on for a year and a half to two years?
12        MR. LARA:  Objection.
13        A    I don't know how long it's been going on,
14  but we've been looking at it, my assessment was,
15  like -- like I said, about a year and a half ago.
16        Q    (By Mr. Gerson) But Carnival's not
17  making -- Carnival's not going to require its ships
18  to have cameras in the corridors until it's required
19  under law?
20        A    No.
21        MR. LARA:  Objection.
22        A    I didn't say that.
23        Q    (By Mr. Gerson) Okay.
24        A    Car -- Carnival is starting to implement
25  this next year within -- within the dry docks.

Page 116

1        Q    Okay.  So Carnival's going to wait until
2  the next wave of ships go into dry dock and then
3  it's your testimony that Carnival is going to start
4  installing security cameras on its vessels?
5        A    We're starting to put in cameras, yes.
6        Q    Okay.  And is that in response to -- is
7  that -- are those -- this assessment that you're
8  describing, that is to protect -- help protect
9  passengers from things like rape and sexual assault;
10  correct?
11        MR. LARA:  Objection.
12        A    It's to assist in documenting allegations
13  and providing evidence to law enforcement upon their
14  request.
15        Q    (By Mr. Gerson) Okay.  So you would agree
16  that there's been requests and allegations made that
17  Carnival has been unable to document allegations of
18  rape and sexual assaults because they don't have
19  closed -- they don't have CCTV cameras in passenger
20  corridors?
21        MR. LARA:  Objection.
22        A    Can you rephrase that, please?
23        Q    (By Mr. Gerson) Sure.  What is -- what is
24  Carnival's under -- what is Carnival's position as
25  far as why the CCTV cameras are -- have been

Page 117

1  proposed by the coast guard?
2        MR. LARA:  Objection.
3        A    I -- I think I answered that in the
4  cameras are proposed to assist law enforcement in
5  the documentation of crime and preserving evidence.
6        Q    (By Mr. Gerson) Okay.  So are you aware of
7  any official plans for Carnival to follow through
8  with this implementation of CCTVs in the passenger
9  corridors?
10        A    That's in the process now.  That's being
11  worked on with -- by another department.
12        Q    Okay.  What department is that?
13        A    I believe it's corporate IT.
14        Q    But that's not going to happen for --
15  well, when is the Sensation supposed to go into dry
16  dock?
17        A    I don't know.
18        Q    When is the Breeze supposed to go into dry
19  dock?
20        A    I don't know.
21        Q    When is the Conquest supposed to go into
22  dry dock?
23        A    I don't know.
24        Q    When is the Valor supposed to go into dry
25  dock?

Page 118

1      A    I don't know.
2      Q    When is the Miracle supposed to go into
3  dry dock?
4      A    I don't know.
5      Q    When is the Liberty supposed to go into
6  dry dock?
7      A    I don't know.
8      Q    So all these -- how many carnival vessels
9  are there active right now?
10     A    24.
11     Q    24?  So Carnival's going to wait until
12  these 24 ships go into dry dock and then it's going
13  to put CCTV cameras in the corridors?
14          MR. LARA:  Objection.
15     A    The dry dock schedule is beginning I
16  believe 2016, so it will be starting within another
17  couple of months.
18     Q    (By Mr. Gerson) This security -- this
19  assessment that you conducted, did you write a
20  report in connection with that?
21     A    No.
22     Q    Okay.  What is the document called?
23     A    I didn't write a document.
24     Q    You just -- how did you -- how did you
25  make the determination that you should have more

Page 119

1  security cameras?  Is it just based on what the
2  coast guard told you?
3      A    No.  I took the deck plans of the vessel
4  and reviewed the deck plans and then put cameras
5  where I thought they should be pursuant to the deck
6  plans of the vessel.
7      Q    Okay.  So where on the Sensation do you
8  think they should be?
9          MR. LARA:  Objection.
10     A    Where on the vessel -- on the Sensation
11  did I put them pursuant to my assessment?
12     Q    (By Mr. Gerson) Yes.
13     A    The best of my recollection was Lido deck,
14  Promenade deck, Empress deck, the crew hall -- or
15  guest hallways, main deck around the -- the guest
16  services area.  General areas where our guests
17  would -- would go.
18     Q    Okay.  And right now there are no security
19  cameras at all in any of those areas?
20     A    No, I didn't say that.
21     Q    Well, right now there are no security
22  cameras in any of the passenger corridors?
23     A    Correct.
24     Q    So the only people that are providing
25  security for passengers are the security officers

Page 120

1  that are working on the ship?
2          MR. LARA:  Objection.
3      A    That's not correct.
4      Q    (By Mr. Gerson) Well, the only -- let me
5  rephrase that.  The only security measures in place
6  for passengers by their state rooms would be the
7  security officers that are working that particular
8  shift?
9          MR. LARA:  Objection.
10     A    That's not correct.
11     Q    (By Mr. Gerson) Okay.  What other security
12  measures are in place that I'm not aware of?
13     A    All of our crew members on the ve --
14  vessel have been trained and go through suspicious
15  activity and patrol techniques training and are
16  instructed pursuant to that training that if they
17  see anything suspicious in the course of their
18  duties, if it doesn't -- basically if it doesn't
19  seem right, it's not right, and to notify security.
20     Q    So this would include people like
21  maintenance and cleaning personnel?
22     A    All crew members on the vessel.
23     Q    All crew members on the vessel.  Does
24  Carnival identify sexual or other criminal assaults
25  against passengers as a list of credible security

Page 121

1  threats?
2          MR. LARA:  Objection.
3      A    What are you -- what are you speaking
4  about?
5      Q    (By Mr. Gerson) The vessel security plan.
6      A    No.
7      Q    Does the vessel security plan include any
8  procedures for responding to sexual or other
9  criminal assaults against passengers?
10     A    No.  The security plan is related to
11  security of the vessel.
12     Q    Do any internal documents identify sexual
13  or other criminal assaults against passengers and
14  crew in its list of credible security threats?
15     A    No.
16     Q    Has the staff captain and the vessel
17  security officer integrated the Cruise Vessel
18  Security and Safety requirements mandated by the
19  CVSSA into the MS Sensation's vessel security plan?
20     A    No.
21     Q    Why not?
22          MR. LARA:  Objection.
23     A    The ship's security plan or vessel
24  security plan is with respect to threats against the
25  vessel.  The CVSSA addresses concerns of the crew

Page 122

1  and passengers aboard that vessel.
2      Q    (By Mr. Gerson) Do you know who
3  John Butchko is?
4      A    Yes.
5      Q    Who is that?
6      A    An investigator.
7      Q    And was Mr. Butchko involved in the
8  investigation into the incident involving
9  Lindsey Horne?
10     A    I don't recall.  He may have been.
11          MR. GERSON:  Let me take a --
12          MR. LARA:  Are we off?
13          MR. GERSON:  Yeah, two minute break.
14          (There was a brief recess.)
15          MR. GERSON:  Okay.  Back on the record.
16     Q    (By Mr. Gerson) Mr. Williams, going back
17  to your involvement in investigations or Carnival's
18  investigation of criminal incidents such as rape and
19  sexual assault, I think you already told me that
20  part of the procedure is you get notified at some
21  point by the ship?
22     A    Correct.
23     Q    Okay.  And sometimes that notification
24  comes in the form of an e-mail; is that correct?
25     A    With respect to what?

Page 123

1      Q    Well, is -- do you communicate with the
2  ship personnel via e-mail once you've been notified
3  of a serious incident such as a rape or a sexual
4  assault?
5      A    If they're crimes delegated under the
6  CVSSA we receive a phone call from the ship.
7      Q    Okay.  And -- and then you may communicate
8  with the vessel's personnel via e-mails?
9      A    At a later time, yes.
10     Q    Okay.  And John Butchko, you told me
11  that's an investigator?
12     A    Correct.
13     Q    And Michael Panariello, we know who that
14  is; right?
15     A    Yes, we do.
16     Q    And the hotel director, that's someone who
17  might be included in the e-mails?
18     A    There would -- that e-mail would have
19  probably -- if he was included, he's part of the
20  ship's command, that would have probably come from
21  the ship.
22     Q    Okay.  Now, as the Carnival Cruise Lines,
23  once the ship goes into port and provides it's --
24  and it notifies law enforcement that there's been a
25  rape or sexual assault, someone like -- you're

Page 124

1  the -- you are the -- you're the person who deals
2  with law enforcement; correct?
3      A    Well, first -- first of all, Mr. Gerson,
4  with respect to the allegation of sexual assault,
5  law enforcement for the most part, unless there's
6  a -- a -- a time situation, would be notified prior
7  to the vessel getting into port.
8      Q    Okay.  You've brought up a good point.
9  When is -- when is the FBI supposed to be notified?
10     A    As soon as possible I believe after an
11  allegation.
12     Q    Okay.  And as soon as there's an
13  allegation of a rape, once the ship arrives into
14  port, what is the procedure?  Do you go onto the
15  ship first?
16     A    In rare occasions.
17     Q    Okay.  Do you assist law enforcement with
18  its investigation?
19     A    In rare occasions.
20     Q    Okay.  Did you assist law enforcement in
21  this investigation?
22     A    What is your definition of assist?
23     Q    Did you help law enforcement with their
24  investigation in this case?
25     A    With regards to -- to what?

Page 125

1      Q    With regards to any of the investigation.
2  Here, let me -- let show you, just so we're not --
3      A    I'm not playing -- I'm not playing games
4  here.
5      Q    -- just so we're straightforward.  I know
6  we're not playing games.  I -- I know, sir, because
7  here's your affidavit, so we'll look at -- you take
8  a look at your affidavit.  And --
9      A    Uh-huh.
10     Q    -- this is -- I think this is you, right,
11  Robert Williams, Jr?
12     A    I just want to make sure I answer the --
13  the question properly.
14     Q    I appreciate that, sir.  I want you to
15  read paragraph four of your affidavit.  Well, let's
16  just -- for identification purposes you see this
17  affidavit; right?
18     A    Yes.
19     Q    You filed this affidavit; right?
20     A    Yes.
21     Q    This is your signature?
22     A    That's correct.
23     Q    What's the date of it?
24     A    The 3rd day of September 2015.
25     Q    Okay.  Why don't you go ahead and take a

Page 126

1  look at this affidavit and beginning on paragraph
2  four, read into the record what you wrote, sir.
3      A    "For the sole purpose of assisting law
4  enforcement with this investigation to any specific
5  crimes alleged to have occurred onboard Carnival
6  Ships.  Upon request, Carnival provides its internal
7  investigation paperwork for each specific alleged
8  crime to law enforcement, including the incident
9  report, witness statements that are prepared at the
10 direction of counsel in an anticipation of
11 litigation and any photographs taken at the time of
12 the incident, collectively the materials."
13     Q    Okay.  What did you mean by when you used
14 the word assisting?
15     A    Okay.  That's more specific.  With respect
16 to that I contacted law enforcement and provided
17 them with any documentation that would have been
18 generated pursuant to that investigation at the time
19 it was available.
20     Q    And -- and why did you do that?
21     A    To assist law enforcement with the
22 investigation of the allegation.
23     Q    Because you're required to, it's a policy
24 of Carnival; right?
25          MR. LARA:  Objection.

Page 127

1      A    We're required to notify law
2  enforcement --
3      Q    (By Mr. Gerson) Okay.
4      A    -- FBI.  And we do assist law enforcement.
5  That is our policy, to assist law enforcement.
6      Q    Did you -- did Carnival make its assistant
7  chief security officer available to speak with the
8  FBI in this case?
9      A    I -- I don't know.
10     Q    Okay.  Well --
11     A    I mean, if he was onboard the vessel and
12 the FBI wanted to speak with him, he would have been
13 made available.
14     Q    Okay.
15     A    Other than that, I don't know.  I wasn't
16 there.
17     Q    Okay.  Well, you didn't -- you didn't
18 assist with the investigation in this case once law
19 enforcement was contacted?
20     A    Again, what --
21     Q    Let me ask you this, sir.  Did Carnival
22 assist law enforcement with the investigation
23 conducted by the FBI?
24     A    They presented and provided documentation
25 to the FBI and law enforcement.

Page 128

1      Q    Okay.  Did Carnival make the assistant
2  chief security officer available for questioning
3  from -- with the FBI?
4      A    I don't know.
5      Q    Okay.  Did Carnival make available the
6  first responding security officer,
7  Mr. Rakesh Chaven, available to law enforcement as
8  part of the investigation in this case?
9      A    I wasn't there.  I don't know.  If law
10 enforcement wanted to speak to them and they were
11 available on the ship, they would have spoken to law
12 enforcement.  I was not there.
13     Q    Okay.  Did you speak to anyone from the
14 FBI about your investigation as the senior invest --
15 investigator into this incident?
16     A    With respect to -- can you be more
17 specific as to what you're talking about?
18     Q    I mean, I'll -- I'll bring you back here
19 in your individual capacity I suppose if you want
20 to, but I'm trying to kill two birds with one stone
21 so --
22     A    I'm -- I'm not trying to be difficult.
23     Q    Okay.
24     A    I just don't understand --
25     Q    Okay.

Page 129

1      A    -- the scope of your question.
2      Q    All right.  Did you -- you were -- you
3  were notified of this incident; right?
4      A    Correct.
5      Q    Okay.  You're the shoreside investigator;
6  right?
7      A    Correct.
8      Q    Okay.  And when the ship got into port
9  you -- you dealt with law enforcement, did you not?
10     A    I dealt with law enforcement prior to the
11 ship getting into port.
12     Q    Okay.  You didn't deal with them at all
13 once the ship was in port?
14     A    I may have had some conversations with
15 them, but I think the general --
16     Q    Okay.  Well, that counts.
17     A    I said I may have, I -- afterwards.
18     Q    What kind of conversations did you have?
19     A    Just with respect to usually what we'll do
20 is a follow up conversation with the FBI, do you
21 need anything from us?
22     Q    Okay.  What is the purpose of you
23 conducting an investigation shoreside if an
24 investigation has already been -- been completed by
25 Carnival's officers on the ship?

Page 130

1      MR. LARA:  Objection.
2      A    I think -- I think you're somewhat missing
3  the point.  As I -- I believe I had testified
4  earlier that we liaise with the ship's security and
5  the ship's security conducts the investigation.  And
6  then we -- based on that, we speak with law
7  enforcement and make the law enforcement
8  notifications.
9      Q    (By Mr. Gerson) Okay.  So did you speak
10 with people from the FBI about the fact that
11 Lindsey Horne was -- alleged that she was raped by
12 two African passenger -- or raped on a Carnival
13 ship?
14     MR. LARA:  Objection.
15     A    I would have notified the FBI that there
16 was an allegation of a sexual assault.
17     Q    (By Mr. Gerson) Okay.  And isn't it true
18 the person that you contacted was an FBI agent by
19 the name of Mathew Pagliarini?
20     A    Pag -- Pagliarini.
21     Q    Pagliarini.
22     A    Yes.
23     Q    Yes?  You know who that is?
24     A    Yes, I do.
25     Q    And who is Mathew Pagliarini?

Page 131

1      A    He's an FBI special agent assigned to the
2  Melbourne, Florida RA office.
3      Q    Okay.  And you've dealt with him in the
4  past, have you not?
5      A    Several times.
6      Q    How many times have you dealt with him
7  before this incident?
8      A    I don't know.  Numerous times.
9      Q    Okay.  And those numerous times were other
10 rapes and sexual assaults that occurred on Carnival
11 vessels?
12     MR. LARA:  Objection.
13     A    Other allegations of crimes pursuant to
14 the CVSSA.
15     Q    (By Mr. Gerson) Okay.  And what is the
16 purpose of you -- are you the first person from
17 Carnival that makes direct contact with law
18 enforcement?
19     A    In this situation, yes.
20     Q    Okay.  In this case you were; right?
21     A    Yes.
22     Q    And in other cases you have been as well;
23 correct?
24     A    Yes.
25     Q    Okay.  And you sent Mr. Pagliarini a copy

Page 132

1  of the alleged serious violations of US law, the
2  crime log and the ship's security incident report?
3      A    I don't know what I sent him.
4      Q    Okay.  Are you -- what is the -- why are
5  you -- why are you, sir, the person who is to
6  initiate contact with the FBI?
7      A    It's basically the protocol of our office.
8      Q    Okay.
9      A    The ship is -- is doing their
10 investigation and we notify -- pursuant to the CVSSA
11 we notify the appropriate FBI agency -- a -- office
12 or RA, and give them a brief synopsis of the initial
13 investigation.
14     Q    Okay.  So you would have told
15 Mr. Pagliarini -- Pagliarini what your -- what the
16 synopsis was of the investigation that had been
17 conducted by Carnival?
18     A    I would have told Special Agent Pagliarini
19 a brief synopsis of the allegation, the
20 investigation into that allegation.  And then if
21 there was any documentation that was available he
22 would have gotten that.
23     Q    So if you were -- if I were to tell you
24 that according to the Carnival Cruise Lines report
25 of serious alleged violations of the US law you made

Page 133

1  contact with the FBI Agent Mathew Pagliarini at 2:25
2  p.m. on September 3rd, 2014?
3      MR. LARA:  Objection.
4      A    No, it would have been before that.
5      Q    (By Mr. Gerson) Okay.  Let me show you and
6  ask you if you that refreshes your recollection as
7  to when you made contact with the FBI and notified
8  them of the rape of Lindsey Horne?
9      A    That's not when I notified him.
10     Q    Okay.  When did you notify him?
11     A    I notified Special Agent Pagliarini, it
12 would have had to have been, I believe it was
13 around -- spoke with the ship probably 11:00
14 o'clock -- about 12:00 o'clock.
15     Q    12:00 o'clock that day?
16     A    On the -- that day after I was notified,
17 yes, 12:00 o'clock.
18     MR. LARA:  What day?
19     Q    (By Mr. Gerson) What day?
20     A    The day of the incident.
21     Q    So you notified the ship -- or, excuse me,
22 you notified the FBI at 12:00 o'clock a.m. --
23     A    No.
24     Q    -- 12:00 o'clock p.m. --
25     A    12:00 o'clock p.m.

Page 134

1    Q    -- on September 3rd, 2014?
2    A    Correct.
3    Q    So the fact that this says 2:25, you're
4  telling me that you'd actually contacted them two
5  and a half hours earlier?
6    A    Correct.
7    Q    And so what did you tell him, the FBI
8  agent?
9    A    Verbatim I don't know what it was
10 verbatim, but as a --
11   Q    Do you have any documentation of
12 contacting the FBI agent at 12:00 o'clock?
13   A    Yes, I do.
14   Q    Okay.  What documentation do you have?
15   A    It's a report that I generated.
16   Q    And where is that?
17   A    I don't know.
18   Q    What's it called?
19   A    The investigative report.
20   Q    And the investigative report, is that
21 something that is provided to the FBI pursuant to
22 Carnival's policies and procedures or is that just a
23 document that you generate on your own?
24   A    It's an internal document.
25   Q    Do you know if that --

Page 135

1    A    -- completed in anticipation of
2  litigation.
3    Q    And you provided that to -- you provided
4  that document to the FBI?
5    A    No.
6    Q    Okay.  When you say it's completed in
7  anticipation of litigation, what is the name of the
8  document exactly?
9    A    Investigative -- investigation report.
10   Q    Investigation report?
11   A    Yes.
12   Q    And you prepare the report?
13   A    Yes, I do.
14   Q    And how many pages is the report?
15   A    I believe three, four maybe.
16   Q    And who did you provide the report to?
17   A    It's an internal document.
18   Q    Who do you provide it?
19   A    I provide it to my vice-president,
20 Dom Froyo.
21   Q    And when are you supposed to provide
22 Mr. Froyo with an investigation report?
23   A    There's no set -- no set time table.  It's
24 just in a timely manner.
25   Q    And what is it -- do you write the report

Page 136

1  up yourself or is this a form that you fill out?
2    A    It's written up myself.  It's a form that
3  I complete.
4    Q    Okay.  And did you -- did you type it all
5  up?
6    A    Yes.
7    Q    Did you write it -- were there any
8  photographs attached?
9    A    No, there's -- it's a stand alone report.
10   Q    Okay.  And when are you supposed to
11 prepare this investigation report?
12        MR. LARA:  Objection.
13   A    Again, it's in a timely manner.  There's
14 no set time table.
15   Q    (By Mr. Gerson) Okay.  And you provide it
16 to your VP?
17   A    Correct.
18   Q    And who else?
19   A    That's it.
20   Q    Okay.  And that's a separate document from
21 the incident report?
22   A    Totally separate.
23   Q    Totally separate.  Okay.  And does it get
24 sent to legal?
25   A    No.

Page 137

1    Q    Does it --
2    A    Not that I'm aware of.
3    Q    Does it get sent to Mike Panariello?
4    A    It stays in our office.  It does not get
5  sent to legal.  It's a -- it stays -- not that I
6  know of unless -- it stays in our office.
7    Q    Okay.  Going back to your -- you said that
8  your initial contact with the FBI is documented in
9  this report?
10   A    Correct.
11   Q    And so this report would identi -- would
12 indicate when you made contact with the FBI?
13   A    Correct.
14   Q    Okay.  Are you supposed to advise the FBI
15 of what the -- what Carnival's investigation
16 shows -- showed thus far?
17   A    Well, yes, to give them -- an idea of
18 what -- what the allegation is and -- and --
19   Q    Okay.  So it's called a -- just an
20 investigation report?
21   A    Correct.
22   Q    And you don't do this every -- every case,
23 do you?  You don't do -- you don't file an
24 investigation report under every circumstance, do
25 you?

Page 138

1    A    Not in every circumstances, no.
2    Q    Okay.  You decide when to do it, when you
3 don't?
4    A    We have certain protocol when it's done.
5    Q    Okay.  And what are those protocols?
6    A    Any violation of a -- designated CVSSA
7 crime.
8    Q    What else?
9    A    Internal investigations.
10   Q    Okay.
11   A    Anything that would -- any incidents
12 involving -- incidents that would have happened on
13 the company grounds, if there was a -- involving
14 employees or that would elevate itself to a
15 criminal -- criminal acts.
16   Q    Where is -- how do you know what the
17 guidelines are for preparing an investigation
18 report, is that in the Carnival security manual?
19   A    No.
20   Q    Okay.  Is it just a -- a verbal -- verbal
21 procedure?  Meaning, you know, what -- how do you
22 know when you're supposed to do it, when you're not
23 supposed to do it?
24   A    Through our training, that's how we're --
25 we're trained to do --

Page 139

1    Q    Okay.
2    A    -- invest --
3    Q    There's nothing -- so there's no written
4 document that says you should file -- you should
5 prepare an investigation report in any, you know,
6 manual or policy, written policy that you're aware
7 of?
8    A    There may be, I -- I don't know.  But
9 basically any -- any crime designated in the CVSSA
10 an investigative report is done.
11   Q    Okay.  So you read this report before
12 coming in for your deposition today?
13   A    Yes, I looked at it.
14   Q    Okay.  When did you look at it?
15   A    Few days ago.
16   Q    Okay.  And did you discuss it with
17 Mr. Dominick Fanello, I think that's his name?
18   A    Froyo.
19   Q    Froyo, excuse me.
20   A    F-R-O-Y-O.
21   Q    Mr. Froyo?
22   A    Discuss it when with him?
23   Q    Why did you review the investigative
24 report?
25   A    Because it was part of this -- the

Page 140

1 information.
2    Q    Okay.  What information does it contain?
3    A    It contains the information where the FBI
4 was notified.
5    Q    Okay.  And does it have -- contain
6 recommendations to how to prevent another incident?
7    A    No.
8    Q    Okay.  What -- it doesn't attach a copy of
9 the incident report or anything like that, does it?
10   A    It's a stand alone document.
11   Q    Okay.  And this is -- so it's not a
12 document that is used ordinarily in the course and
13 scope of Carnival's business, is there --
14   A    I don't understand your question.
15   Q    Sure.  It's not a document that you're
16 supposed to prepare every time something happens?
17   A    We're supposed to prepare it in respect to
18 certain incidents, every time certain incidents
19 happen.  As I said before, every time you see CVSSA
20 incidents happen, document needs to be prepared.
21   Q    Okay.  So when was the investigative
22 report provided to Dominick Froyo?
23   A    I don't -- I don't have a date.  I don't
24 know.
25   Q    Approximately.

Page 141

1    A    All I can tell you, Mr. Gerson, that I
2 presented it to him in a timely manner.
3    Q    Okay.  So a timely manner within a week of
4 the incident?
5    A    Two weeks.  A week, two weeks, I don't
6 know.
7    Q    Okay.  So Mr. Froyo, every time that there
8 is a serious incident or violation under the CVSSA,
9 you prepare an investigative report and that report
10 is provided to Mr. Froyo?
11   A    That is when there's an allegation of --
12   Q    Right.  I appreciate the distinction.
13   A    Thank you.
14   Q    Now, do you also, in the report, document
15 the ship's findings in investigations?
16   A    Yes, some of it.
17   Q    Not all of it?
18   A    It depends.
19   Q    Okay.  When you speak -- when you spoke
20 to -- when you spoke to Special Agent Pagliarini,
21 did you tell Mr. Pagliarini that there was evidence
22 that Lindsey Horne had been raped?
23   A    First of all, that had been allegedly
24 raped.  And I don't believe I did tell him there was
25 any evidence.

Page 142

1    Q    If there was evidence that -- based on
2   Carnival's investigation that Lindsey Horne had been
3   raped, is that something that you're -- that you're
4   supposed to inform the FBI about?
5        MR. LARA:  Objection.
6    A    I would have given Special Agent
7   Pagliarini a synopsis of the investigation, initial
8   investigation conducted by the ship.
9    Q    (By Mr. Gerson) That's not my -- that
10  wasn't my question, but I appreciate the answer.  My
11  question, sir, is if you were made aware of evidence
12  from Carnival's investigation that Lindsey Horne was
13  in fact raped, is that information that you are
14  supposed to provide to the FBI?
15       MR. LARA:  Objection.
16   A    Okay.  First of all, it would be an
17  allegation of rape.
18   Q    (By Mr. Gerson) Okay.  Go ahead.
19   A    Okay.  And if there was evid -- evidence
20  or -- pursuant to that allegation I would have -- I
21  can't imagine I would not have told Special Agent
22  Pagliarini.
23   Q    So if there was evidence based on your
24  investigation shoreside with Carnival's shipboard
25  investigation that Lindsey Horne was in fact raped,

Page 143

1   you would have relayed that information to the FBI
2   and said, we've determined on our own that there's
3   evidence of a rape?
4    A    No.
5    Q    You wouldn't?
6    A    Well, first of all, we would have made
7   that determination.
8    Q    As part of your investigation do you speak
9   to ship personnel about what -- what their
10  investigation revealed?
11   A    Yes, the investigation.  It still remains
12  an allegation and we will present evidence and
13  statements pursuant to that allegation to law
14  enforcement.
15   Q    Okay.  Did you provide any evidence of any
16  of the allegations that Lindsey Horne was raped?
17   A    Again, allegedly raped.  And we would have
18  provided the FBI with written statements of the
19  parties involved prior -- I believe it was prior to
20  them getting into port.
21   Q    Is it -- is it common in the course and
22  scope of Carnival's business and as part of their
23  investigations that people like yourself or, excuse
24  me, the security officers, speak with the shipboard
25  physicians --

Page 144

1        MR. LARA:  Objection.
2    Q    (By Mr. Gerson) -- when a rape or sexual
3   assault has been alleged?
4    A    It's been -- not usually for the simple
5   reason a lot of times the HIPAA requirements are in
6   the place or the -- but there's times, depending on
7   if the -- what the guest allows, but it's up to
8   medical.
9    Q    Okay.  So it wouldn't be out of the
10  ordinary for the chief security officer to speak
11  with the physicians about their findings?
12   A    Oh, the chief, yeah.
13   Q    Yeah, that's what I mean.
14   A    Yeah, the chief would talk to the medical
15  and I don't know what they discuss.
16   Q    Okay.  But then -- and then if -- they
17  could come back and tell you what they discussed
18  with the medical and then you could pass that
19  information along to the FBI?
20       MR. LARA:  Objection.
21   A    That information would be relayed to the
22  FBI either through the doctor or when they arrive or
23  whatever.
24   Q    (By Mr. Gerson) So you would expect the
25  doctor in conversations with the FBI to relay the

Page 145

1   same information as to their findings as they
2   relayed to the chief security officer; right?
3        MR. LARA:  Objection.
4    A    I can't speak for what the doctor would
5   say.
6    Q    (By Mr. Gerson) Well, you would at least
7   expect -- Carnival would expect that it's doctors
8   are reporting accurately their findings to the FBI;
9   right?
10       MR. LARA:  Objection.
11   A    Again, I don't know what was relayed to
12  the chief security officer and I don't know what was
13  relayed to the FBI, but I would --
14   Q    (By Mr. Gerson) Well -- sorry, go ahead.
15   A    No, but if the FBI, pursuant to this
16  allegation, interviewed the doctor, I would assume
17  that the doctor would be accurate in his -- you
18  know, with the -- with the -- respect to his
19  performance of his duties.
20   Q    I'm going to ask you this question
21  personally, sir, Mr. Williams, Robert Williams, did
22  you personally tell anyone from the FBI that based
23  on Carnival's investigation that there was evidence
24  that Lindsey Horne had been raped?
25   A    Absolutely not.

Page 146

1    Q    Okay.  And that's because you were not
2  aware of any evidence from any investigation that
3  Lindsey Horne had been raped; correct?
4    A    I wouldn't have done that -- an allegation
5  until it's invested by law enforcement.
6    Q    Wasn't what I was saying.  If you were --
7  if in response to an allegation information was made
8  available to you as part of the investigation that
9  Carnival's investigation revealed that in fact
10  Lindsey Horne had been raped, you would have
11  communicated that to the FBI?
12       MR. LARA:  Objection.
13    A    No, I would have still maintained that
14  there's an allegation of rape and here is the
15  investigative findings.
16    Q    (By Mr. Gerson) Okay.  So if the
17  investigative findings included that Lindsey Horne
18  was raped, you would have included that, you would
19  have provided that to the FBI or told them yourself?
20       MR. LARA:  Objection.
21    A    I would have not said Lindsey Horne was
22  raped.  I would have said there was an allegation of
23  rape and provided the pertinent documentation to the
24  FBI.  I would not say she was raped.
25    Q    (By Mr. Gerson) Okay.  What if you were

Page 147

1  told by the ship that there was evidence that
2  Lindsey Horne was raped?
3       MR. LARA:  Objection.
4    A    I would have still maintained it's an
5  allegation.
6    Q    (By Mr. Gerson) Would you have told the
7  FBI that there is at least evidence in support of
8  the allegation that Lindsey Horne was raped?
9    A    I would have forwarded the -- whatever
10  documents were forwarded to me, provided them to the
11  FBI, and the FBI can do their own investigation and
12  come up with their own determination if there was a
13  crime committed or not.
14    Q    Okay.  So you never told anyone from the
15  FBI there was any evidence to support the fact that
16  Lindsey Horne was raped the way that she says she
17  was?
18    A    No.
19    Q    And Carnival never informed anyone from
20  the FBI that based on their investigation that there
21  was evidence in support of the allegation that
22  Lindsey Horne was raped?
23       MR. LARA:  Objection.
24    A    Again, I don't know what communications
25  occurred between the doctor and the FBI, but as far

Page 148

1  as with the security, as far as our investigation,
2  it's an allegation until turned over to law
3  enforcement.
4    Q    (By Mr. Gerson) Did you ever provide a
5  copy of the investigative report to your attorneys?
6       MR. LARA:  Objection.  Don't answer that
7  question.  Any communications, including
8  anything in written format between you and your
9  attorneys is privileged and confidential
10  communication.
11       MR. GERSON:  Well --
12       MR. LARA:  Don't answer that question.
13    Q    (By Mr. Gerson) Did anyone assist you in
14  writing the investigative report before you provided
15  it to the VP, Dominick Froyo?
16    A    No.
17    Q    Did you discuss the report with
18  Dominick Froyo after it was -- after you read the
19  report?
20    A    I don't know if we had a discussion, but
21  I'm sure we had some type of discussion.  I don't
22  know what specifics it was, but he was given the
23  report for his review.
24    Q    Okay.  And how many of those reports have
25  you written.

Page 149

1    A    In?
2    Q    The last three years.
3    A    30.
4    Q    And out of those 30 those were all rape
5  and sexual assaults?
6       MR. LARA:  Objection.
7    A    No.
8    Q    (By Mr. Gerson) What -- what other
9  incidents have they -- well, you said they were for
10  crimes under the CVSSA; right?
11    A    Right.  And I also said for internal
12  investigations, for investigations that occur on
13  Carnival property, investigations involving Carnival
14  employees.
15    Q    Okay.  So do you know what the purpose of
16  the report is?
17    A    Yes.
18    Q    What is the purpose of the report?
19    A    It's to memorialize our -- our -- our part
20  in the investigation.
21    Q    Why isn't the ship incident report and the
22  statements good enough to memorialize Carnival's
23  investigation?
24       MR. LARA:  Objection.
25    A    Because shoreside we have a part to play

Page 150

1  with respect to notifying the FBI and liaison with
2  the FBI and that point is documented in these
3  reports also.
4       Q    (By Mr. Gerson) So this report that you're
5  describing better details Carnival's involvement and
6  communications and dealings with the FBI in the
7  event of a serious crime?
8       A    No.  I think the -- the ship has the
9  majority of the involvement with the FBI once they
10 board the ship to conduct an investigation. Ours is
11 more of a supportive effort with respect to making
12 sure the FBI's notified, making sure that the FBI
13 has all available pertinent documentation available
14 to them prior to responding to the vessel so they
15 have a clearer image of exactly what's happening.
16      Q    Do you know whether or not anyone was
17 arrested as a result of this incident?
18      A    I'm not aware of anybody.
19      Q    Okay.  Do you know why?
20           MR. LARA:  Objection.
21      A    That's a law enforcement decision.
22      Q    (By Mr. Gerson) Okay.  Are you aware of
23 whether or not anyone was criminally charged for
24 what happened to Lindsey Horne or anyone else that
25 Lindsey Horne was traveling with on

Page 151

1  September 3rd, 2014?
2       A    Again, that's a law enforcement decision.
3  I'm not aware of anyone.
4       Q    Okay.  Isn't it true that, so far as you
5  know, that there were no -- there was -- no one was
6  arrested?
7       A    I'm not aware of any arrest.
8       Q    Okay.  And you don't know why that is?
9       A    It's a -- like I said, it's a law
10 enforcement decision.
11      Q    Okay.  But you would agree, sir, that
12 Carnival is responsible for assisting law
13 enforcement with their investigation into crimes
14 that occur on its ships; correct?
15           MR. LARA:  Object -- objection.
16      A    I'm sorry, can you rephrase that, what you
17 said?
18      Q    (By Mr. Gerson) You would agree that
19 Carnival is responsible for assisting FBI and law
20 enforcement with criminal investigations?
21           MR. LARA:  Objection.
22      A    Carnival Cruise Lines is responsible for
23 assisting the FBI, notifying the FBI pursuant to the
24 CVSSA and assisting the FBI in their response to
25 that notification.

Page 152

1       Q    (By Mr. Gerson) Okay.  And Carnival did
2  that in this case; correct?
3       A    Correct.
4       Q    And of the -- move to strike that.  As
5  part of the investigation into this incident did
6  Carnival attempt to retrieve any CCTVs for the route
7  of travel that Ms. Horne and any of the people
8  involved in this incident would have taken on the
9  night of this incident?
10      A    Yes.
11      Q    Okay.  What did Carnival do to try to
12 locate video?
13      A    There is no video.
14      Q    Okay.  What is Carnival's ex -- what is
15 the total number of security cameras that are on the
16 Sensation?
17      A    Security cameras?
18      Q    Yes.
19      A    Security cameras, roughly 50.
20      Q    And how many of those are in the casino?
21      A    Well, those are the stationary.  There's
22 security cameras and then there's other cameras.
23      Q    Okay.
24      A    Are you talking -- what are you talking
25 about?

Page 153

1       Q    Okay.  Well, tell me what the difference
2  between the security camera and whatever distinction
3  you're making?
4       A    There's cameras that are in the security
5  office and then there's your casino cameras and
6  different other cameras at various points of the
7  ship.
8       Q    Okay.  How many cameras in total are there
9  on the Sensation?
10      A    Roughly about 135, somewhere in that area.
11      Q    Okay.  And of those 135, how many of them
12 were capable of capturing video?
13      A    Of recording?
14      Q    Yes, that's what I mean, capturing
15 recording.
16      A    Well, I -- this is a rough guess, maybe
17 70.
18      Q    Okay.
19      A    80.
20      Q    And of those 70 or 80 are there any
21 cameras capable of recording video by the pizzeria
22 where Lindsey Horne and her friends were before the
23 events in this matter?
24      A    No.
25      Q    Okay.  Were there any video -- so it's

Page 154

1   your testimony there are -- there are none in that
2   area at all?
3       A    There's no cameras recording.
4       Q    Are there cameras at all?
5       A    I don't believe there are.
6       Q    Okay.  So where -- did Carnival do
7   anything to look for the video?
8       A    Yes.
9       Q    Who -- who looked?
10      A    The ship looked to determine if there was
11  any CCTV coverage of the parties and there is no
12  CCTV camera.
13      Q    Were you involved in that part of the
14  process?
15      A    I was not involved in looking.
16      Q    Okay.  Who was?
17      A    That would have been conducted by the
18  ship's security.
19      Q    Who in the ship's security would have been
20  involved?
21      A    Chief and assistant chiefs.
22      Q    So Mr. Misquitia and Mr. Manuel?
23      A    I believe they would have been the ones
24  that would have done that, unless they delegated it
25  out, but they would have been the ones that did

Page 155

1   that.
2       Q    Are they required, as part of this
3   reporting requirement, to document that they in fact
4   checked the CCTV cameras and weren't able to locate
5   any video?
6       A    It should -- it should have been on the --
7       Q    Do you know whether or not they did that
8   in this case?
9       A    I believe if you look at the -- in the
10  ship security incident report it's documented in
11  there as there's no CCTV coverage.
12      Q    Okay.  And so your interpretation of that
13  is that they looked and they weren't able to find
14  any?
15      A    There is none.
16      Q    Okay.  How is there not one piece of video
17  footage from the pizzeria to Lindsey Horne's state
18  room?
19           MR. LARA:  Objection.
20      A    There's no cameras recording it.
21      Q    (By Mr. Gerson) Okay.  So it's your
22  testimony that there are no cameras that are
23  recording in any -- well, let me ask you this.  Did
24  your security officers go back and trace the route
25  of travel that Lindsey Horne and Troy Randle and

Page 156

1   Lamarcus James took on that night?
2           MR. LARA:  Objection.
3       A    I don't know what they did.
4       Q    (By Mr. Gerson) So Carnival doesn't know
5   what was done?
6       A    I assume as part of that investigation
7   previous they would have -- they would have checked
8   to make sure that there was no CV -- CCTV coverage
9   in the areas that the parties were alleged to be
10  observed at.
11      Q    The audit that you conducted recently --
12  the assessment, excuse me --
13      A    Yes.
14      Q    -- did you provide that -- did you provide
15  the findings in your assessment to Mr. Froyo?
16      A    As I've stated before, there's no official
17  document relating to the assessment.
18      Q    Okay.  Is there any particular reason why
19  you wouldn't memorialize your findings of a security
20  assessment into an official document?
21      A    Because that was, as I said before, the
22  location of the cameras was -- IT, corporate IT is
23  the -- basically the supervising department
24  responsible for that and we assisted them with the
25  assessment.

Page 157

1       Q    Are you aware of any corrective action for
2   the Sensati -- for any Carnival vessel within the
3   three years prior to the date Lindsey Horne was
4   raped at all?
5       A    No.
6       Q    Carnival hasn't done anything to try to
7   improve the security on any of its ships in response
8   to any rape or sexual assault in the last three
9   years, has it?
10          MR. LARA:  Objection.
11      A    No, for -- because, again, I believe that
12  Carnival provides adequate security to keep our
13  guests in a reasonably safe environment.
14      Q    (By Mr. Gerson) Okay.  The only efforts
15  that Carnival has ever undertaken to improve the
16  quality of security on its vessels are when congress
17  comes in and passes a law and tells Carnival you
18  need to put peepholes on every door and you need to
19  have a rape kit and things like that; correct?
20      A    Well, as I stated before, the rape kits
21  were on the ship already.
22      Q    Okay.
23      A    And peepholes were on most of the cabin
24  doors already.
25      Q    Okay.  Carnival has never taken any

Page 158

1    independent action to try and improve the quality of
2    security measures on its ships to deter against
3    rape, sexual assault on any vessel that you're aware
4    of?
5         MR. LARA:  Objection.
6         A    Again, the measures that Carnival has in
7    place are adequate to assure reasonable safety to
8    our guests.
9         Q    (By Mr. Gerson) Would it be unreasonable
10   for Carnival to increase the number of security
11   guards in relation to the number of passengers each
12   ship provides?
13        MR. LARA:  Objection.
14        A    Again, I -- I can stay here all day and
15   answer this.  Again, Carnival provides an adequate
16   security measures to keep our guests in a reasonably
17   secure environment.
18        Q    (By Mr. Gerson) Would it be unreasonable
19   for Carnival to add more security personnel to its
20   ships?
21        MR. LARA:  Objection.
22        A    Again, Carnival provides reasonable --
23   adequate security to keep our guests reasonable.
24        Q    (By Mr. Gerson) Okay.  I understand that,
25   but would it be unreasonable for Carnival to add

Page 159

1    more security guards?
2         MR. LARA:  Objection.
3         A    I believe so, yes.  What we're doing right
4    now is -- is -- we have good security measures in
5    place.  I believe, yes.
6         Q    (By Mr. Gerson) Okay.  So even though,
7    sir, Carnival's security officers have been voicing
8    a need for more security coverage and more cameras
9    in the corridors, Carnival still thinks it would be
10   unreasonable for them to provide more security
11   officers?
12        MR. LARA:  Objection.
13        A    What I'm saying is Carnival has adequate
14   security measures in place to assure that our guests
15   are in a reasonably safe environment.
16        Q    (By Mr. Gerson) And what is a reasonably
17   safe environment?
18        MR. LARA:  Objection.
19        A    I think I've said that before.
20        Q    (By Mr. Gerson) I don't think so.
21        A    Yes.
22        MR. LARA:  Asked and answered.
23        Q    What's a reasonably safe environment?
24        MR. LARA:  Objection.
25        A    Where our guests can go onboard the cruise

Page 160

1    and be able to enjoy themselves in a safe, secure
2    environment.  Reasonably safe, secure environment.
3         Q    (By Mr. Gerson) What security measures are
4    in place to deter and prevent passengers from being
5    sexually assaulted on Carnival ships?
6         A    Again, we have an adequate number of
7    security officers on board the ships.  We have
8    security measures in place, security patrols.  We
9    have -- all our crew members are trained in patrol
10   techniques and suspicious activity techniques,
11   awareness, so to be able to report any suspicious
12   incidents to security in immediate fashion.
13        Q    What were the total number of passengers
14   on the Sensation the day Lindsey Horne was raped?
15        A    I believe it was around 2400, somewhere in
16   there.
17        Q    Okay.  And do you know how many security
18   officers were on duty between the hours of 12:00
19   o'clock a.m. and 6:00 o'clock a.m?
20        A    I think it varied between four and six
21   officers.
22        Q    Okay.  Sir, do you know, not what you
23   think?
24        A    Well, depending on what time it was, there
25   would have been different officers, number of

Page 161

1    officers working.
2         Q    Okay.  You would rely on -- well, let me
3    ask you this.  You don't know with any certainty how
4    many security officers are patrol -- were on duty
5    at the time that this incident occurred, do you?
6         A    Normally --
7         Q    Well, normally --
8         A    -- well, there's between four and six.
9         Q    Okay.
10        A    And six -- I should say six at the
11   beginning and then down to four.
12        Q    Do you know how many security officers
13   were on duty at the time of this incident?
14        A    No.  I can give you what is normal.
15        Q    I don't want -- I don't want you to guess.
16        A    Okay.
17        MR. LARA:  Just a moment.  He should be
18        able to answer the question.  You were saying?
19        A    What I was saying is, normally between
20   those hours, there's -- starts off at six security
21   officers, five to six security officers at midnight
22   and then by the time you get down to 3:00 o'clock or
23   4:00 o'clock it goes down to four officers.
24        Q    (By Mr. Gerson) Who determines the
25   schedule?

Page 162

```
1      A    The staff captain and chief security
2 officer.
3      Q    Who determines the staffing requirements?
4      A    As far as how many officers are on a
5 vessel?
6      Q    Yes.
7      A    That would be shipboard personnel.
8      Q    Okay.  What is the director of security's
9 involvement in that?
10     A    He makes recommendations with respect to
11 that, the shipboard personnel.  He is ultimately
12 the -- the one that will make the -- the
13 determination of the number of guards or officers on
14 board.
15     Q    Okay.  Mr. Panariello is in a higher
16 position of authority than you are, you would agree
17 with that, would you not?
18     A    Yes.
19     Q    Okay.  You would agree that Mr. Panariello
20 would have more knowledge about the number of
21 security officers that are deployed at a given time
22 on a vessel such as the Sensation, would you not?
23          MR. LARA:  Objection.
24     A    I have an understanding of how many
25 officers are involved.  Mr. Panariello is
```

Page 163

```
1 responsible for the security officers throughout the
2 fleet.
3      Q    (By Mr. Gerson) Okay.  So you would defer
4 to Mr. Panariello then as far as the number of
5 security officers that were working during this time
6 frame, would you not?
7          MR. LARA:  Objection.
8      Q    (By Mr. Gerson) You've already indicated
9 to me that you're not sure, Mr. Panariello has
10 indicated that he -- he knew?
11         MR. LARA:  Objection.
12     A    What I indicated was I believe there was
13 four to six officers --
14     Q    (By Mr. Gerson) Okay.
15     A    -- depending on the time in question.
16     Q    Okay.  But you don't know whether -- you
17 don't know how many security officers were on duty
18 at the time?
19     A    No.
20         MR. LARA:  Objection.
21     Q    (By Mr. Gerson) Okay.  Mr. Panariello,
22 that's his job; right?
23         MR. LARA:  Objection.
24     A    One of his many.
25     Q    (By Mr. Gerson) Okay.  One of -- one of
```

Page 164

```
1 Mr. Panariello's many jobs is to know the deployment
2 personnel and allocation of deployment personnel
3 because he's the director of security; right?
4      A    I don't understand what --
5      Q    (By Mr. Gerson) Sure.  When you were the
6 director of security at the Nevada or the -- the
7 gaming company --
8      A    Uh-huh.
9      Q    -- you were -- as the director of security
10 you were responsible for the deployment of security
11 personnel; right?
12     A    Correct.
13     Q    And just like Mr. Panariello is
14 responsible for the deployment of security personnel
15 on Carnival Ships?
16     A    Well, shipboard personnel is responsible
17 for the deployment.
18     Q    Okay.  But as far as staffing levels,
19 Mr. Panariello, that's his job?
20     A    Shipboard personnel, budgeting, there's
21 several factors involved with allocation of
22 manpower.
23     Q    Okay.  And you don't know what the -- how
24 many sec -- security patrol logs did you review in
25 preparation of your deposition today?
```

Page 165

```
1      A    I don't recall.  Four, five, something.  I
2 don't recall.
3      Q    Four or five?
4      A    I believe so.
5      Q    And were they all for the hours of 12:00
6 o'clock a.m. to 6:00 o'clock a.m.?
7      A    I believe they were -- some were -- I
8 believe they were for the day.  I -- I don't -- I
9 don't know.
10     Q    So how many of the security patrol logs
11 for this vessel did you review between the hours of
12 12:00 o'clock a.m. and 6:00 o'clock a.m.?
13     A    I don't recall.
14     Q    Some of the -- some of the patrol logs
15 that you reviewed were for different shifts other
16 than 12:00 o'clock a.m. and 6:00 o'clock a.m.?
17     A    Again, I don't recall.
18     Q    Okay.  Well, sir, take a look at number
19 60.
20     A    Uh-huh.
21         MR. LARA:  6-0?
22         MR. GERSON:  6-0.
23     Q    (By Mr. Gerson) Did you not know, sir,
24 that you were going to be asked questions about the
25 security patrol logs for the incident or for the day
```

Page 166

1   of this incident?
2       A    No, I knew.
3       Q    Okay.  So out of the four or five that you
4   reviewed --
5       A    I'm just saying approximate -- I don't
6   recall how many.
7       Q    Well, when did you look at them?
8       A    Maybe -- maybe last week sometime.
9       Q    Why'd you look at them?
10      MR. LARA:  Why?
11      MR. GERSON:  Yeah, why?
12      MR. LARA:  Okay.
13      Q    (By Mr. Gerson) What did -- why did you
14  look -- why did you look at them?
15      A    Because that's part of the deposition;
16  correct?
17      Q    Okay.  So why don't you remember what you
18  looked at?
19      MR. LARA:  Objection.
20      Q    (By Mr. Gerson) You can answer.  What's
21  your explanation as to why you don't know what the
22  security patrol logs showed?
23      MR. LARA:  Objection.
24      A    I looked at a lot of things.
25      Q    (By Mr. Gerson) What else did you look at?

Page 167

1       MR. LARA:  Objection.
2       A    And I don't recall the exact specifics of
3   the security watch logs.
4       Q    (By Mr. Gerson) Sir, couldn't Carnival be
5   doing more than it's doing to protect its
6   passengers?
7       MR. LARA:  Objection.
8       A    No.
9       Q    (By Mr. Gerson) Couldn't Carnival be doing
10  more to protect their passengers from being raped
11  and sexually assaulted?
12      A    No.
13      MR. LARA:  Objection.
14      Q    (By Mr. Gerson) So Carnival's testimony is
15  it's doing everything they possibly can to make sure
16  that its cruise ships are safe as they are as any
17  land based environment?
18      MR. LARA:  Objection.
19      A    As reasonably -- Carnival Cruise Lines
20  provides our guests with a reasonable expec -- we
21  provide a reasonable expectation of security to our
22  guests.
23      Q    (By Mr. Gerson) What are the total number
24  of crew members serving on the Sensation or what
25  were the total number of crew members?

Page 168

1       MR. LARA:  Objection.
2       A    I -- offhand, I believe it was around 890,
3   somewhere in that area.  890 I believe,
4   approximately.
5       Q    (By Mr. Gerson) Do you know?
6       A    I said approximately 890.
7       Q    Do you -- what is the basis for that
8   statement?
9       A    Basically I -- I believe it was review of
10  the documentation.
11      Q    What documentation?
12      A    That was provided.
13      Q    Can you tell me what the documentation is?
14      A    The ship's security report.  I don't have
15  the -- whatever the ship's security had the numbers
16  on the -- the bottom.
17      Q    Okay.  You prepared for your deposition
18  today I imagine?
19      A    Yes.
20      Q    Okay.  You met with one of your attorneys?
21      A    Yes.
22      Q    Mr. Lara or someone else?
23      A    Yes.
24      Q    Okay.  When did that meeting take place?
25      A    Roughly about 11:00 o'clock a.m.

Page 169

1       Q    Is that the first time you ever spoke with
2   a lawyer from Mr. Lara's office about your
3   deposition testimony in this case?
4       A    No.
5       Q    How many times have you met with a lawyer
6   from Mr. Lara's office in preparation of your
7   deposition?
8       A    Once or twice, tops.
9       Q    Okay.  And who else did you meet with
10  other than Mr. Lara?
11      A    Thomas Briggs.
12      Q    And when did you meet with Mr. Briggs?
13      A    For -- last week sometime I believe.
14      Q    Okay.  And that occurred in your office?
15      A    Yes.
16      Q    And who else was present for that meeting?
17      A    Victor.  I don't know his -- Victor's last
18  name.
19      MR. LARA:  Palaez, P-A-L-A-E-Z.
20      Q    (By Mr. Gerson) Okay.  Anyone else?
21      A    No, I think that's it.
22      Q    Have you ever spoken with Susie Vazquez
23  about your deposition testimony?
24      A    No.
25      Q    Have you spoken with Mr. Froyo about your

Page 170

1  deposition testimony?
2      A    To the extent that I told him I was being
3  deposed. He's my boss, just wanted to let him know
4  where I was.
5      Q    When was the last time that you spoke to
6  Mr. Froyo about this case?
7      A    I saw him this morning.
8      Q    Okay. And was that in the presence of
9  counsel?
10     A    No.
11     Q    And what conversations did you have?
12     A    I told him that I was going to be deposed
13 today.
14     Q    Did he give you any advice?
15     A    No.
16     Q    Did you discuss anything about the context
17 of your deposition testimony?
18     A    No.
19     Q    So Mr. Froy -- that wasn't the first time
20 you ever spoke to Mr. Froyo about this case, was it?
21     A    I believe I testified earlier that I have
22 spoken with him prior -- prior.
23     Q    How many times would you say you've spoken
24 to Mr. Froyo about your knowledge of what happened
25 to Lindsey Horne?

Page 171

1          MR. LARA:  Objection.
2      A    I don't know the exact number of times.
3      Q    (By Mr. Gerson) More than a few?
4          MR. LARA:  Objection.
5      A    I would say more than a few, a couple of
6  times and that would have been more than like --
7  right around the time of the investigation.
8      Q    (By Mr. Gerson) Have you ever spoken with
9  Troy Randle or Lamarcus James about these events?
10     A    No.
11     Q    Are you aware of any communications with
12 Lamarcus James or Troy Randle other then the
13 statements that were taken as part of Carnival's
14 investigation into what happened?
15     A    You mean any Carnival communication with
16 them?
17     Q    Any communications with them.
18     A    No, I'm not aware of any.
19     Q    Do you know whether or not Lamarcus James
20 and Troy Randle spoke to the investigators with
21 the -- or the -- spoke to any members of law
22 enforcement about what happened in this case?
23     A    I can assume they did.
24     Q    Well, do you know if they did?
25     A    I don't recall what -- what I was told

Page 172

1  regarding their conversations, if there was any
2  conversations with -- between law enforcement and
3  Mr. La -- Lamarcus James or Troy Randle.
4      Q    You don't know?
5      A    Well, I'm sure they did talk to them.
6      Q    Well --
7      A    Would I have firsthand -- do I have
8  firsthand knowledge? No.
9      Q    Okay.
10     A    But I'm sure as a course ---
11     Q    Do you know -- I'm sorry, go ahead.
12     A    I'm sure as a course of their
13 investigation they would have interviewed those
14 parties.
15     Q    Do you know whether or not Troy Randle and
16 Lamarcus James invoked their Fifth Amendment right?
17     A    I have no knowledge on it.
18     Q    Do you know whether or not they actually
19 had any substantive conversations with any members
20 of law enforcement about what happened?
21     A    I have no knowledge of that.
22     Q    So you don't know one way or another
23 whether or not Troy Randle and Lamarcus James
24 actually spoke to law enforcement about what took
25 place?

Page 173

1      A    No, I don't.
2      Q    So according to Carnival no one knows what
3  the conversations, if any, that took place with FBI
4  agents in connection with this investigation?
5      A    I'm not aware.
6      Q    Okay. Same thing for Troy Randle?
7      A    I'm not aware.
8      Q    Same thing with Lamarcus James?
9      A    I'm not aware of either one, what the
10 results of their investigation were.
11     Q    So the fact that the FBI was contacted
12 doesn't mean that the people who were accused of
13 committing this crime said anything to the FBI?
14     A    That's the FBI's investigation. That's
15 not Carnival Cruise Lines' investigation.
16     Q    Okay. And Carnival does -- doesn't --
17 isn't aware of what the results of those
18 communications were?
19          MR. LARA:  Objection.
20     A    Not that I'm aware.
21     Q    (By Mr. Gerson) Now, Carnival's aware, is
22 it not, that there were multiple statements taken of
23 Lamarcus James?
24     A    Two statements.
25     Q    Right. And isn't it true that according

Page 174

1    to the first statement by Lamarcus James, he
2    disclaimed having any involvement or any interaction
3    with Lindsey Horne or any of her cabin mates?
4             MR. LARA:  Objection.
5        A    I believe his statement was roughly that
6    he was walking by and observed something going on
7    and -- at the time and I -- I believe he had
8    interaction with her cabin mates.
9        Q    (By Mr. Gerson) And that statement was
10   taken at about 7:45 in the morning?
11       A    Correct.
12       Q    And according to his statement taken at
13   7:45 in the morning, Mr. James never made any
14   reference to knowing Lindsey Horne or anyone in her
15   cabin, did he?
16            MR. LARA:  Objection.
17       Q    (By Mr. Gerson) Correct?
18       A    That's correct.  That's correct.
19       Q    The only remarks that he made were that at
20   3:30 in the morning that he was going somewhere and
21   he didn't indicate that he was with anyone?
22       A    That's correct.
23       Q    Okay.  And then after his statement was
24   taken Carnival security confined Lamarcus James to
25   another room?

Page 175

1        A    I believe it's to his cabin.
2        Q    To his cabin?  Okay.  And John Manuel is
3    the one who interviewed Lamarcus James; correct?
4        A    I believe so.
5        Q    Okay.  And more than 13 or 14 hours later
6    Mr. James provided a different statement or provided
7    another statement?
8        A    An additional statement; correct.
9        Q    Okay.  And the additional statement was
10   completely opposite of what he initially wrote down;
11   correct?
12            MR. LARA:  Objection.
13       A    It provided other elements to the --
14       Q    (By Mr. Gerson) Okay.  Well, in the first
15   statement there was no mention of Lindsey Horne or
16   anyone by name, was there?
17       A    That's correct.
18       Q    In fact, he used the words three females
19   trying to -- strike that.  Lamarcus James didn't use
20   any names in his first statement; correct?
21            MR. LARA:  Objection.
22       A    I believe you're right, correct.
23       Q    (By Mr. Gerson) Okay.  His second
24   statement that was taken over 13 hours later, he
25   provided names and a -- a completely different story

Page 176

1    as far as where he was coming from, where he was
2    going to and what happened?
3        A    That's correct.
4             MR. LARA:  Objection.
5        A    Correct.
6        Q    (By Mr. Gerson) In fact, in the second
7    statement Lamarcus James claimed at 10:30 p.m. on
8    September the 3rd, 2014, that he engaged in
9    consensual oral self with Ms. Horne?
10            MR. LARA:  Objection.
11       A    Correct.
12       Q    (By Mr. Gerson) And that there was another
13   African American male involved in this -- there was
14   another African American male involved?
15            MR. LARA:  Objection.
16       A    Correct.
17       Q    (By Mr. Gerson) Based on your training as
18   a member of law enforcement, is bruising on the arms
19   and evidence of blood taken in response to a rape
20   kit consistent with forceable rape?
21            MR. LARA:  Objection.
22       A    What -- what do you mean blood taken?
23       Q    (By Mr. Gerson) Well, you know what a rape
24   kit is; right?
25       A    Yes.

Page 177

1        Q    Okay.  A rape kit was conducted on
2    Lindsey Horne?
3        A    Yes.
4        Q    Okay.  And wasn't there evidence of blood
5    from one of the swabs in the rape kit?
6        A    I'm not aware of that.
7        Q    Carnival's not aware of that?
8             MR. LARA:  Objection.
9        A    I'm not aware of it.
10       Q    (By Mr. Gerson) What is your understanding
11   of the -- what is your understanding of the context
12   in which Mr. James decided that he wanted to change
13   his -- or write another statement?
14            MR. LARA:  Objection.
15       A    I can't put myself into Mr. James's
16   mindset.
17       Q    (By Mr. Gerson) Okay.  What is Carnival's
18   understanding of the context in which the statement
19   was made?
20            MR. LARA:  Objection.
21       A    I don't understand what you mean.
22            MR. LARA:  In all fairness, that was my
23   objection too.
24       Q    (By Mr. Gerson) In Mr. Randle's first
25   statement that was taken in this case --

Page 178

1    A    Mr. Randle or Mr. James?
2    Q    Excuse me, sorry.  Mr. James's first
3  statement taken in this case, did he indicate in any
4  way that he knew Lindsey Horne before he wrote that
5  statement?
6         MR. LARA:  Objection.
7    A    No.
8    Q    (By Mr. Gerson) In the first statement
9  that Mr. James wrote and that was provided as part
10 of the investigation in this case, did Mr. James say
11 anything about hanging out with Lindsey Horne or
12 being friendly with her?
13   A    No.
14   Q    In the first statement that Mr. James
15 wrote as part of the investigation in this case did
16 he mention anything about going back with
17 Lindsey Horne, based on any agreement, to have fun?
18   A    No.  The first statement you're talking
19 about?
20   Q    The first statement.
21   A    No.
22   Q    And in Mr. James's second statement he
23 claimed that he was having consensual oral sex with
24 Lindsey Horne?
25        MR. LARA:  Objection.

Page 179

1    Q    Is that correct?
2    A    In those -- somewhat in those words, yes.
3    Q    (By Mr. Gerson) Okay.  And in the second
4  statement he then said that another passenger by the
5  name of Troy Randle came in and also had sex with
6  Lindsey Horne?
7    A    Yes.
8    Q    So in Lamarcus James's second statement he
9  claimed that he started having oral sex with
10 Lindsey Horne and then another friend of his came
11 and then she started having sex with the other male
12 passenger?
13        MR. LARA:  Objection.
14   A    She had sex with them.
15   Q    (By Mr. Gerson) Okay.  So there were --
16 she had sex with -- according to Mr. James's second
17 statement, he had sex -- she had sex with Mr. James
18 and she had sex with another passeng -- with
19 Mr. Randle?
20   A    Correct.
21   Q    Now, the fact that there were two
22 statements taken by Mr. James and Mr. Randle, or
23 excuse me, by -- two statements taken by Mr. James,
24 did you provide both of those statements to the FBI?
25   A    I believe the ship would have, yes.  They

Page 180

1  would have been given to both of those, yes.
2    Q    Do you know whether or not the ship did
3  provide both statements to the FBI?  And by both, I
4  mean Lamarcus James's first statement and
5  Lamarcus James's second statement?
6    A    The first statement I gave I e-mailed to
7  the FBI.  The second one I don't recall if I
8  e-mailed it to the FBI or the ship would have given
9  it to them.
10   Q    So you don't know whether or not the
11 second statement by Lamarcus James was provided to
12 the FBI?
13   A    Personally, no.
14   Q    Does Carni -- Carnival doesn't know?
15   A    I can't speak for what the chief security
16 officer would have given to responding law
17 enforcement.
18   Q    Why wouldn't -- why would the first
19 statement and not the second statement be given to
20 the FBI?
21        MR. LARA:  Objection.
22   A    I don't know what time I received the
23 second statement.  The first statement I received in
24 the afternoon and it was forwarded to the FBI.
25   Q    (By Mr. Gerson) So you provided the first

Page 181

1  statement to the FBI, but you didn't provide the
2  second statement to FBI?
3    A    I do not believe so.
4         MR. GERSON:  I have no further questions.
5             CROSS EXAMINATION
6  BY MR. LARA:
7    Q    The only thing I think for, I guess the
8  sake of good order, is I want to ask you about the
9  specific areas of inquiry that you have come today
10 to testify pursuant to the
11 Plaintiff's Exhibit Number 1, the 30(b)(6) deposition
12 notice.
13        Are you here to give testimony under
14 30(b)(6) for areas one, 10, 11, 12, 13 through 22,
15 through 29 --
16        MR. GERSON:  Hold on.  Uh-huh.
17   Q    (By Mr. Lara) -- 32 and 33, 36 through 49,
18 50 through 58, 59 through 69, 70, including all
19 subparts, 71 through 74, 75, 76, 77, 78, 79?
20   A    Yes.
21        MR. GERSON:  What about 82?
22        MR. LARA:  I don't have an 82.  I have an
23 81.
24        MR. GERSON:  Well, you might not have the
25 right --

Page 182

1    MR. LARA:  It's possible.
2    MR. GERSON:  -- notice, but the witness --
3  I mean, this should have been marked I believe.
4    MR. LARA:  Well, once it's marked we can
5  look at it.
6    MR. GERSON:  Well, I actually -- this is
7  my red ink.
8    MR. LARA:  This is Exhibit 1?
9    MR. GERSON:  Yes.  Is it the same?
10   MR. LARA:  Yeah.  Ends at 81.
11   MR. GERSON:  81.
12   MR. LARA:  And you said 82, but it ends at
13  81.  Okay.  I think we're looking at the same
14  one, Nick.
15   MR. GERSON:  Well --
16   MR. LARA:  Unless you have one that says
17  82?
18   MR. GERSON:  I do.
19   MR. LARA:  Okay.
20   MR. GERSON:  I have one that says 80 --
21  88.
22   MR. LARA:  But the one you handed me --
23   MR. GERSON:  Right.  Well, this is the one
24  that the court -- I guess the court reporter
25  had, but we changed -- we made a couple of

Page 183

1  changes.  Here's the one that was sent.
2    I can probably -- I wouldn't have written
3  all this in.  So this says it was provided to
4  Defense counsel continued from 10/27.  That
5  doesn't really make sense.
6    MR. LARA:  Which is going to be Exhibit 1
7  which is the notice governs for this depo?
8    THE WITNESS:  Do you mind if I --
9    MR. LARA:  No.  It's right in the middle
10  of a question right now.
11   THE WITNESS:  Oh, okay.
12   MR. GERSON:  Okay.
13   MR. LARA:  Were those added to the end?
14   MR. GERSON:  Yes.
15   MR. LARA:  Because what -- what -- I guess
16  what we're marking 1 here, we'll put a sticker
17  on it.  This is Plaintiff's 1.  This one,
18  Exhibit 1, says it was sent on the
19  19th of October.  The one that I was referring
20  to also says it was served on the
21  19th of October.
22   MR. GERSON:  Uh-huh.
23   MR. LARA:  This one says Wednesday,
24  October 28th.
25   MR. GERSON:  Right.  We never re-noticed

Page 184

1  it after your request to --
2    MR. LARA:  Move it to today to 1:00
3  o'clock?
4    MR. GERSON:  Right, but we didn't
5  change any -- we didn't add anything since then
6  either.
7    MR. LARA:  In the one that I have it
8  said -- let's see what the additional --
9    MR. GERSON:  Well, what's -- what's the --
10  what's the issue?
11   MR. LARA:  Well, he's -- my understanding
12  he was here for -- working off the one that
13  went up to number 81.
14   MR. GERSON:  Uh-huh.
15   MR. LARA:  And if you're adding seven new
16  areas I want to look at them to see if these
17  are the areas that he's being deposed on right
18  now.
19   MR. GERSON:  Well, I -- I think I've asked
20  him.
21   MR. LARA:  I think you're right, I just
22  haven't seen this one.
23  Q    (By Mr. Lara) Okay.  Continuing with the
24  last number, which I think was 80 of
25  Defendant's Exhibit 1, number 81, 82, 83, 84, 85 of

Page 185

1  Defendant's Exhibit Number 1, did you appear to
2  today to give testimony under Federal Rule 30(b)(6)
3  as to those areas of inquiry?
4  A    Yes.
5  Q    Okay.
6    MR. GERSON:  And I just want to point out
7  that the witness does not know answers to some
8  of the topics that have been designated, so
9  what we do about that we'll have to take up at
10  a later time.
11   We can talk about it after the fact, but I
12  think that's been, you know, pointed out in the
13  record that the witness doesn't know some of
14  the information that I've asked, some of the
15  answers that I've asked and I guess that's --
16  that's it for me now.
17   MR. LARA:  Well, okay, I -- I don't know
18  what exactly you intend by making the statement
19  on the record, but we have been here for the
20  areas so designated.  And I guess I'll just go
21  on the record and say I disagree that he wasn't
22  prepared or didn't know the answers reasonably
23  expected to be known concerning the areas of
24  inquiry that you've already designated.
25   In any event, if you wish to follow it up

Page 186

1   afterwards, we'll take that up off the record
2   and --
3          MR. GERSON:  Okay.
4          MR. LARA:  -- following the end of the
5   depo.
6          MR. GERSON:  Oh, I have one other request
7   sorry.  I referred to it and I'll just mark
8   Exhibit 2 as the affidavit of Mr. Williams that
9   I referred to and just for --
10         MR. LARA:  Yep.
11         MR. GERSON:  -- housekeeping purposes that
12  will be Exhibit 2.
13         MR. LARA:  We'll read and we'll take a
14  copy.
15         THE COURT REPORTER:  Are you ordering?
16         MR. GERSON:  I don't know yet.
17         THE COURT REPORTER:  Okay.
18         MR. LARA:  I'll take a copy if he orders
19  and I don't need a copy of the video at this
20  time.
21         (Plaintiff's Exhibits 1 and 2 were marked
22  for identification purposes.)
23         (The deposition was concluded at 5:20 p.m)
24
25

Page 187

1                CERTIFICATE OF OATH
2
3   THE STATE OF FLORIDA      )
4   COUNTY OF MIAMI-DADE      )
5
6
7          I, Jonna Foster, Court Reporter, Notary Public,
8   State of Florida, certify that ROBERT G. WILLIAMS,
9   JR. personally appeared before me on the 29th day of
10  October, 2015, and was duly sworn.
11
12         Signed this 19th day of November, 2015.
13
14
15
16         JONNA FOSTER, REPORTER
               Notary Public, State of Florida
17             Commission No.  EE185111
               Expires:  July 15, 2016
18
19
20
21
22
23
24
25

Page 188

1                CERTIFICATE OF REPORTER
2
3
4   STATE OF FLORIDA      )
5   COUNTY OF MIAMI-DADE   )
6
7
8
9          I, JONNA FOSTER, Reporter, certify that I
10  was authorized to and did stenographically report
11  the deposition of ROBERT G. WILLIAMS, JR., pages 1
12  through 184; that a review of the transcript was
13  requested; and that the transcript is a true record
14  of my stenographic notes.
15
16         I further certify that I am not a
17  relative, attorney or counsel of any of the parties,
18  nor am I a relative or employee of any of the
19  parties' attorneys or counsel connected with the
20  action, nor am I financially interested in the
21  action.
22         DATED this 19th day of November, 2015.
23
24         JONNA FOSTER, REPORTER
25             WITNESS NOTIFICATION LETTER

Page 189

1   DATE:  November 19th, 2015
2   TO:   MR. ROBERT G. WILLIAMS, JR.
            C/O: RICHARD LARA, ESQ.
3           Mase Lara
            2601 South Bayshore Drive
4           Suite 800
            Miami, FL  33133
5
    IN RE:   LINDSEY HORNE VS. CARNIVAL CRUISE LINES
6   CASE NO:  15-21031-CIV-ALTONAGA/O'SULLIVAN
               Deposition taken on October 29th, 2015
7              U.S. Legal Support Job No. 1340160
8   The transcript of the above proceeding is now
    available for your review.
9
    Please call to schedule an appointment between the
10  hours of 9:00 a.m. and 4:00 p.m., Monday through
    Friday, at a U.S. Legal Support office located
11  nearest you.
12  Please complete your review within 30 days.
13
14  Very truly yours,
15
16  JONNA FOSTER, Court Reporter
    U.S. Legal Support, Inc.
17  One Southeast Third Avenue
    Suite 1250
18  Miami, Florida  33131
    (305)373-8404
19
20  CC via transcript:
        Nicholas Gerson, Esq.
21
22
23
24
25

1           E R R A T A   S H E E T

2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3           IN RE: Horne vs. Carnival Cruise Lines

               Robert G. Williams, Jr.

4           Thursday, October 29th, 2015

              U.S. LEGAL JOB NO. 1340160

5

6    PAGE NO.   LINE NO.      CHANGE          REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Under penalties of perjury, I declare that I have

18   read the foregoing document and that the facts

19   stated in it are true.

20   _____      _____

21   Date                 Robert G. Williams, Jr.

22

23

24

25