

1        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA

2

3     CASE NO. 15-21031-CIV-ALTONAGA/O'Sullivan

4

LINDSEY HORNE,

5

     Plaintiff,

6

vs.

7

CARNIVAL CRUISE LINES,

8

     Defendant.

9

10   _____/

11

12

13     DEPOSITION OF SUZANNE BROWN VAZQUEZ

14

15       Monday, October 26, 2015
        10:20 a.m. - 2:30 p.m.
16      Gerson & Schwartz, P.A.
        1980 Coral Way
17    Miami, Florida 33145-2624

18

19

20    Stenographically Reported By:

21      JOHN PAUL CANO, FPR

22

23

24

25

Page 2

1  APPEARANCES:
2
   On behalf of the Plaintiff
3   Nicholas I. Gerson, Esquire
    Gerson & Schwartz, P.A.
4   1980 Coral Way
    Miami, Florida 33145-2624
5   (305) 371-6000
    ngerson@gslawusa.com
6
7  On behalf of the Defendant
    Curtis J. Mase, Esquire
8   Mase Lara, P.A.
    2601 South Bayshore Drive
9   Suite 800
    Miami, Florida 33131
10   (305) 377-3770
    cmase@maselara.com
11
12
13            INDEX OF PROCEEDINGS
   Witness                              Page
14
   Suzanne Brown Vazquez
15
   Direct Examination by Mr. Gerson         3
16  Certificate of Oath                    196
    Certificate of Reporter                197
17  Witness Review Letter                  198
    Errata Sheet                           199
18

19            EXHIBITS
20  Number      Description                 Page
21  1      Letter from Mr. Mase's Office       4
    2      Second Notice of Taking Deposition  3
22  3      Notice of Taking Deposition         3
    4      Brevard Sheriff's Office Records    24
23  5      Response-Number of Sexual Assaults  31
    6      Chart of Incidents                  51
24
          (MR. GERSON RETAINED ALL EXHIBITS.)
25

Page 3

1       Deposition taken before John Paul Cano, FPR,

2  Notary Public in and for the State of Florida at large

3  in the above cause.

4       - - - -

5       THE COURT REPORTER: Do you swear or affirm

6   that the testimony you are about to give is the

7   truth, the whole truth, and nothing but the truth?

8       THE WITNESS: Yes, I do.

9  THEREUPON,

10       SUZANNE BROWN VAZQUEZ,

11  having been first duly sworn, was examined and testified

12  as follows:

13       DIRECT EXAMINATION

14  BY MR. GERSON:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  Please state your name for the record?

18   A.  Suzanne Brown Vazquez.

19   Q.  Ms. Vazquez, you understand that you are here

20  pursuant to a notice of taking deposition for which I've

21  marked as Exhibits 2 and 3?

22       (Plaintiff's Exhibit Nos. 2 and 3 were marked

23  for identification.)

24       MR. MASE: How many were there, by the way?

25       MR. GERSON: My understanding is that there

Page 4

1  were – I believe, the deposition was noticed four

2  times. And I'm going to put on the record, we also

3  have a letter from counsel dated Friday, October

4  23rd, which is Exhibit 1, and I'm going to attach

5  these exhibits to the deposition just for

6  housekeeping matters.

7       (Plaintiff's Exhibit No. 1 was marked for

8  identification.)

9       MR. GERSON: It's my understanding, and

10  speaking to your counsel, that the letter that was

11  sent and topics that you are prepared to address

12  today correspond to Exhibit 2, which is the second

13  notice of taking deposition and not the third notice

14  of taking deposition, which is both – they are both

15  dated for Wednesday, October 28th, but they were

16  actually rescheduled for today by agreement between

17  counsel.

18       MR. MASE: I think that's true and I think the

19  letter itself is self-explanatory. It starts off by

20  saying – makes reference to the second notice of

21  taking videotape deposition, not that it matters.

22  I'm going to look and see if there are any

23  differences.

24       MR. GERSON: There were a couple of

25  differences and we'll worry about them --

Page 5

1       MR. MASE: Can you tell me what the

2  differences are, because we made every effort to

3  comply. I was not aware that you renoticed on the

4  19th again.

5       MR. GERSON: I understand.

6       MR. MASE: I may have been aware, I just

7  didn't catch it. What are the changes?

8       MR. GERSON: There's a change in the

9  numbering, there was additional subjects that were

10  included, I believe, the results of the rape kit were

11  included in the third as opposed to the second. I

12  don't know off the top of my head, but I think there

13  were additional items other than those that were

14  included.

15       MR. MASE: Okay. So then for the record, I

16  will say this, the sexual assault kit results are not

17  something that Carnival has, although we did produce

18  to you on Friday the records from the Brevard County

19  Sheriff's Office. I think you should have gotten

20  them electronically -- and maybe they're big, but I

21  will tell you that the results of the sexual assault

22  kit are bound in the Brevard County records, which

23  were produced to you, I believe, on Friday.

24       The records and documents in connection with

25  the sexual assault kit – I mean, what you have are

Page 6

1  the medical records of the ship's doctor who says I
2  did it.  And then Ms. Vazquez can easily speak to
3  this today.  What the ship's doctor does is performs
4  the sexual assault kit, follows the guidelines, seals
5  it, hands it to law enforcement, so the results are
6  not within Carnival's care, custody, or control.  No
7  one at Carnival can testify to those, and the Brevard
8  County Sheriff's Office, in fact, has the results in
9  the documents that you were sent, and I can tell you
10  they are specific test results in there because I
11  read them, so to answer that.
12      I don't know what else there may have been.
13  Policy and procedures followed by Carnival's ship
14  personnel once the rape kit is performed, I suspect
15  Ms. Vazquez can handle that here today.  And if there
16  are other areas here that were not -- because see,
17  the problem is, that's served on the 19th,
18  unfortunately, I was mistakenly operating under the
19  second one.
20      MR. GERSON:  So I just wanted to point that
21  out on the record and if an issue comes up and we
22  need to readdress it, we will.  Otherwise, we'll try
23  to move forward with what --
24      MR. MASE:  I would like to complete
25  Ms. Vazquez's depo today, so if there was a specific

Page 7

1  issue that wasn't detailed between the second, the
2  third, I'm happy to talk to Ms. Vazquez for a moment
3  outside as her counsel to see if we are in a position
4  to address that.
5      MR. GERSON:  Okay.  The other thing is, my
6  understanding is that Mr. Mase has a personal
7  appointment today --
8      MR. MASE:  Right.  I have a doctor's
9  appointment.
10      MR. GERSON:  -- so there are time constraints.
11      MR. MASE:  You need to speak fast.
12      MR. GERSON:  Well, I'm not waiving my right to
13  take a complete seven hours.  I'm going to take up as
14  much time as we have today and in the event we need
15  to reschedule and have the witness come back, we'll
16  work that out.
17      MR. MASE:  We'll see what that comes to.  I
18  think you knew going into today there were time
19  constraints and we made you aware of that, number 1.
20  Number 2 -- and I think it's important that the
21  record reflect this -- it's our position, and I
22  believe, that's supported by the rules of procedure
23  that seven hours applies to the corporate
24  representative in total.  You do not get seven hours,
25  Ms. Vazquez is seven hours and Mr. Williams, for

Page 8

1  example.  You get seven hours in total.  So whatever
2  you've used today for Ms. Vazquez comes off of what
3  you give Mr. Williams tomorrow.
4      MR. GERSON:  I have a different understanding
5  of the rule.
6      MR. MASE:  We will be filing the appropriate
7  motions and objections we need to with that.  We'll
8  come back to that.
9      MR. GERSON:  Okay.  With that said, what time
10  is it now?
11      THE COURT REPORTER:  10:20.
12      MR. GERSON:  Okay.
13      MR. MASE:  I think we started when you started
14  marking exhibits.  Anyway, let's go.
15      MR. GERSON:  Well, let the record reflect we
16  did not begin at 10:00 a.m., and let's not quibble
17  over --
18      MR. MASE:  I'm not quibbling.
19      MR. GERSON:  Okay.
20  BY MR. GERSON:
21      Q.  Ms. Vazquez, you understand that you're here
22  pursuant to a notice of taking deposition, which was
23  provided to you by counsel seated next to you, Mr. Mase,
24  correct?
25      A.  Yes.

Page 9

1      Q.  Okay.  And you understand that pursuant to the
2  notice you are here under Rule 30(b)(6) of the federal
3  rules?
4      A.  Correct.
5      Q.  And you understand that your answers are
6  binding upon Carnival Corporation; do you not?
7      A.  Correct.
8      Q.  And you understand that essentially you are
9  Carnival Corporation for purposes of this deposition?
10      A.  Yes.
11      Q.  Okay.  Please tell us your name and position
12  with Carnival?
13      A.  Suzie Vazquez.  I'm director of guest claims
14  and staff counsel.
15      Q.  And as director of guest claims and staff
16  counsel, does that mean you are also an attorney?
17      A.  Yes.
18      Q.  Okay.  And how long have you been a director
19  of guest claims for Carnival?
20      A.  I've been with the company 11 years.  I
21  started as manager and was promoted to director, I
22  believe, in 2009, maybe.
23      Q.  Okay.  And would you tell me briefly your
24  duties and responsibilities as the director of guest
25  claims for Carnival?

Page 10

1    A. In that capacity, I oversee all guest-related
2  claims and lawsuits.
3    Q. Okay. And by guest-related claims, meaning?
4    A. Not crew. Not crew members.
5    Q. Okay. So are passenger accidents and injuries
6  that passengers may encounter on Carnival ships, the
7  areas for which you are primarily assigned to deal with?
8    A. Overseeing them, yes. We have a team of
9  adjusters and lawyers and great outside counsel that do
10  most of the heavy lifting.
11    Q. Understood. When a claim has been made, or if
12  a claim is made, that gets brought to your attention; is
13  that correct?
14    A. Yes.
15    Q. And the types of claims that are made, this
16  is, as far as your department is concerned, they are
17  only claims or incidents that involve passengers?
18    A. No. My department handles everything. I
19  don't handle crew. I only handle passengers.
20    Q. Are crimes that have been committed on
21  passengers included in the types of incidents that you
22  respond to?
23    A. Yes.
24    MR. MASE: Object to form.
25    THE WITNESS: And especially if they bring a

Page 11

1  claim.
2  BY MR. GERSON:
3    Q. Okay. And who do you report to?
4    A. Robert Kirk.
5    Q. And who is Robert Kirk?
6    A. The vice president of legal services.
7    Q. And he's out of the Miami office?
8    A. Yes.
9    Q. And how many lawyers, approximately, are in
10  the legal claims department for Carnival?
11    A. In the legal services department there are
12  six -- wait. Six or seven.
13    Q. Okay. And just -- can you give me an idea
14  generally the types of claims that you deal with on a
15  routine basis?
16    A. They are varied. It would take a long time to
17  say every claim that comes across my desk.
18    Q. Slip and falls?
19    A. Uh-huh. Anything that happens onboard the
20  ship or during the cruise that brings a claim against
21  Carnival.
22    Q. You understand we're here to discuss a rape
23  that was alleged to have occurred on a Carnival ship
24  back in September 3, 2014?
25    MR. MASE: Objection to form.

Page 12

1    THE WITNESS: An alleged rape, yes.
2  BY MR. GERSON:
3    Q. Does Carnival dispute the fact that my client,
4  Lindsey Home, was in fact raped?
5    A. I guess it comes down to the legal definition
6  of what rape is what and what version of the events are
7  accurate.
8    Q. Okay.
9    MR. MASE: I'm going to object to the question
10    further in so far as beyond the scope of the notice
11    of taking deposition. It invades the attorney/client
12    work product privilege.
13    MR. GERSON: Okay.
14  BY MR. GERSON:
15    Q. You mentioned that as far as the legal
16  definition of rape, you are an attorney. I would
17  imagine you know the legal definition of rape.
18    A. It actually varies depending on the
19  jurisdiction, depending on which one you're looking at.
20  I think I would defer to Counsel on the case to decide
21  what is or isn't rape. I think we can agree that your
22  client alleges that she was attacked inside her cabin
23  and that the attack was sexual in nature.
24    Q. So Carnival to date does not admit that based
25  on their investigation that Lindsey Home was in fact

Page 13

1  raped?
2    A. Well, depends, again, on whether you're
3  terming rape as penetration and what level of
4  penetration. So she gave various versions of her
5  events. She told law enforcement that she was not
6  penetrated, so again, I will leave that up to the
7  lawyers and the judge to decide what -- or maybe the
8  jury to decide what the definition of rape is.
9    MR. MASE: And I reiterate my previously
10    stated objection on the same grounds to that
11    question.
12    MR. GERSON: Okay.
13  BY MR. GERSON:
14    Q. Ms. Vazquez, you mentioned that Ms. Home --
15  to your understanding that Ms. Home told law
16  enforcement that she was not penetrated, correct?
17    A. Correct.
18    Q. And what is the basis of that knowledge?
19    A. The Brevard County Sheriff's report and/or the
20  FBI report. I can't remember which one I was looking at
21  when I was reading her statement.
22    Q. And any other documents or information for
23  which you as both the vice president -- or excuse me,
24  director of legal claims and corporate representative
25  for Carnival believe that Lindsey Home was not

Page 14

1  penetrated?

2    A.  Yes.

3    Q.  Tell me what other information?

4    A.  Some of it is work product, so I won't divulge

5  what I have discussed with Counsel, but the medical

6  reports, I think, indicate that as well.

7    Q.  Do you have a copy of the medical reports with

8  you?

9    A.  I think so, somewhere in this binder.

10   Q.  Okay.  The medical reports, anything else?

11   A.  Possibly the statements she made to the doctor

12  and nurse onboard, but I would have to look at those

13  again.

14   Q.  Okay.  Taking a look at the notice, and just

15  so we're clear, one of the topics which has been noticed

16  for today is Defendant's position about the sequence of

17  events for the subject incident, or subject incident in

18  this case; do you see that?

19   A.  Uh-huh.

20   Q.  Okay.  And I see you have some handwritten

21  notes with you, yes?

22   A.  Yes.

23   Q.  Okay.  And those were prepared by you?

24   A.  Yes.

25   Q.  Okay.  So going back to Carnival's

Page 15

1  understanding that Lindsey Horne, based on the

2  investigation that was conducted or the sequence of

3  events, it's your testimony that there is evidence,

4  documentary and testimony in the form of written

5  statements, that Lindsey Horne was not penetrated?

6    MR. MASE:  Objection to form.

7    THE WITNESS:  I didn't say written statements.

8  I said the medical records and the reports from law

9  enforcement and I believe they took tape statements.

10  I have not listened to those tape statements.  I have

11  only seen the written reports from law enforcement

12  based on the statements.

13   MR. MASE:  I also think you are

14  mischaracterizing what she said.

15   MR. GERSON:  I think she said both, but the

16  record will --

17   MR. MASE:  The record will stand for itself.

18  BY MR. GERSON:

19   Q.  Ms. Vazquez, where in Ms. Horne's statement

20  does it state that she was not raped?

21   A.  She told that to law enforcement, initially.

22  I don't remember if it was the FBI agent or the Brevard

23  County Sheriff.  I don't know who was conducting the

24  interview with her initially.

25   Q.  Were you present for that interview?

Page 16

1    A.  No.  Again, I'm just reading the reports from

2  law enforcement.

3    Q.  Okay.  Do you have those reports with you?

4    A.  Some of them, I think I do.

5    Q.  May I see them?

6    MR. MASE:  The Brevard?

7    THE WITNESS:  Yes.

8    MR. MASE:  I don't know that I actually

9  received them because I think what happened is we

10  tried to send them electronically, but it was too

11  big, so you're welcome to show them to him.

12   THE WITNESS:  Okay.

13   MR. MASE:  So you know, we just got them and I

14  think we sent them -- actually, I'm not sure when we

15  got them, I take that back.  I believe what we did

16  was give them to you, I want to say Friday, so they

17  were dropped in the mail, is what I was told this

18  morning, because the size of the file was too big.

19   MR. GERSON:  Okay.

20   THE WITNESS:  It's pretty long.

21   MR. MASE:  Hand him all the records.

22  Ms. Vazquez is going to let you see her set, but

23  these are hers.

24   MR. GERSON:  Okay.  I'll make a copy.

25   THE WITNESS:  It's somewhere in this.

Page 17

1    MR. MASE:  He can find them.

2    MR. GERSON:  If you have the whole thing,

3  we'll...

4    MR. MASE:  You want me to try to send them

5  electronically?  I can.  It was long.

6    THE WITNESS:  See, these are some of the

7  statements, so let me get the law enforcement stuff.

8    MR. GERSON:  Thank you.  I'm going to have

9  someone make copies of this.

10   THE WITNESS:  Yes.

11   MR. MASE:  You want the rest?

12   MR. GERSON:  This is all that file?

13   MR. MASE:  Yes, it's part of the file.

14   Mr. Gerson, in addition to that, you should be

15  aware there were some audio recordings, which I think

16  has part to do with why they were sent to you via

17  mail, and I believe the audio recordings -- I don't

18  know if the audio recordings were sent or not.  I may

19  just have sent you copies of the disk.  Just so that

20  you know, and for the record, if you don't get the

21  audio recordings and you would like them, ask for

22  them.  Ask me for them.

23   MR. GERSON:  Okay, got it.

24  BY MR. GERSON:

25   Q.  Just so we're clear, you've mentioned that

Page 18

1 based on your interpretation of the definition of rape,
2 Carnival's legal position or Carnival's position is that
3 Ms. Home was not raped because of certain findings and
4 statements in her investigative files, some of the
5 materials you just handed over to me.
6      MR. MASE:  Objection to form.
7      THE WITNESS:  I did not say what our position
8 was.  We don't know, but there's a dispute as to
9 whether she was penetrated and the dispute as to
10 whether that would constitute rape under whatever
11 legal definition you're going to operate under.
12 BY MR. GERSON:
13     Q.  Okay.  Does Carnival dispute the fact that
14 Lindsey Home was a victim of a violent attempted rape?
15     MR. MASE:  Objection to form.
16     THE WITNESS:  We don't know.  We know that
17 Ms. Home alleged that she was attacked inside her
18 cabin and that the nature of the attack was sexual.
19 BY MR. GERSON:
20     Q.  Okay.  And what is Carnival's understanding as
21 far as how many people were involved in this attack?
22     A.  Well, it ended up with her friends in the
23 cabin and sort of a physical altercation at the end, but
24 Ms. Home alleges there were two individuals that
25 entered her cabin with her and attacked her on some

Page 19

1 level.  There was some dispute in her story as to how
2 that went down inside, but there were two males.
3     Q.  Is it Carnival's understanding that
4 Ms. Home – the two males that got into Ms. Home's
5 room forcibly entered or forced their way into her room?
6     A.  She initially said no, that she took them –
7 one she said she went voluntarily, then she said she saw
8 them halfway down and they snuck in behind her.  She
9 changed her story to say they forced their way in, so I
10 think it sort of evolved.
11     I think she was a little patchy on the
12 details, but yes.  I mean now, she said in her
13 deposition, which I read through, that they were behind
14 her and pushed their way in when they entered her cabin.
15     Q.  Okay.  This last account of what your –
16 Carnival's understanding of what happened is based on
17 review of Ms. Home's deposition testimony?
18     A.  Right, which is the most recent of her
19 statements.
20     Q.  Okay.  The second account, which you just
21 talked about, was that they were a little behind her and
22 snuck their way in?
23     A.  She told law enforcement that she saw them
24 coming down the hallway and they had a little
25 conversation.  She had met them earlier in the night and

Page 20

1 earlier in the cruise, and I think they told her their
2 cabin was on that deck – I think is what she told law
3 enforcement.  And that when she opened the door to come
4 in, they just snuck in behind her.
5     Q.  When you say "they snuck in," they weren't
6 invited in?
7     A.  Followed her.  Right.  That was her statement
8 that she did not invite them in.  They dispute that, but
9 there's a lot of versions of what happened depending on
10 who –
11     Q.  So it's your understanding based on your –
12 let me strike that.
13     You're familiar with this file, are you not?
14     A.  Somewhat.  Probably not as much as you and
15 Mr. Mase are.
16     Q.  Fair enough.  But you are familiar with the
17 file because you are the director of legal claims for
18 Carnival, correct?
19     A.  Correct.
20     Q.  And that's also probably the reason why you
21 are here designated as the representative on behalf of
22 Carnival, correct, fair statement?
23     A.  Correct.
24     Q.  Okay.  And so based on your – you've read
25 some of the reports in this case, have you not?

Page 21

1     A.  Yes.
2     Q.  And you have reviewed – well, tell me what
3 other materials you read and reviewed in preparation of
4 today's deposition.
5     A.  I've read a lot.
6     Q.  Just tell me generally.
7     MR. MASE:  Objection to form.  Don't answer
8 that question.  It invades the mental thought
9 processes of counsel and you are not required to
10 respond to it.  I won't allow you ask her to identify
11 which documents she's looked at.  What I will allow
12 you to do is to say, did you look at this document
13 and you identify it.
14 BY MR. GERSON:
15     Q.  Okay.  Can you identify all non-attorney
16 authored documents that you reviewed?
17     MR. MASE:  Do not answer that question.  The
18 question as phrased invades the attorney/client work
19 product privileges and is an impermissible question.
20 Once again, I'll allow Ms. Vazquez to answer specific
21 questions about documents that Mr. Gerson identifies.
22 BY MR. GERSON:
23     Q.  What Carnival internal records, other than
24 records prepared by your attorneys or yourself did you
25 review?

Page 22

1    MR. MASE: Don't answer that question. Same

2  instruction.

3  BY MR. GERSON:

4    Q.  Did you review the Carnival incident report?

5    MR. GERSON:  And Mr. Mase, I think the proper

6  objection would be a protective order.  I don't think

7  it's proper for you to instruct the witness not to

8  answer.

9    MR. MASE: I appreciate your thoughts on that.

10    MR. GERSON:  You are instructing the witness

11  not to answer based on attorney/client privilege?

12    MR. MASE:  My instruction is clear on the

13  record.

14    THE WITNESS:  To clarify, I reviewed what

15  Mr. Mase thought I should review, so that's the

16  nature of the attorney/client privilege.  But if

17  you're asking if I reviewed the incident report from

18  this particular ship's security incident report, I

19  did.

20  BY MR. GERSON:

21    Q.  Okay.  Did you review Ms. Horne's statement?

22    A.  I found her written statement illegible.  I

23  think she was pretty intoxicated when she wrote it.  I

24  did see in her deposition she read it into the record,

25  so I was able to review it sort of that way.

Page 23

1    Q.  Okay.  And did you review the statements of

2  law enforcement or any statements by law enforcement?

3    A.  I skimmed them.  As we just noted, it's a

4  pretty thick file that I received just this weekend.

5    Q.  Okay.  And it's your understanding by reading

6  the statements based on the investigation of law

7  enforcement in this case is that at the time when

8  Ms. Horne was interviewed by the local authorities, FBI

9  or police officers, she told them that the two people

10  who allegedly raped her were involved in this

11  altercation, snuck or forced their way into her room?

12    A.  She didn't say that to law enforcement.  She

13  actually said to law enforcement she was not penetrated

14  and that it was one guy, the man with gold teeth, that

15  actually tried to penetrate her, but she didn't think

16  she was penetrated.  But she did tell law enforcement

17  she did not invite them in and I think the way she said

18  it is they followed me in the room.  It didn't seem as

19  aggressive as she described it in her deposition a week

20  ago.

21    Q.  Okay.  What about the way she described it in

22  her statement?  Do you recall how she described it in

23  her statement?

24    A.  I don't.

25    Q.  Okay.

Page 24

1    A.  Her statement to me was illegible and I

2  couldn't read it.  But I do remember – I think Mr. Mase

3  or you had her read it into the record during her

4  deposition, so we looked at it they way.

5    MR. GERSON:  We're going to mark for the

6  record –

7    MR. MASE:  That's hers.

8    MR. GERSON:  I'm sorry.  So Exhibit 4 to the

9  deposition will be the records, which were just

10  produced by Ms. Vazquez, which apparently are Brevard

11  County Sheriff's Office's investigation, which

12  include photographs and some audio CDs which

13  incorporate some statements.

14    (Plaintiff's Exhibit No. 4 was marked for

15  identification.)

16  BY MR. GERSON:

17    Q.  Now –

18    A.  You know, it says right here they're reviewing

19  the statement from the ship, so in her statement on the

20  ship, she said, "She was followed toward her room and

21  two black males forced their way into her room" is the

22  way that our security report read to law enforcement.

23    Q.  Okay.  So Carnival conducted an investigation

24  into this case, correct?

25    A.  Preliminarily, yes.

Page 25

1    Q.  And the procedure is that Carnival, anytime

2  there's a serious criminal incident, Carnival has their

3  own security officers and assistant chief security

4  officer and some other security personnel who perform a

5  preliminary investigation or an investigation on behalf

6  of the cruise line?

7    MR. MASE:  Object to the form.

8    THE WITNESS:  Correct.

9  BY MR. GERSON:

10    Q.  And that occurs before any members of the law

11  enforcement are able to reach the ship because many

12  incidents occurred while the ship is out at sea?

13    A.  It depends on when the incident occurs and

14  where the ship is.

15    Q.  Okay.  And based on Carnival's understanding

16  of what the ship's investigation revealed was that

17  Ms. Horne claimed that at the hours of around 3:00 in

18  the morning, that she was followed toward her room by

19  two black males who forced their way into her room?

20    MR. MASE:  Objection to form.

21    THE WITNESS:  That is what the Brevard County

22  Sheriff's Office put in their narrative as the

23  findings from the ship.  I don't remember reading

24  that from the ship, but that's what the Brevard note

25  say.

Page 26

1  BY MR. GERSON:
2      Q.  That was based on Ms. Horne's statement to the
3  crew?
4      A.  Presumably.  She was the only other one that
5  was there and both of the men say it was consensual,
6  so...
7      Q.  Okay.  Does Carnival believe that based on
8  what they know of this case and the investigation
9  conducted that this was a consensual act?
10         MR. MASE:  Objection to form.
11         THE WITNESS:  We really don't know.  We
12     weren't there, so depending on whose version you want
13     to believe.  You would have to look at everybody's
14     statement.
15  BY MR. GERSON:
16     Q.  So officially, Carnival's position, "whose
17  version you want to believe" is the position -- they
18  have no position about what really happened; is that a
19  fair statement?
20     A.  Right.  There was no one from Carnival that
21  witnessed it or was present at the time of the incident.
22  So what we ask our ship to do in anticipation of
23  litigation is get the facts, try to get statements, law
24  enforcement obviously wants those, and they try to get
25  to the bottom of what happened as well.

Page 27

1      Q.  So based on Carnival's review of all the
2  records and reports and everything that has been
3  produced in this case up to today's date, Carnival has
4  no position whether or not Ms. Horne consented to any of
5  these acts or whether or not she did not consent to any
6  of these acts?
7      A.  We do not know at this juncture what happened.
8  I'm not even sure that the people involved know what
9  happened.  Based on their statements to law enforcement,
10  they were a little fuzzy on the details.  They weren't
11  sure what exactly occurred and the sequence of events.
12     Q.  Okay.  Now, what was this incident -- how was
13  this incident classified?
14     A.  Sexual assault.
15     Q.  Okay.  And why was it classified as a sexual
16  assault?
17     A.  You would probably have to ask somebody from
18  security services how they classify it.  They have their
19  own classification system.  They would be in a better
20  position to --
21     Q.  As the director of legal claims for Carnival,
22  how many sexual assault claims have you reviewed in the
23  last three years?
24         MR. MASE:  Objection to form.
25         THE WITNESS:  I don't know.

Page 28

1  BY MR. GERSON:
2      Q.  Okay.  You understand that one of the issues
3  before you today, or that one of the reasons why you
4  were asked to come today was to talk about prior rapes
5  and sexual assaults, right?
6      A.  Prior incidents, yes.  But you just asked me
7  for claims, which I view as very different.
8      Q.  Okay, fair enough.  I forget I'm talking to a
9  lawyer.  How many prior claims of sexual assaults have
10  been brought against Carnival in the last three years?
11     A.  Again, I don't know.
12     Q.  Okay.  Isn't it true that Carnival does not
13  have a drop-down bar for -- to actually classify an
14  incident as rape?
15         MR. MASE:  Objection to form.
16         THE WITNESS:  I don't know what you mean by a
17     "drop-down bar."
18  BY MR. GERSON:
19     Q.  Sure.  You're familiar with Carnival's
20  internal reporting system?
21     A.  We have a lot of internal reporting systems.
22     Q.  You are familiar with the incident reporting
23  system?
24     A.  There is InfoShip, which is where accident
25  reports go, and then there are incidents for crime.  The

Page 29

1  incident for crime is more -- I'm not even aware that
2  it's in a database, other than putting them in the
3  claims database.  So you would have talk to somebody
4  from security claim services about how they are
5  cataloging them.
6         We get all the copies, but we don't actually
7  run that database.  They do.
8      Q.  So who makes the determination as far as how
9  to categorize a prior crime, whether it be a rape or
10  sexual assault?
11     A.  You'd probably have to ask Bobby Williams or
12  Dominick Froio.  Someone from the security services team
13  makes that determination.
14     Q.  Okay.  One of the issues before us today are
15  the number of rapes and sexual assaults that have
16  been -- that Carnival has been notified about in the
17  last three years.
18     A.  Okay.
19     Q.  We were produced a document set, and do you
20  have any documents identifying those?
21     A.  I do.
22     Q.  Okay.  Do you have a copy of the documents
23  set?
24         MS. VAZQUEZ:  Do you have an extra copy of
25  this in front of you?

Page 30

1    MR. MASE: Okay. So I think what he's
2  referring to is –
3    THE WITNESS: Oh, the actual production.
4    MR. MASE: So let me show you that. What he's
5  referring to is going to be –
6    THE WITNESS: I think it's interrogatory –
7    MR. MASE: Yeah. It's 6, right around the
8  back of 6.
9    THE WITNESS: Interrogatories. Tab 7 and
10  Tab 10.
11    MR. MASE: So, Mr. Gerson, you were given a
12  couple of charts, which one are you referring to?
13    MR. GERSON: Let me go ahead and mark what's
14  been – what we'll mark as the next exhibit to the
15  deposition and –
16    THE WITNESS: Is this the same one you
17  highlighted?
18    MR. MASE: Yes.
19    THE WITNESS: It's a different one.
20    MR. MASE: Hold on. Is that it?
21    THE WITNESS: No. Go to Tab 10.
22    MR. GERSON: I'll just go ahead and represent
23  this is what was provided to us in a supplemental
24  response to request for production.
25    THE WITNESS: Okay.

Page 31

1    MR. MASE: Hold on. Supplemental responses to
2  request for production, would be – it doesn't have a
3  Bates number on it?
4    MR. GERSON: I don't believe so. I didn't
5  create this.
6    MR. MASE: Do you know what request that is?
7    MR. GERSON: I believe this is the
8  supplemental response to a second amended first set
9  of interrogatories.
10    THE WITNESS: This is Confidential Exhibit A.
11    MR. MASE: So it is Exhibit A?
12    MR. GERSON: Exhibit A, yes.
13    THE WITNESS: But that's not what I'm looking
14  at here.
15    MR. GERSON: We'll go ahead and mark this
16  as – what's the next exhibit?
17    THE COURT REPORTER: The next one would be 5.
18    (Plaintiff's Exhibit No. 5 was marked for
19  identification.)
20    MR. MASE: Mr. Gerson, as you'll recall, I
21  sent you what was marked as Exhibit 1 on Friday
22  offering to have Ms. Vazquez look at incident reports
23  and other reports concerning each matter if you
24  wanted a greater level of factual detail. You
25  obviously indicated you didn't want to do that, so in

Page 32

1  an effort to try to be – well, let's let you ask
2  your questions and we'll se where we get to as to the
3  others.
4    MR. GERSON: Okay.
5  BY MR. GERSON:
6    Q. Ms. Vazquez, as the corporate representative
7  for Carnival, how many rapes or sexual assaults have
8  been allegedly committed on a Carnival vessel in the
9  last three years the three years prior to
10  September 3, 2014?
11    A. I believe it is about 58 or 59.
12    Q. Okay. And of these 58 or 59, does Carnival
13  have a way of documenting how those incident occur?
14    A. Yes.
15    Q. Okay. And does Carnival do that on a routine
16  basis when they become made aware that a rape or sexual
17  assault has the been allegedly committed?
18    MR. MASE: Objection to the form of the
19  question.
20    THE WITNESS: The company asks the ship to
21  prepare an accident or incident report in
22  anticipation of litigation on every severe crime
23  alleged, yes.
24  BY MR. GERSON:
25    Q. And isn't it true in this case, our office

Page 33

1  similarly asked Carnival to identify the number of rapes
2  and sexual assaults that have been allegedly committed
3  on a Carnival vessel in the last three years?
4    MR. MASE: Objection to form. Besides her
5  knowledge of that would necessarily invade the
6  attorney/client privilege. The only way that
7  Ms. Vazquez is going to know is if we told her.
8    MR. GERSON: Okay.
9  BY MR. GERSON:
10    Q. Ms. Vazquez, do you have a copy of what has
11  been marked as Exhibit 5?
12    A. Yes.
13    Q. And this is a document that was produced by
14  Carnival in response to interrogatories that were sent
15  to Carnival regarding the total number of prior rapes
16  and sexual assaults on a Carnival ship that have been
17  limited pursuant to the judge's instructions?
18    A. I believe so.
19    MR. MASE: Objection to form.
20    MR GERSON: Or the judge's order.
21  BY MR. GERSON:
22    Q. And as you sit here today, you don't know –
23  do you know what the court order was as far as the
24  limitation of number of rapes or sexual assaults that
25  Carnival was required to disclose in this case?

Page 34

1    A.  I forgot the exact definition.  I don't know
2  if the Court defined it, but I think it was pretty clear
3  in discussions.  So we went and research and tried to
4  find anything that was responsive to the interrogatory
5  request as limited by the court order.
6    Q.  Okay.  To your understanding, the document
7  that has been noted as exhibit -- or marked as
8  Exhibit 5, this is a list of prior sexual assaults --
9  rapes and sexual assaults that Carnival has been able to
10  identify in the last three years prior to this incident?
11    A.  Right, fleet-wide on all 24 vessels.
12    Q.  And do you -- are you the person who compiled
13  this information?
14    A.  I assisted.
15    Q.  Okay.  Who else, other than yourself, assisted
16  in compiling the information?
17    A.  A lot of people.  People from security
18  services team that pulled the reports, they had to be
19  manually reviewed, our lawyers came over, paralegals.
20    Q.  Okay.  Tell me about that process.
21    MR. MASE:  Well, can you be a little more
22  specific because that necessarily involved
23  communication with counsel for Carnival and Carnival,
24  so I would ask respectfully you be more specific.
25

Page 35

1  BY MR. GERSON:
2    Q.  Okay.  Can you tell me what other people --
3  what other documents -- what documents were used to
4  compile this spreadsheet marked as Exhibit 5?
5    A.  Mostly the incident reports themselves and
6  other communication summaries from the security services
7  team.
8    Q.  Okay.  And how many different security
9  officers did you have to speak to in order to gather the
10  information that was eventually produced in the
11  spreadsheet?
12    A.  We didn't have to speak any security officers.
13  We spoke to the shoreside security services team.  They
14  are all retired law enforcement.  Mostly Bobby Williams
15  oversaw the project for his department.
16    Q.  Okay.  How long did it take you once you were
17  informed that Carnival had to identify the number of
18  prior rapes and sexual assaults on a Carnival ship?  How
19  long did it take Carnival to make that determination to
20  provide it to our office?
21    A.  A long time.  It was a kind of an arduous
22  process.
23    Q.  Okay.  So by "a long time," it's something
24  that took hours, fair?
25    A.  Yes.

Page 36

1    Q.  Okay.  And it took more than one person to
2  gather the information?
3    A.  I mean, one person could have, but you had us
4  on a really tight turnaround.  The judge gave us one
5  week from the hearing date to do it, so we had a team to
6  try to get you the information in a timely fashion.
7    Q.  So that would mean, would it not, that
8  Carnival doesn't have a document readily available that
9  it uses to document serious crimes like rapes and sexual
10  assaults in one organized fashion?
11    MR. MASE:  Objection to form.
12    THE WITNESS:  Again, you would have to ask
13  security services how they organize the data, how
14  they organize the reports.  We did a manual review of
15  the reports, but they may have some checklist or
16  spreadsheets, I don't know.  You would have to ask
17  them.
18  BY MR. GERSON:
19    Q.  How many reports would you say you reviewed?
20    A.  I don't know.  I have no idea.
21    Q.  More than a hundred?
22    A.  I don't know how many were reviewed.  I really
23  don't.
24    Q.  Were all the reports that you reviewed -- is
25  it fair to say that not all of the reports you reviewed

Page 37

1  made their way into the spreadsheet?
2    A.  There were some reports that were not sexual
3  in nature or sexual assaults, right.  So those would not
4  have been included in the definition as instructed by
5  the Court.
6    Q.  Okay.  And when you say there were reports
7  that were not sexual in nature, why did you review them
8  then?
9    A.  Because we were trying to be thorough.  Ones
10  that were either unclassified or classified as maybe a
11  groping or a touching or somebody touched somebody's
12  shoulder and a father reported that someone touched my
13  daughter inappropriately, we looked in appropriate
14  touching to see if that wasn't sexual, it was just
15  reported as creepy, so to speak right.  I don't know how
16  else to say that.
17    MR. MASE:  "Creepy."  That's a legal term of
18  art, and so we looked at all the creepy reports.
19    THE WITNESS:  But again, you are going to have
20  to speak to Bobby Williams and how he classifies
21  them.
22  BY MR. GERSON:
23    Q.  But ultimately, you are one that's overseeing
24  this process?
25    A.  Not really.  Bobby Williams oversaw for

Page 38

1   security services with our lawyers. I went down there
2   one afternoon with them in the thick of things and I
3   reviewed things on the back end.
4       Q.  So there are other incidents, which are not
5   accounted for, amongst you said 59 prior incidents that
6   Carnival has identified that are responsive to the
7   request for prior similar incidents?
8       A.  No.  There are 59 prior incidents that were
9   responsive to the Court's order.
10      Q.  Right.  And there are other incidents like
11  inappropriate touchings, "creepy," I think is the word
12  you used, that were not included in the spreadsheet?
13      MR. MASE:  Objection to form.
14      THE WITNESS:  I don't remember exactly which
15  ones were reviewed.  It could have been other thefts
16  or things, I don't know.  But, yes.
17  BY MR. GERSON:
18      Q.  Well, you wouldn't have reviewed thefts in
19  response to the inquiry for prior incidents, right?
20      A.  Well, I don't know how they were pulled from
21  security services team, so that's something you need to
22  ask Bobby Williams because he was responsible for
23  pulling anything out that could be responsive and we
24  went through everything.
25      Q.  How many inappropriate touchings did you

Page 39

1   actually personally review of the incident reports that
2   were --
3       A.  I didn't go through them all.  We had
4   people -- the files were on a table and they were
5   reviewing them.
6       Q.  Who else from Carnival was there reviewing the
7   incident reports other than yourself?
8       A.  Our lawyers.
9       Q.  Okay.  And by your lawyers, was Mr. Mase part
10  of that team?
11      A.  Not directly that day in the office.
12      Q.  Okay.  Were there other members of your staff
13  that were assisting in this project?
14      A.  Bobby Williams' staff.
15      Q.  Bobby Williams' staff, okay.  And of the --
16  and you all made a judgment call -- or Carnival made a
17  judgment call as to whether or not inappropriate
18  touching met the level of -- the threshold level of
19  whether or not the incident should be disclosed in this
20  case?
21      MR. MASE:  Objection to form.
22      THE WITNESS:  No.  They didn't make a judgment
23  call.  We were given a definition of sexual assault,
24  and that's what we went by.
25

Page 40

1   BY MR. GERSON:
2       Q.  Were you given a definition of rape?
3       A.  I don't remember.  I think the judge wanted
4   all sexual assaults, anything that could be deemed
5   sexual assault.
6       Q.  Isn't it -- as you sit here today, it's your
7   understanding there were 59 incidents reported?
8       A.  Correct.
9       Q.  Okay.  And of the 59 incidents that were
10  reported, that information has been documented in
11  Exhibit 5, correct?
12      A.  Yes.
13      Q.  And isn't it true that Carnival does not have
14  a way of documenting a rape as a rape, but only has the
15  capability of documenting it as a sexual assault?
16      MR. MASE:  Objection to form.  Further, I'd
17  like to lodge a legal objection because --
18      MR. GERSON:  I think form objections are all
19  you can really make, unless you're going to assert a
20  privilege.
21      MR. MASE:  I'm unaware that I'm not able to
22  assert my legal objections.  My legal objection is
23  very simply the phrase of art rape has been subsumed
24  by sexual assault by the law.
25      MR. GERSON:  Well, I don't agree and I would

Page 41

1   just ask you to please object to the form of the
2   question, because I'm being pretty lenient with
3   speaking objections and testimony, which I don't
4   think is called for.
5   BY MR. GERSON:
6       Q.  Ms. Vazquez, getting back to my question, in
7   the 58 or 59 incidents that have been identified by
8   Carnival for which the spreadsheet is in front of you,
9   can you identify any of those 59 incidents documenting
10  an incident as a rape?
11      A.  From your list?
12      Q.  Actually, from your list.  This is a list that
13  was produced by you.
14      A.  They are all just classified as sexual assault
15  because that's what the judge ordered, which is more
16  than just rape.  Rape to me -- and depending again
17  whatever definition you're using, whether it's Florida
18  law, federal law, et cetera, it needs a level of
19  penetration.  There's other case law that says digital
20  penetration is -- I mean, you can go on and on, but
21  saying sexual assault assumes more than just rape.  It
22  would be any touching of the sexual organs.
23      Q.  Okay.  Any touching of the sexual organs is
24  how --
25      A.  I believe so.

Page 42

1    Q. How does Carnival classify a sexual assault?
2    A. Again, you are going to have to talk to
3  security services about their levels of how they – they
4  have, I think, a sexual contact, a sexual assault a
5  sexual – I don't know. You have to ask Bobby Williams.
6  They classify it how they want to classify it.
7        From a legal perspective in response to the
8  Court's order, we were looking at a very different
9  definition. So we just had to look at everything to
10  determine what was a sexual assault.
11    Q. As a director of legal claims and as corporate
12  representative for Carnival, does Carnival make a
13  distinction between a sexual contact as opposed to
14  sexual assault?
15        MR. MASE: Objection to form.
16        THE WITNESS: Again, you would have to ask
17  security services how they classify their incidents.
18  They have an incident reporting system and speak to
19  them how they organize their data.
20  BY MR. GERSON:
21    Q. And as far as you're concerned, this is
22  your – you're the one that oversees this department –
23    A. I do not oversee the security services team.
24    Q. I understand. But you oversee claims?
25    A. Right. And so from a claims perspective, we

Page 43

1  were operating from the definition of sexual assault,
2  which includes and subsumes rape.
3    Q. Doesn't it also include and subsume sexual
4  touching?
5    A. Yes. I believe these are sexual touchings,
6  penetration, rapes, et cetera.
7    Q. So it would be more – if we were operating
8  under the guidelines, under say the Model Penal Code or
9  even criminal statutes in the State of Florida, is it
10  your testimony that a sexual touching is not the same
11  thing as a sexual assault?
12        MR. MASE: Objection to form.
13        THE WITNESS: I don't know. I don't know what
14  penal code you're talking about, the Model Penal
15  Code. I don't know what the definition of –
16  honestly.
17  BY MR. GERSON:
18    Q. What about under Florida law?
19        MR. MASE: Objection.
20  BY MR. GERSON:
21    Q. Would you agree that a sexual touching is the
22  same thing as a sexual assault?
23        MR. MASE: Objection to form.
24        THE WITNESS: Again, I don't know. I don't
25  know that there is under Florida law, a definition of

Page 44

1  sexual touching. I think it's all sexual assault.
2    It's been a while; I'm very rusty. I haven't done
3  criminal law in 15 years.
4  BY MR. GERSON:
5    Q. And so if there were sexual-touching incidents
6  that were not included in this spreadsheet, that would
7  mean that not all of these sexual assaults that have
8  occurred on a cruise ship have been identified by
9  Carnival in this spreadsheet?
10        MR. MASE: Objection to form.
11        THE WITNESS: I think they were all produced,
12  all the sexual touchings.
13  BY MR. GERSON:
14    Q. I think you told me that sexual touching is a
15  different classification of an incident by Carnival and
16  that some of those weren't included in here?
17    A. I'm going to say it again. Security services
18  classifies their incidents when they prepare their – in
19  a way that I'm not completely familiar. I think they
20  have a sexual contact, they may have a rape, they have a
21  sexual assault. For the purposes of this spreadsheet,
22  we ignored their classifications and we looked at
23  everything that could potentially fall within the
24  Court's order and your request and provided them, and
25  these are the 59 incidents.

Page 45

1        So you're mixing up the definition that says
2  sexual assault here as per the court order versus
3  security services shoreside at Carnival Cruise Lines,
4  how they categorize their incidents. Does that make
5  sense?
6    Q. Uh-huh. Do you know whether or not Carnival
7  has a classification for rape?
8    A. I do not know. You need to ask them.
9        You mean security services?
10    Q. Yes – I mean, Carnival. The department
11  within Carnival.
12    A. Well, I haven't been noticed for that in the
13  30(b)(6). Nowhere in the notice does it discuss that,
14  but I'm telling you if you need ask someone, it would
15  probably be someone from security services that could
16  give you that.
17    Q. Okay. In your last ten years of employment
18  with Carnival as the director of legal claims, have you
19  ever seen a rape as a type of incident that can be
20  classified as such by a Carnival reporting document or a
21  document used by Carnival?
22        MR. MASE: Objection to form.
23        THE WITNESS: I'm really not sure how they
24  classify it. Usually, when I'm looking at the
25  incident reports, I'm looking at the narrative, which

Page 46

1  is what happened rather than somebody's arbitrary
2  classification of it, so you would have to ask them.
3  Maybe that's changed over the years as the law has
4  changed, I don't know.
5 BY MR. GERSON:
6    Q.  Let me ask you this:  Taking a look at the
7  spreadsheet, who makes the determination of what type of
8  incident is reported?  Does Carnival base that
9  information according to what the victim reports or what
10  its investigation reveals?
11    A.  Yes, what the victim reports.  We ask the ship
12  to prepare an incident report for pretty much any
13  allegation of crime.
14    Q.  Okay.  So it's your testimony that of all
15  these 59 incidents, none of them – none of the
16  passengers allege they were actually raped?
17    MR. MASE:  Objection to form.
18    THE WITNESS:  No.  Say that again.
19 BY MR. GERSON:
20    Q.  Sure.  Of all the 59 prior incidents that are
21  identified in this spreadsheet, it's your testimony that
22  all 59 reported that they were raped and not sexually
23  assaulted?
24    MR. MASE:  Objection to form.
25    THE WITNESS:  No, that is not at all my

Page 47

1  testimony.
2 BY MR. GERSON:
3    Q.  Okay.  Can you clarify that for me?
4    Let me ask you this, of these 59 incidents,
5  how many of these incidents were claimed as rapes as
6  opposed to sexual assaults?
7    A.  I do not know.  I have not gone through that
8  information.  I was not asked to examine it that way.
9    Q.  Well, of the 59 incidents that have been
10  identified, wouldn't you agree that none of them have
11  been identified as a rape?
12    MR. MASE:  Objection to form.
13    THE WITNESS:  So I guess what they have
14  decided to do is sexual assault because that is what
15  the Court has ordered, produce all incidents of
16  sexual assault, and they all are sexual assaults.  It
17  can be rape, it also can be inappropriate touching.
18    MR. MASE:  Okay.  At this point in time I
19  believe it's appropriate to note for the record that
20  I move for a protective order because Mr. Gerson has
21  indicated it's the appropriate thing for me to do.
22  And I move for protective order because as
23  Magistrate O'Sullivan will recall, I asked
24  specifically for a definition from Mr. Gerson.  He
25  declined to give it.

Page 48

1    This became the subject of considerable
2  dispute.  There was discussion before the magistrate
3  judge.  I repeatedly asked for assistance in defining
4  this.  I think ultimately, there was a court order
5  entered that gave some guidance on this, but I
6  believe I can find documentation where I asked very
7  specifically for Plaintiff's counsel to define for us
8  what they considered to be a sexual assault, et
9  cetera and they declined to do so.
10    So I believe what we have here is gamesmanship
11  in something that is really inappropriate harassing
12  the corporate representative, so we move for
13  protective order on that basis.
14    MR. GERSON:  Okay.  We can bring that up
15  before the judge.  Hold on one moment.
16    So Mr. Mase has moved for protective order and
17  we will address –
18    MR. MASE:  I didn't instruct her not to
19  answer.
20    MR. GERSON:  Well, by moving for protective
21  order, you're essentially taking the position that I
22  can't ask any more questions about this –
23    MR. MASE:  Taking the position that you're
24  harassing the witness and I'm bringing this matter to
25  the Court's attention.  You do what you want at your

Page 49

1  peril.
2 BY MR. GERSON:
3    Q.  Ms. Vazquez, do you feel I'm harassing you?
4    A.  I don't want to opine on way or the other.  I
5  think I'm prepared to answer questions about the
6  59 incidents if you want to ask them.  I don't have – I
7  can't look at the reports.  I wish you would have let me
8  do that.  It would have made that so much easier for me,
9  but nonetheless, I think if you want to ask me a
10  question about a particular incident, I can probably
11  answer that for you.
12    And yes, to answer your line of questioning,
13  the sexual assault categories includes both rapes and
14  other types of incidents.
15    Q.  Okay.  Do you feel I'm harassing you?
16    A.  Again, I'm not going to answer that question.
17    Q.  You're laughing while you're answering, so
18  I'm –
19    A.  I always think these depositions are a little
20  bit harassing.
21    Q.  Okay.  I by no means am trying to harass you.
22  I'm trying to get to the bottom of the information and
23  understand Carnival's procedures and the way they
24  disclosed the information to, not only our office but
25  the Court, and whether or not they have complied with

Page 50

1 their obligation under the last magistrate that
2 addressed these requirements that Carnival disclose that
3 information.
4       So with that said, the protective order – I
5 think we all know what a protective order is and we'll
6 just go on to the next line of questioning.
7       So Ms. Vazquez, isn't it true that there was
8 an incident dated November 5, 2011 on the vessel
9 Liberty?
10   A.   Yes.
11   Q.   And that was identified as a sexual assault?
12   A.   Yes.
13   Q.   Okay.  And was that a – did that involve a
14 female passenger?
15   A.   Yes.
16   Q.   And the female passenger – did you bring any
17 documents – did you bring documents with you to provide
18 responses to these questions?
19   A.   Yes.
20       MR. MASE:  The incident reports here, subject
21   to your agreement, makes reference to them that we
22   won't be waiving the privilege on that basis.
23       MR. GERSON:  Okay.
24       MR. MASE:  In the alternative, I have a chart,
25   which is less detailed than the incident reports, but

Page 51

1   which can be utilized to refresh Ms. Vazquez's
2   recollection.  I will – as long as you'll agree that
3   that's subject to confidentiality, I think it's best
4   to use the chart to give you basic facts.
5 BY MR. GERSON:
6   Q.   Okay.  Ms. Vazquez, you have the chart in your
7 lap?
8   A.   Yes.
9   Q.   Okay.  Can I see a copy of the chart?
10   A.   Yes.
11       THE WITNESS:  You have one, Curtis?
12       MR. MASE:  Sure.
13       MR. GERSON:  Thank you.  We'll mark this as
14   Exhibit 6.
15       (Plaintiff's Exhibit No. 6 was marked for
16       identification.)
17 BY MR. GERSON:
18   Q.   Ms. Vazquez, we marked – I'm going to start
19 asking you questions about the prior incidents and
20 there's a document you were referring to and we've
21 marked that as Exhibit 6.
22   A.   Yes.
23   Q.   Okay.  What is this document?
24   A.   It mirrors the Exhibit A that was produced.
25 It just has some descriptive information.  I don't

Page 52

1 really recall the facts because it's 59 incidents.  I
2 can't remember them all, so Counsel prepared a blurb,
3 which –
4       MR. MASE:  It matches Exhibit A and B.
5       THE WITNESS:  It matches A and B.  It tracks it
6   sequentially in time so that you would be able to ask
7   me –
8       MR. MASE:  For the record –
9       THE WITNESS:  It was a tool to help me.
10       MR. MASE:  For the record, this was prepared
11   by Counsel and my office prepared it to serve as tool
12   in an effort to try to comply with our obligation in
13   the Rule 30(b)(6).
14 BY MR. GERSON:
15   Q.   Ms. Vazquez, isn't it true that the document,
16 which has been identified as Exhibit 6 and brought with
17 you today, is from the part of either the iCare or
18 InfoShip's reporting system that Carnival utilizes?
19   A.   No.
20   Q.   It is not?
21   A.   No.
22   Q.   Okay.
23       MR. MASE:  I'll repeat myself.  That's an
24   original document created by Counsel and our office
25   to serve as a tool to assist Ms. Vazquez to refresh

Page 53

1   her recollection with respect to the 50-odd incidents
2   you asked that she be prepared to testify about.  It
3   is not a Carnival-created document in any way, shape,
4   form, or fashion.  That document originated and was
5   created in my law firm's computer system.
6       MR. GERSON:  Okay, I appreciate that.
7 BY MR. GERSON:
8   Q.   Are there any other documents that you have
9 with you today that you would like to give me that would
10 assist in –
11   A.   That's all I'm allowed to have.
12   Q.   Okay.  Let's go on to the incidents.  So
13 Ms. Vazquez, the incident that was identified as
14 November 5, 2011, it's my understanding that someone had
15 been allegedly raped; is that correct?
16   A.   Yes.
17   Q.   Okay.  And that was on the vessel – or strike
18 that.
19       It was on the vessel, Liberty?
20   A.   Yes, it was on the Liberty.
21   Q.   Okay.  Do you know how old the victim was?
22   A.   I think she was 15.  What happened was she
23 went missing.  The mother was looking for her, and she
24 said she was having consensual sex with a male.  The
25 mother claimed because of her tender age, she couldn't

Page 54

1  consent. And they did actually, I believe, arrest that
2  man, but he was found not guilty.
3     Q. Okay. And --
4     A. Because she was under the age of consent in
5  federal law.
6     Q. Okay. Do you know what time of day that
7  happened at?
8     A. I don't remember. I think it was late at
9  night because the mother couldn't find the teenager.
10    Q. And was this an incident that occurred in the
11  stateroom?
12    A. I think it was his stateroom.
13    Q. Okay. So do you know what time of night it
14  happened at?
15    A. Again, I don't know the exact time.
16    Q. Okay. Do you know what day of the voyage the
17  incident happened?
18    A. It happened on November 5th. I don't know how
19  many days into the particular voyage that was. You
20  would have to pull up the itinerary.
21    Q. Then eight days later on November 13, 2011,
22  there's another incident that has been identified on the
23  Destiny, correct?
24    A. On the Destiny, correct.
25    Q. And was that a rape or sexual assault?

Page 55

1     A. It was an allegation of sexual assault. It
2  was a very bizarre one that turned out to be ridiculous.
3  Nonetheless, she claimed that someone entered her cabin.
4  She thought it was her husband trying to have sexual
5  intercourse with her. He was lying next to her in bed.
6  She claims someone else was in the cabin.
7     Q. Okay. When you say that was "ridiculous" --
8     A. It was found to be untrue later.
9     Q. It was found to be untrue. Was an
10  investigation conducted?
11    A. There was an investigation onboard, as always,
12  because she alleged that there was a man that she saw
13  briefly naked in her cabin who ran out in the middle of
14  night as her husband was right next to her asleep. It
15  was a strange one.
16    Q. Okay. So that was on the Destiny?
17    A. Yes.
18    Q. And that was on November 13, 2011?
19    A. Yes.
20    Q. And in that case, the passenger alleged she
21  awoke and someone was on top of her engaging in sexual
22  intercourse?
23    A. Starting. I think she thought that her
24  husband was trying to wake her up to have sex, so she
25  said she brushed him off. And then he tried again, and

Page 56

1  she said she brushed her husband off, but when she woke
2  up, there was another man in the room who ran out.
3     Q. And didn't that turn out to be allegedly a
4  crew member?
5     A. I don't think they ever identified who --
6  anyone.
7     Q. Well, what did Carnival do to investigate how
8  the perpetrator, or the man who fled the cabin room
9  naked, got in the room?
10    MR. MASE: Objection to form.
11    THE WITNESS: I think they looked at the Link
12  Lock readings and there was no in and out. They
13  couldn't figure out -- I don't remember exactly the
14  facts and circumstances.
15       We had another one somewhat recently that was
16  very similar in nature where there was no entry in
17  and out of the cabin. There was no way that anybody
18  could have gotten in and out. The purported
19  victim -- she said later she might have been
20  hallucinating, she wasn't sure.
21  BY MR. GERSON:
22    Q. This incident classified as the second
23  incident on Exhibit 6 says that "Started to engage in
24  sexual intercourse with her"; do you see that?
25    A. Yes.

Page 57

1     Q. And that's based on your review of the
2  information of this incident?
3     A. No. I remember this particular incident and I
4  don't know where they got this verbiage. Again, this is
5  prepared by Mr. Williams' office. Probably from the
6  incident report, but I don't think she ever alleged
7  there was penetration. I think it was just that he was
8  trying to through her nightgown or clothes. I don't
9  think there was ever any actual penetration, but since
10  she said he was attempting to rape her or trying to
11  penetrate her --
12    Q. Well, doesn't it say, "She felt someone on top
13  of her starting to engage in sexual intercourse with
14  her"?
15    A. My recollection is that there wasn't actual
16  intercourse, but he was trying in her mind.
17    Q. Okay. You classified this, or Carnival in
18  Exhibit -- excuse me. In Exhibit 5, Carnival has
19  classified this November 13th incident as a sexual
20  assault and not a rape.
21    A. Right. Attempted rape.
22    Q. Attempted rape, but Carnival actually
23  classifies it as a sexual assault?
24    A. No. The Court told us to disclose all sexual
25  assaults, so that's why you have all the sexual

Page 58

1  assaults. Now, if you want to get into the nuts and
2  bolts of what each incident was, that's what, I guess,
3  we could do today. But I would call that an attempted
4  rape.
5      Q. So you would call this as an attempted rape?
6      A. Right. That's what the victim alleged and
7  that is what you have to go on when you're talking about
8  allegations of prior sexual assaults.
9      Q. Right. So how come that's not what -- you're
10 claiming that the reason why it's identified as a sexual
11 assault is based on the Court's order in this case?
12     A. No, sir. In Exhibit 5, you keep saying we
13 classified it as a sexual assault. The Court told us to
14 disclose all sexual assaults.
15     Q. And all rapes.
16     A. Well, rape is included in a sexual assault.
17     Q. Okay. And as you sit here today, you are not
18 aware of whether or not that incident happened or
19 involved a potential crew member?
20     A. The purported suspect was not identified.
21     Q. Okay. Did Carnival conduct an investigation
22 into how the perpetrator got into the room?
23     A. I believe they did. They would have looked at
24 Link Lock readings, but I don't remember the minutia of
25 the investigation.

Page 59

1      Q. Okay. Do you know what time of day that
2  happened at?
3      A. 1:00 a.m., it says by this description.
4      Q. So it would have been 1:00 a.m. in the
5  stateroom of the passenger?
6      A. Correct.
7      Q. And it was agreed that the person that was
8  trying to have intercourse with this passenger was not
9  her husband after all?
10     A. Again, the husband was still in bed next to
11 her asleep and it was never verified that anyone was
12 ever in that cabin other than her. And I can't remember
13 if this is the one where there was two children in the
14 cabin, also, but in any event.
15     Q. Okay. And then four days later on
16 November 17, 2011, there's another rape or sexual
17 assault that has been identified?
18     A. Yes, on the Ecstasy. A minor female passenger
19 alleged she was sexually assaulted and raped by a male
20 passenger after voluntarily entering his cabin and
21 consuming alcohol.
22     Q. And whose allegations are you relying on that
23 the passenger said that she invited someone in?
24     A. She -- that's usually what the victim says,
25 the purported victim says this happened. So this is

Page 60

1  that blurb what the victim says happened. Whether it
2  did or didn't, again, none of us were there.
3      Q. Okay. So on November 17, 2011, a victim how
4  old?
5      A. I think she was 15.
6      Q. Okay. She reported she was sexually assaulted
7  and raped by another passenger in their stateroom?
8      A. Yeah. Actually, it was a similar situation
9  where the mother was looking for her or the parents were
10 looking for her. She entered a man's cabin, they drank
11 alcohol, and she alleged he raped her. It wasn't
12 reported onboard. It was reported late.
13     Q. Okay.
14     A. Like a year later.
15     Q. Okay. Then approximately six weeks later,
16 there's another female passenger that alleges she was
17 raped by another male passenger on the Valor; is that
18 correct?
19     A. Yes.
20     Q. That would have been -- just so we're
21 precise -- so after the November 17, 2011 incident,
22 there was another incident on January 1, 2012?
23     A. Yes, on the Valor. Different ship.
24     Q. Okay. And what was the date of birth of the
25 passenger who alleges she was raped by another male

Page 61

1  passenger?
2      A. I think she was 22, 4/15/90.
3      Q. And that was also in her stateroom?
4      A. I don't remember whose stateroom it was.
5      Q. Okay.
6      A. She didn't report it until the day she was
7  disembarking the ship and I think she reported it to
8  guest services. She didn't want medical treatment or
9  rape test kit or anything. She declined to pursue any
10 charges. I think she just told guest services.
11     Q. And you are basing this off of this
12 spreadsheet here?
13     A. The spreadsheet and what I kind of remember
14 about it. Most of these cross my desk at some point.
15     Q. Okay. This incident, this September 1st
16 incident, has been identified on Exhibit 5, which was
17 produced in this case as a sexual assault.
18     A. Number 4? Yes.
19     Q. Okay. But in Number 6, it claims there was
20 raped.
21         MR. MASE: Objection to form.
22         THE WITNESS: Okay. Again, I don't know how
23 many times we need to go over this. There's no
24 classification. When it says "sexual assault," that
25 includes all forms of sexual assault, rape, digital

Page 62

1    penetration, attempted rape, all of that would be --
2    BY MR. GERSON:
3      Q.  Okay, and that's fine.  I think that's the
4    point I was trying to make earlier, and you said that
5    you didn't know and that I would have to ask people from
6    security.
7      A.  No, no, no.  Again, you're putting words in my
8    mouth.  This sheet, both 4 and 5 or 5 and 6, were
9    prepared for this litigation only in response to the
10   Court's order in this deposition.  The classification of
11   how an incident report from security services is drafted
12   and cataloged is up to them.  It has no bearing on what
13   I do.
14     Q.  Okay.
15     A.  So you would have to ask them how -- if that
16   interests you -- they categorize a particular incident.
17        MR. MASE:  And to be clear, I recall the
18   discussions we had in open court,
19   Magistrate O'Sullivan, and him saying rapes and gave
20   some other explanation that those are incorporated or
21   I'm thinking you may have them with you here.
22        The fact is, what we did was since we felt
23   that rape was subsumed within the definition of
24   sexual assault and since that seems to be the more
25   common, more politically correct way of describing

Page 63

1    these, we used that for all of them.  But we
2    specifically complied with the order in terms of
3    getting all the things that he'd asked us to capture,
4    so we're clear.
5        MR. GERSON:  Okay.  Understand.
6        MR. MASE:  I don't mean to interfere, sorry.
7        THE WITNESS:  And you asked me if it was in
8    the cabin, it wasn't.  It was on Deck 5 because when
9    she went to guest services, she said she was drunk
10   and she feels like it happened on Deck 5.  So I feel
11   it wasn't in a cabin.  I don't know where she was
12   alleging.  I know, strange.
13   BY MR. GERSON:
14     Q.  Are you guessing -- you're guessing?
15        MR. MASE:  Objection to form.
16        THE WITNESS:  I just remember this particular
17   incident, I think, when she reported it to guest
18   services.  She said she was raped on Deck 5.
19   BY MR. GERSON:
20     Q.  Do you know if there are any cabins on Deck 5?
21     A.  There would be, but I kind of recall, like,
22   she thought it was an open deck.  I'm sorry, you just
23   asked if it was in a cabin.  I guess I'll stick with, I
24   don't know.
25     Q.  You don't know.  So you are unsure of where it

Page 64

1    happened?
2      A.  Yeah.  I think she was a little unsure.
3      Q.  Okay.  Now, when is the next incident?
4      A.  January 5, 2012 onboard the Conquest.  "A
5    female alleged she was groped by a male while she was
6    laying in her bed in her cabin.  She claims she was half
7    asleep when the male reached up her skirt and touched
8    her private parts.  Local authorities were notified in
9    New Orleans and declined to take the case."
10     Q.  Okay.  And in that case, a female alleged she
11   was groped by a male.  What does "groping" mean?
12     A.  I think she alleged -- there were two
13   versions.  She alleged he touched her underwear and
14   later, when I believe a lawsuit was filed, she alleged
15   he went under her underwear and touched her private
16   parts.
17     Q.  Did she allege in that case that there was
18   some sort of digital penetration?
19     A.  I think -- well, I don't know.  I think she
20   alleged it was under the underwear.  Whether there was
21   actual penetration, I don't know.
22     Q.  Okay.  And it says this was on the vessel,
23   Conquest?
24     A.  Yes.
25     Q.  And what time of day did this incident occur?

Page 65

1      A.  I think this one was in the afternoon,
2    strangely enough.  I think she was taking a nap in her
3    cabin, like maybe late in the afternoon, 5:00 or 6:00.
4    I could be wrong.
5      Q.  Are you sure?
6      A.  No, I'm not sure, no.
7      Q.  Okay.  And do you know whether or not this
8    incident -- was anyone staying in the cabin with her?
9      A.  If memory serves, I think her husband.  They
10   had two cabins.  He was across the hall, maybe in the
11   kids' cabin, or maybe she was in the kids' cabin and he
12   was in their cabin.  I think they had two cabins.  They
13   had a cabin as a family.  I do know she had a husband
14   who was not in the cabin with her, but was across the
15   hall, maybe, and she woke up and started screaming.
16     Q.  Okay.  While there was -- Carnival would have
17   conducted an investigation in this case, right?
18     A.  There is an investigative report, which would
19   be so helpful if you would just let me look at that, so
20   I can give you the information that you need.
21     Q.  Do you know whether or not -- do you know how
22   this person got into her room?
23     A.  I think he was the cabin -- not cabin
24   steward -- either housekeeping or cabin steward.  He was
25   coming to get the trays from -- they have meals

Page 66

1  delivered to the cabin and he was getting the trays out
2  of the cabin.
3      Q. So in this incident on January 5, 2012, on the
4  Conquest, this was an incident, a sexual assault where a
5  cabin steward entered a stateroom of a sleeping woman
6  and he sexually assaulted her while she was sleeping.
7  Is that your understanding?
8      A. No. That's my understanding of what she
9  alleged happen. I have no idea of what actually
10  happened.
11      Q. Was there any proof in that case that she
12  invited the crew member into her room?
13      A. I think what happened was that he knocked and
14  she didn't respond, so he came in to get the dishes and
15  the issue was he had come back in to get the rest of the
16  dishes. Big deal about dishes.
17      Q. And isn't it true that as a matter of policy
18  and procedure that anytime a Carnival employee is
19  accused or alleged to have accused a rape or sexual
20  assault, the crew member is immediately sent back to
21  their place of origin?
22          MR. MASE: Objection to form.
23          THE WITNESS: Not -- I don't know if that's
24  always the case, but they would be terminated. I
25  think if there's evidence at all that they committed

Page 67

1  any type of crime, they would be terminated
2  immediately.
3  BY MR. GERSON:
4      Q. Do you know whether or not the cabin steward
5  in this case was handed over to law enforcement?
6      A. I don't remember what happened to him.
7      Q. Do you know why, if he wasn't handed over to
8  law enforcement, what the reason was?
9      A. No.
10      Q. So did the FBI press charges in that case?
11      A. No.
12      Q. Do you know why the FBI didn't press charges
13  in that case?
14      A. I don't know.
15      Q. Isn't it true that the FBI didn't press
16  charges in that case because the crew member was sent
17  back to his home country before the FBI could talk to
18  him?
19          MR. MASE: Objection to form.
20          THE WITNESS: No. I wouldn't agree at all
21  that that happens. But I'm kind of remembering now,
22  were you the plaintiff's lawyer on that case?
23          MR. MASE: See, they don't even need to ask
24  you these questions.
25

Page 68

1  BY MR. GERSON:
2      Q. Okay. When was the next incident?
3      A. February 2, 2012 on the Splendor. "A female
4  passenger alleged she was sexually assaulted by another
5  male passenger."
6      Q. And how old was that passenger?
7      A. I don't know.
8      Q. Is there a date of birth that has been
9  identified?
10      A. Oh, I'm sorry. 10/22/1980.
11      Q. So that was a female passenger?
12      A. Thirty-two, I guess.
13      Q. And that was on the Splendor?
14      A. Yes.
15      Q. The FBI was contacted?
16      A. Yes.
17      Q. And do you know whether or not that occurred
18  in her stateroom?
19      A. I do not know.
20      Q. Do you know whether or not what day of the
21  trip it occurred?
22      A. It happened on February 2nd. I don't know
23  what day.
24      Q. You don't know what day of the voyage it was?
25          Do you know what the outcome was of the sexual

Page 69

1  assault that was committed, the criminal prosecution?
2      A. I don't know it. And it says unknown on the
3  spreadsheet, so I don't think they ever notified us.
4      Q. So far we've gone over -- it looks like 1, 2,
5  3, 4, 5, 6. Based on the last six incidents that we
6  have gone over thus far, are you aware of any successful
7  prosecutions for any criminal incident or charges that
8  may have been brought?
9          MR. MASE: Objection to form.
10          THE WITNESS: Yes. I know they did bring
11  charges in at least one of those, but the suspect was
12  found not guilty by a jury.
13  BY MR. GERSON:
14      Q. Are you aware of any successful prosecutions
15  of any of the six prior claims that have been identified
16  to you so far?
17          MR. MASE: By "successful," you mean what?
18          MR. GERSON: That resulted in a conviction.
19          MR. MASE: Objection to form.
20          THE WITNESS: The only one I know was arrested
21  was the very first one.
22  BY MR. GERSON:
23      Q. Okay. Of the six prior so far, you are not
24  aware of any successful prosecutions of any of those?
25          MR. MASE: Objection to form.

Page 70

1    THE WITNESS: I'm not aware. I don't think
2  the FBI pursued charges on any of those or any law
3  enforcement agency, but I don't know for sure.
4  BY MR. GERSON:
5    Q. Okay. Number 6, that occurred on
6  February 2, 2012, that occurred at nighttime?
7    A. I don't know.
8    Q. You don't know what time?
9    A. I don't know.
10   Q. All we know is that it was a female that was
11 sexually assaulted by another male passenger?
12   MR. MASE: Objection to form.
13   THE WITNESS: That's not all we know. I'm not
14 allowed to look at the incident reports and I don't
15 have a photographic memory, so I'm having a hard time
16 remembering the minutia of detail. And it may help
17 us if it's something you really want is just to do an
18 interrogatory and we list out the facts as you need
19 them.
20 BY MR. GERSON:
21   Q. Okay. Do you know whether or not the male
22 passenger forced his way into the stateroom in this
23 case?
24   MR. MASE: Objection to form.
25   THE WITNESS: I don't know. I would have to

Page 71

1  look at the incident report.
2  BY MR. GERSON:
3    Q. So Carnival doesn't know without looking at
4  the incident report whether or not this male passenger
5  forced his way into the stateroom February 2, 2012 and
6  committed a sexual assault?
7    A. I just don't remember. I would need to
8  refresh my recollection.
9    Q. Okay. And then Number 7 is another incident,
10 looks like approximately a month later, March 10, 2012?
11   A. Yes, on the Victory.
12   Q. Okay. And what was the age of that victim?
13   A. I believe she was in her early 20s.
14   Q. And what did the female passenger allege in
15 that instance?
16   A. She alleged she was raped by two men in their
17 cabin.
18   Q. She alleged she was raped by two men in their
19 cabin?
20   A. In their cabin, yeah.
21   Q. And do you know what time of day the incident
22 happened?
23   A. It was late at night. They had been drinking
24 and went back to their cabin and drank some more and she
25 alleges that they attacked her.

Page 72

1    Q. Who provides the alcohol on ships?
2    A. Who provides?
3    Q. Yes.
4    A. We sell alcohol onboard the ship.
5    Q. Are passengers allowed to bring alcohol on the
6  ship?
7    A. No. They do, but they are not allowed to.
8    Q. It's against –
9    A. It's against the rules, and if found out,
10 they'll confiscate it.
11   Q. Okay.
12   A. But you're allowed to get liquor in your room.
13 You can get a bottle sent to your room.
14   Q. Okay, Number 8?
15   A. That was March 31, 2012, on the Elation.
16   Q. That was 20 days later?
17   A. On a different ship.
18   Q. Okay. Female passenger, again, alleges she
19 was sexually assaulted by another male passenger inside
20 a cabin?
21   A. Yes.
22   Q. And was the FBI contacted?
23   A. Yes.
24   Q. And do you know what the results were of
25 any – strike that.

Page 73

1    Isn't it true that that involved a minor male
2  passenger on another minor female passenger?
3    A. Yes. I believe they were participating in a
4  scavenger hunt or something and he said, let's go back
5  to my cabin, and they went back to his cabin. That's
6  where she alleged he pushed her down to the ground.
7    Q. You're basing that off of personal knowledge?
8    A. I just remember this one.
9    Q. Okay. What was age of the minor male?
10   A. He might have been 16. They were around 15,
11 16 both of them. They were in the Club O2 program.
12   Q. So do you know whether or not what – strike
13 that.
14    Does Carnival know what the results were of
15 the criminal prosecution?
16   A. I don't think there was criminal prosecution.
17 I think they reported it late and there was no
18 prosecution of the kid.
19   Q. Do you know why?
20   A. No. You would have to ask law enforcement.
21   Q. So far, we have eight alleged rapes and sexual
22 assaults and so far as you know, no successful
23 prosecutions up to this point?
24   MR. MASE: Objection to form.
25   THE WITNESS: And I would say that the first

Page 74

1  incident we talked about, I think that is a
2  successful prosecution. Our justice system worked
3  properly. He was found not guilty by a jury of his
4  peers.
5  BY MR. GERSON:
6      Q. Well, that and since it involved a minor
7  female passenger that had been raped by a male.
8      A. Correct. And they prosecuted him and a jury
9  found him not guilty.
10     Q. Well, you don't know that, do you?
11         MR. MASE: Objection to form.
12         THE WITNESS: I do know that.
13 BY MR. GERSON:
14     Q. Do you know whether or not he pled down to a
15 lesser charge?
16     A. No. I think there was a jury trial and he was
17 found not guilty.
18     Q. Okay.
19     A. No, I know that's the case.
20     Q. So far of the eight prior incidents that we've
21 identified, no convictions of anyone involved?
22     A. There was one prosecution that we know so far
23 that resulted in not guilty, and I don't believe any
24 charges were filed that we know of. There are a couple
25 cases we didn't know the outcome, but that generally

Page 75

1  means that the AUSA or the FBI declined to prosecute.
2      Q. Okay. And Number 8, we have – we went over
3  Number 8. Then we have another incident on what date?
4      A. June 23, 2012, on the Ecstasy and a minor
5  female passenger alleged she was sexually
6  assaulted/raped by another minor passenger. And I
7  believe that one was in a restroom, a public restroom.
8      Q. Do you know what day of the itinerary?
9      A. No.
10     Q. Okay. And then we have another one – what's
11 the next one?
12     A. On June 23, 2012 onboard the Dream. A woman
13 reported that she was assaulted by two men in her cabin.
14     Q. Okay. And isn't it true –
15     A. Or maybe in their cabin, I'm not sure. They
16 both alleged it was consensual.
17     Q. When you say "they both alleged it was
18 consensual," who are "they"?
19     A. The two alleged suspects.
20     Q. Isn't it true that the female passenger
21 alleged that the males forced their way into her cabin?
22     A. I don't remember if she actually said they
23 forced their way in. I think – from what I remember,
24 they were all socializing all together, and they went
25 back, but maybe – I do know that – in fact, strike

Page 76

1  that.
2      A. I do believe they were drinking together and
3  she went voluntarily with one of them and the other one
4  she claims showed up and then she said she was raped,
5  but it was found later to be not true.
6      Q. When you say "it was found later to be not
7  true"; what do you mean?
8      A. The plaintiff's lawyer figured it out and
9  dropped the case because she was lying.
10     Q. Okay. And when you say the plaintiff's lawyer
11 figured out she was lying, who's the plaintiff's lawyer
12 and –
13     A. Jim Walker.
14     Q. So your testimony is that the incident on the
15 Carnival Dream, identified as Incident 10, the lawyer on
16 that case was Jim Walker and the allegations that were
17 made in that case, the lawyer took the position that
18 they were untrue and that she was not raped?
19     A. Well, he never filed the case because I told
20 him the facts, and I guess he figured it out and then
21 said he would no longer – he didn't pursue it.
22     Q. And the fact that – I think you used the word
23 "lying," so I want to make sure you have an opportunity
24 to clarify.
25     A. Well, so it turns out she's trying to claim

Page 77

1  she got AIDS from the two guys. She had AIDS for
2  15 years and didn't disclose it to them. They both
3  claim that it was consensual, and I guess when he
4  figured out that he had a client that lied to him, he
5  couldn't trust her anymore, but you would have to talk
6  to him.
7      Q. So you don't know whether or not he claimed
8  that she was lying about what happened, do you?
9      A. Well, I think it's pretty clear she didn't get
10 AIDS from these crew members because her medical records
11 showed she had AIDS for about 10 years or so before.
12     Q. Okay. What about the fact that she was raped?
13     A. You know, again, it seemed that her motive was
14 to pin her medical condition on this incident, and all
15 the facts and circumstances that our investigation
16 revealed, it seemed pretty clear that she had flirted
17 with other crew members, we had people that witnessed
18 them go down a hallway together, et cetera, voluntarily,
19 which was different than her story, so again, I wasn't
20 there. All you can do is look at the facts.
21     Q. So a legal claim was brought in this case
22 against Carnival, right?
23     A. I got a claim letter from Jim and then we had
24 some phone conversations about what was going on.
25     Q. And then Carnival agreed to resolve the case?

Page 78

1    A. No.
2    Q. There was no settlement?
3    A. None.
4    Q. Okay. The 11th incident. When did that
5 happen? There's another incident about two weeks later.
6    A. The one from the Dream in June, that's the one
7 we just discussed. And there was one July 9th on the
8 Magic where –
9    Q. I'm sorry. I missed – there was – the week
10 of June 23, 2012, there were two incidents, correct?
11    A. One was on the Ecstasy and one was on the
12 Dream.
13    Q. Okay. And we walked about the first one?
14    A. We did talk about the first one and the second
15 one was the one we were just discussing.
16    Q. Okay. So then the next incident, Number 11,
17 occurs – if the last incident was June 23rd, we have
18 another incident on July 9th?
19    A. Correct. Where –
20    Q. Let me ask the question since I'm doing this
21 questioning.
22        MR. MASE: You did ask a question and she was
23 answering.
24        MR. GERSON: All I asked was, the last one was
25 on July 9, 2012.

Page 79

1        MR. MASE: Then let her answer.
2        THE WITNESS: Yes.
3 BY MR. GERSON:
4    Q. And that was on the Magic?
5    A. Yes.
6    Q. And in that case, isn't it true that a female
7 passenger with a date of birth of 5/22/1989 alleged she
8 was forced to perform oral sex on a male on a deck?
9        MR. MASE: Objection to form.
10        THE WITNESS: Yes.
11 BY MR. GERSON:
12    Q. And in that case, wasn't there bruising
13 observed on the female's arms?
14    A. Yes.
15    Q. Do you know what time of day the incident
16 occurred?
17    A. I'm pretty sure it was late at night.
18    Q. Okay. Do you know whether or not – or what
19 the results of the criminal investigation were?
20    A. The FBI investigated and determined that no
21 criminal violation occurred.
22    Q. Okay. And was there another incident
23 approximately 13 days later?
24    A. On 7/22/2012 onboard the Paradise, another
25 incident is alleged to have occurred.

Page 80

1    Q. Okay. And the Paradise is just another ship?
2    A. Correct. There's 24 in the fleet.
3    Q. Okay. In this instance, it also involved a
4 female passenger approximately how old?
5    A. She would have been about 40, 38, 37 – how
6 old is she?
7    Q. Approximately 37 years old?
8    A. Thirty-seven, yes.
9    Q. And in that incident she claimed she was
10 sexually assaulted and raped by two passengers inside a
11 cabin?
12    A. Yes.
13    Q. And when is the next time?
14    A. July 27, 2012 onboard the Fantasy.
15    Q. Okay. What was the gender of that victim?
16    A. "A minor female passenger alleged she was
17 sexually assaulted and raped by another minor male
18 inside an unknown cabin."
19    Q. So that was about five days later after the
20 prior incident where the female alleges she was dragged
21 out of a dance club by a male passenger and taken to his
22 cabin –
23    A. On a different ship, yes.
24    Q. On a different ship, okay. And –
25    A. Actually, that's the first one on the Fantasy.

Page 81

1    Q. Okay. And when it says "an unknown cabin,"
2 what does that tell you?
3    A. Many times, especially with the teenagers,
4 they will try to get ahold of alcohol, and then they
5 don't remember exactly what happened. We find when
6 alcohol is involved, they don't remember what really
7 occurred.
8    Q. Okay. So you find that in a lot of these
9 cases that there's alcohol involved?
10    A. I think especially with a younger crowd like
11 that with the teenagers.
12    Q. And do you find that in a lot of cases
13 involving the younger adults, especially those who are
14 not of lawful drinking age, that alcohol also is
15 involved?
16    A. No. I just think they try to smuggle it on.
17 I think teenagers are teenagers. People don't always
18 use common sense.
19    Q. Okay. And so if that incident was – she said
20 "unknown cabin," so if we're looking at Incident 13,
21 July 27, 2012, which is five days after Incident 12, a
22 minor female passenger of how old?
23    A. I don't really recall the facts of this one so
24 well.
25    Q. What time of the day?

Page 82

1    A. I don't recall the facts of this one.
2    Q. Agreed in her cabin?
3    A. I'm sorry?
4    Q. You would agree it happened in the cabin?
5    A. Yes, an unknown cabin.
6    Q. So in this case, the fact that it was an
7  unknown cabin, did the victim allege she was drugged?
8    A. I don't remember. I know it was two teenagers
9  and that's -- I think that I would remember that.
10  Usually, teenagers don't claim they were drugged, but
11  they do, somehow, will steal alcohol somehow. I don't
12  remember if she voluntarily went with this boy to his
13  cabin or she didn't remember what cabin it was. I don't
14  recall the specific facts. Again, if I could look at
15  the incident report.
16    Q. So as you sit here today, you don't know?
17    A. I don't remember exactly.
18    Q. Carnival doesn't know?
19    A. Carnival knows. I just can't remember right
20  now. It's very hard to remember all the salient facts
21  and details of 60 incidents.
22    Q. Okay. Moving along to Number 14, less than a
23  month later we have another incident on the vessel
24  Sensation?
25    A. Yes. On a different vessel, on the Sensation.

Page 83

1    Q. What was the date of that incident?
2    A. August 19, 2012.
3    Q. What was the date of birth of the victim?
4    A. 9/28/96.
5    Q. So that would make her a minor?
6    A. Yes, she was a minor.
7    Q. And approximately how old?
8    A. I think she was 16.
9    Q. Okay. And in that case, the minor female
10  passenger alleged she was sexually assaulted and raped
11  by another passenger?
12    A. Yeah, an adult male who supplied the kids with
13  liquor.
14    Q. And that was onboard the Sensation?
15    A. Correct.
16    Q. And then Number 15 we have another incident, I
17  guess, two months later?
18    A. About two months later onboard the Ecstasy.
19  "A minor female passenger alleged she was sexually
20  assaulted and digitally penetrated by another minor male
21  passenger. The FBI was notified that the parents did
22  not wish to pursue charges." They were both 13 years
23  old, I think.
24    Q. Okay. When is the next one?
25    A. A couple of months after that, two and a half

Page 84

1  months or so, 12/15/2012 aboard the Triumph. "A female
2  passenger alleged she was sexually assaulted and raped
3  by three male passengers inside their cabin after
4  voluntarily entering to have consensual sex with one of
5  the males."
6    Q. Okay. And so in this case, it's your
7  testimony that a passenger alleges that she was sexually
8  assaulted and raped by three male passengers inside
9  their cabin after voluntarily entering to have
10  consensual sex with one of the males?
11    A. Right. She wanted to have sex with one of
12  them, but then two more came in and they raped her, was
13  her allegation.
14    Q. And how old -- what was the age of the males
15  that raped her?
16    A. I don't remember. I don't remember that.
17    Q. So in this case, it's your testimony that the
18  victim consented to having sex with one male, but not
19  the other two males?
20    A. I think she was willing to have consensual sex
21  with one of them, and two more came in and it became
22  nonconsensual, is what she said.
23    Q. According to your notes here, it says, "Female
24  passenger alleged she was sexually assaulted and raped
25  by three male passengers inside their cabin after

Page 85

1  voluntarily entering to have consensual sex with one of
2  the males."
3    A. Right.
4    Q. So if she was sexually assaulted and raped by
5  three male passengers --
6    A. One of them she initially wanted to have sex
7  with. Two more showed up and everything became
8  nonconsensual. That was her allegation.
9    Q. So then this would be an error because it
10  claimed she was raped by two male passengers and not
11  three male passengers.
12    MR. MASE: Objection to form.
13    THE WITNESS: No, Mr. Gerson. If a woman
14  consents to having sex with one person and two more
15  people enter the room to have sex, I think at that
16  point she's free and clear to say, I don't consent to
17  any of you. I'm leaving. And she alleges that the
18  three of them raped her.
19  BY MR. GERSON:
20    Q. Do you know if she was having sex with the one
21  male before?
22    A. I don't remember if they had already gotten
23  undressed, but...
24    Q. Okay. And what was the age of this victim?
25    A. Twenty-something.

Page 86

1    Q. Do you know if the men that forced – do you
2  know if the men forced their way into the cabin?
3    MR. MASE: Objection to form.
4    THE WITNESS: I don't remember.
5  BY MR. GERSON:
6    Q. Do you know how they got into her cabin?
7    A. I think they might have all been staying
8  together, but I would have to refresh my recollection.
9  I think the men were all --
10   Q. Do you know what stateroom this was in?
11   A. We could look it up, but I don't recall
12  offhand.
13   Q. Okay.
14   MR. MASE: How are you doing?  You want a
15  break?
16   THE WITNESS: No, I'm fine.
17  BY MR. GERSON:
18   Q. What was the date of the last incident?  That
19  was December 15th?
20   A. That was the one we were just discussing was
21  December 15th on the Triumph.  The next one was on the
22  Conquest on December 16, 2012 when – I'm sorry.
23   Q. Let me ask you the questions.  I appreciate
24  you wanting to provide me with the information.
25   So the last incident was December 15th, so

Page 87

1  then the next day, December 16th there's an incident on
2  what vessel?
3    A. Well, they don't know if it was actually the
4  16th.  It wasn't reported until this year that it
5  happened three years ago, and so they -- I think they
6  were kind of saying it was sometime during the voyage on
7  the Conquest that would have been taking place.
8    Q. Okay.
9    A. That week.
10   Q. And what day of the voyage did this incident
11  occur?
12   A. We don't know because she doesn't know and she
13  reported it three years later, but sometime between
14  12/16/2012 and 12/23/2012, which is when the subject
15  voyage was talking place.
16   Q. Okay.  And Incident 17 occurred on what day?
17   A. Once again, the victim doesn't know.
18   Q. Sorry, 17.  We are on 18?
19   A. Yes.
20   Q. The 18th incident occurred less than a month
21  later?
22   A. It occurred on the Magic on January 3, 2013.
23   Q. And in that case a minor female passenger
24  alleged she was sexually assaulted; is that correct?
25   A. Yes.

Page 88

1    Q. And where did that incident occur, in her
2  stateroom?
3    A. I don't remember if it was his or hers.  I
4  know he was about 21 and she was 15, so there was a bit
5  of an age gap, but I don't remember specifically.
6    Q. Okay.  And then that same day there was
7  another incident, Number 19, that was on January 3, 2013
8  on the Elation; is that correct?
9    A. On the Elation, correct.
10   Q. And in that case the female passenger alleges
11  she was sexually assaulted by three male passengers?
12   A. She didn't report it onboard.  She notified
13  local law enforcement and FBI contacted us a few weeks
14  after the cruise.
15   Q. But according to the passenger, she alleges
16  she was sexually assaulted by three male passengers,
17  correct?
18   A. Correct.
19   Q. What was the nature of the sexual assault?
20  Was that a rape or that was just what?
21   A. You know, I'm not sure we ever got a full
22  investigation.  I mean, we were notified a month later
23  by the FBI and I don't think we have an incident report
24  or the names of the male passengers, but again, I would
25  have to double check.

Page 89

1    Q. So Carnival didn't have an incident report for
2  that?
3    A. Right.  She didn't report it to us.  She
4  reported it to law enforcement a month later.
5    Q. After it was reported to Carnival, did
6  Carnival do anything to investigate?
7    A. I'm not sure if they did a security summary or
8  not.  I'd have to go back and check.
9    Q. Was the Cayman Islands' police contacted in
10  that case?
11   A. I guess.  I mean, no, just the FBI.
12   Q. The FBI was contacted?
13   A. The FBI contacted us.  She didn't report it to
14  us onboard.  A month later she reported it to either
15  local law enforcement and/or the FBI.  The FBI then
16  picked up the phone and called our security team to let
17  us know there was an alleged assault that occurred.
18   But I don't know if we got specific statements
19  as to what she claims happened inside the cabin, whether
20  it was a full rape or what type of activity it was, but
21  it was a sexual assault by three males.
22   Q. And by sexual assault, you don't know what the
23  severities of the allegations were, whether it was an
24  actual rape or sexual assault or what the specifics
25  were?

Page 90

1     A. I cannot remember specifically whether we have
2  on the back end and did a security incident report for
3  that incident. I would have to double check.
4     Q. Okay. When is the next date or the next
5  incident that's identified?
6     A. Two and a half months later onboard the
7  Splendor on 3/17/2013.
8     Q. And in that case the female passenger alleges
9  she was raped by a male inside her cabin?
10    A. Yes.
11    Q. And do you know what day of the itinerary?
12    A. I do not. And this incident was not reported
13 during the cruise. The victim contacted our guest care
14 department a couple weeks later, and she at that time
15 admitted that she had too much to drink and invited him
16 into her cabin. So once we then reported it to the FBI,
17 the AUSA declined to prosecute.
18    Q. You're basing this off of the information that
19 you -- all this information, these specifics, you are
20 not basing this off of personal knowledge, you are
21 basing this off of a spreadsheet that we have marked?
22    MR. MASE: Objection to the form of the
23 question. Spreadsheet just serves to refresh her
24 recollection. She's testified to that.
25    THE WITNESS: I remember a lot of these cases,

Page 91

1  especially the ones that resulted in claims, and
2  looking at the incident reports when we were
3  preparing all of this stuff for you. But I really
4  don't remember this specific one because it wasn't
5  reported initially, so I'm not sure if we have an
6  incident report, so...
7  BY MR. GERSON:
8     Q. So did Carnival do anything to investigate in
9  this case?
10    A. Again, when they're late reported and law
11 enforcement already has them, we might do a security
12 summary or something in anticipation of litigation
13 trying to figure it out, especially since she was
14 calling guest care, which seems claims-related already,
15 but I don't recall offhand. I would have to look for
16 you, research that.
17    Q. So your memory -- based on your memory
18 investigation, this passenger that claims she was raped
19 by a male inside her cabin, it's your testimony that she
20 also claimed that she had invited him into her cabin?
21    MR. MASE: Objection to the form of the
22 question.
23    THE WITNESS: That is the information we have.
24 I just can't remember if --
25

Page 92

1  BY MR. GERSON:
2     Q. It was not reported to the cruise line?
3     A. It was not initially reported to us onboard.
4  It was reported to us through our guest care, so she was
5  calling in saying, by the way, I was raped. Then the
6  FBI was notified.
7     Q. Okay. And when is the next incident that's
8  identified in this spreadsheet?
9     A. March 25, 2013 onboard the Carnival Spirit.
10    Q. And in this case, a female passenger also
11 claims she was raped by a male passenger inside her
12 cabin?
13    A. Yes.
14    Q. Okay. And do you know what day of the
15 itinerary?
16    A. Again, it's 3/25/2013.
17    Q. Okay. And do you know whether or not if there
18 was a successful prosecution in that case?
19    A. I think they declined to prosecute. They were
20 both in their 20s. She admitted --
21    Q. I don't want you -- well, in your spreadsheet
22 anywhere, does it say that -- or any of the documents
23 that have been produced in this case, does it say that
24 anyone declined to prosecute?
25    MR. MASE: Objection to form.

Page 93

1     THE WITNESS: "Responding police found no
2  evidence of any sexual assault." So I'm thinking
3  that if there's no evidence of sexual assault
4  occurring, nobody would bring prosecution for that,
5  but maybe I'm getting ahead of myself in guessing.
6  BY MR. GERSON:
7     Q. So the fact that the passenger alleges she was
8  raped in this instance, you're reading from the
9  spreadsheet that there was no evidence of a rape found?
10    A. By the police.
11    Q. Okay. Getting back to Incident 21, what was
12 the age of that victim?
13    A. They were both in their early 20s. I think,
14 23 or 20. Early 20s.
15    Q. Okay. But this was an incident of a rape by a
16 male passenger inside her cabin, alleged?
17    A. Yes. She reported it a little late and didn't
18 want to pursue it at that point, but she reported it to
19 local law enforcement anyway.
20    Q. Okay. When is the next incident reported?
21    A. About month later on the Fantasy.
22    Q. Okay. And what happened in that case? That
23 involved a female passenger; is that correct?
24    A. Yes. It was inside a nightclub and she
25 alleged that as she was standing by the bar, a crew

Page 94

1 member – I think it was an entertainment staff came by
2 and put his hand up her skirt.
3    Q.  Okay.  And did the passenger allege that he
4 digitally penetrated her in that case?
5    A.  I think initially, no, but later she did say
6 there was digital penetration.
7    Q.  Okay.
8    A.  Onboard the ship that wasn't the case, but
9 when she filed the claim, the story changed a little.
10    Q.  And the FBI were contacted?
11    A.  Yes.
12    Q.  Whatever happened to the crew member?
13    A.  I don't recall.
14    Q.  Do you know if he's still on the vessel?
15    A.  I'd have to look it up to see if he got fired.
16 He probably got terminated, but I'm not sure.
17    Q.  Okay.  And then a month later we have another
18 incident on the Conquest?
19    A.  Aboard the Conquest, yes.
20    Q.  And in this case a female passenger alleges
21 she was raped by another male passenger?
22    A.  Or attempted rape.  Yeah, I guess it says rape
23 here.  I kind of remember that she went into sort of a
24 pantry or a closet to make out, but then he dropped his
25 pants, and said I want – and she backed up and said no.

Page 95

1    Q.  And then she alleged she was raped?
2    A.  That's what it says here.
3    Q.  What was the age of that victim?
4    A.  I don't remember.  I want to say she was like
5 30.  I think they were a little older.
6    Q.  Okay.  You want to take another look?
7    A.  What?
8    Q.  Talking about the incident on the Conquest.
9    A.  Oh, '92, 21.  Early 20s, right?
10    MR. MASE:  In '13, she would be 21.
11    THE WITNESS:  21.
12    MR. MASE:  Yeah.
13 BY MR. GERSON:
14    Q.  Okay.  And then about five days later, we have
15 another incident on the Victory?
16    A.  On a different ship, the Victory.  The father
17 of a female passenger that his daughter was sexually
18 assaulted.
19    Q.  Is that all?
20    A.  Um –
21    Q.  Doesn't it say that she was sexually assaulted
22 and raped by a minor male passenger and another male
23 passenger inside her cabin?
24    A.  That's what the father alleged.  The girl
25 herself said it was consensual.  The father said a

Page 96

1 14-year old cannot consent.  I think the guy was 17, so
2 there was some dispute there.
3    Q.  So do you know how the passengers got into the
4 stateroom?
5    A.  She voluntarily went with this particular
6 person to have sex, but according to –
7    Q.  So of 23 incidents that we've gone over so
8 far, it's Carnival's position that all of these
9 passengers have voluntarily invited or have consented to
10 the acts?
11    MR. MASE:  Objection to form.
12    THE WITNESS:  No, sir.  I think we have been
13 discussing this list, which is what the victim
14 alleged.  And in this particular case, the father was
15 speaking for the victim, but because it came to us as
16 an alleged rape, we have it on the list.  But the
17 daughter, the purported victim said it was
18 consensual, but under the law, 14-year-olds cannot
19 consent.
20 BY MR. GERSON:
21    Q.  Doesn't it just say the daughter would not
22 cooperate with an onboard investigation?
23    A.  Correct, because she said, Dad, it's
24 consensual.  And Dad said, it can't be consensual
25 because you're only 14 years old.

Page 97

1    Q.  Does it state in here how these passengers got
2 into the room?
3    A.  I think she went with them to his cabin.
4    Q.  Okay.  And then three days later we have
5 another incident?
6    A.  Onboard the Dream.  Let me refresh my
7 recollection.  This girl was 18 and I kind of remember
8 her mother is the one that brought it to the attention,
9 but that the girl did claim she went to have a drink
10 with him and then he raped her inside the cabin and he
11 was actually arrested.
12    Q.  Do you know what day of the itinerary?
13    A.  It was June 4, 2014.
14    Q.  Do you know what day?  The first day?  The
15 second day?
16    A.  No.  We would have to look at the day the ship
17 left and we can calculate it from there.
18    MR. GERSON:  Let's take a two minute break.
19    THE WITNESS:  Okay.
20    MR. MASE:  Fine.
21    (A recess was taken.)
22 BY MR. GERSON:
23    Q.  I think the last incident we were on was
24 June 9, 2013 – excuse me.  June 4, 2013 was the last
25 one we talked about.

Page 98

1    A. Okay. Number 25?

2    Q. Well, that one – we established that one was

3 on the Dream and the female passenger was sexually

4 assaulted and raped by a male passenger, right?

5    A. Yes.

6    Q. Okay. And then the next one was June 9th.

7    A. Yeah. And that guy was arrested in 25, but I

8 don't know the outcome.

9    Q. Do you know – well, tell me what you know

10 about what happened on June 9, 2013 on the Freedom.

11    A. 18-year old female passenger alleged she was

12 sexually assaulted and raped by another minor male

13 passenger in his cabin.

14    Q. How do you know it happened inside her cabin?

15    A. She would have told us. She would have given

16 us that information.

17    Q. Okay. And there is a Broward County Sheriff's

18 report number for that?

19    A. Yes.

20    Q. And so did she report that she went inside his

21 cabin voluntarily?

22    A. I think so. I think she was going inside to

23 have a drink – no. That was the one on the Dream. The

24 one on the Freedom, right?

25    Q. Uh-huh.

Page 99

1    A. Yeah. I don't know how – what – I don't

2 remember the circumstances of how she got in there or

3 what they were doing before.

4    Q. Okay. Now, was that in her statement?

5    A. We have an incident report of that, I just

6 don't remember what the facts and circumstances were

7 before, like if she met him somewhere. I think he was

8 17 and she was 18.

9    Q. Okay. Of the 26 or 25 prior incidents we've

10 discussed, most of them have incident reports with the

11 exception of the ones that weren't reported right away

12 to Carnival –

13    A. Yes.

14    Q. – correct?

15    A. I think they all have incident reports. Most

16 all.

17    Q. Okay. And if an incident report was done,

18 that would mean there would be witness statements,

19 photographs, there would be all kinds of investigative

20 material?

21    A. Depends on the level of investigation, but

22 generally speaking, they are going to try and get

23 witness statements.

24    Q. And that –

25        THE WITNESS: See, you are hungry.

Page 100

1        MR. GERSON: I'm happy to stop.

2        MR. MASE: Keep going. I'm fine.

3 BY MR. GERSON:

4    Q. Okay. Incident 27 is on the Imagination and

5 that's four days later?

6    A. Yes, 6/15/2013.

7    Q. And in that case, what do you know about what

8 happened there?

9    A. It says "Female passenger alleged she was

10 sexually assaulted by a male passenger and forced to

11 perform oral sex on him, but the female passenger didn't

12 want to pursue it." I think her roommate – they didn't

13 actually report it. What happened is, the roommate went

14 and attacked the guy when she saw him, how dare you

15 attack my – and that's how it got reported.

16        The purported victim didn't want to pursue

17 anything about it, but her cabinmate got really mad and

18 tried to beat up the suspect. It's kind of strange. So

19 that is how it got reported.

20    Q. Okay. Miami-Dade Police Department –

21    A. The victim wouldn't help out in the

22 investigation, wouldn't help law enforcement, et cetera.

23    Q. When you say she wouldn't cooperate, what

24 wouldn't she do?

25    A. She refused – the FBI, I think, was notified

Page 101

1 and the local law enforcement was notified and she just

2 refused to cooperate in the investigation.

3    Q. Do you know what specifically?

4    A. No. You probably would have to ask local law

5 enforcement what they asked her to do. But I don't know

6 how she didn't cooperate, but that was the information

7 that got back to us from Miami-Dade, was that she didn't

8 want to participate, and she declined to press charges

9 against the guy.

10    Q. The next incident?

11    A. Was on June 25, 2013 on the Imagination. The

12 minor female passenger alleged that she was sexually

13 assaulted and raped by a male passenger inside his

14 cabin. The victim and her parents declined to pursue

15 criminal charges.

16    Q. Was the FBI contacted?

17    A. The FBI was contacted as well as the

18 Miami-Dade Police Department, but because they didn't

19 want to pursue criminal charges, nothing happened

20 further. I don't recall this one offhand either. There

21 was no claim or anything, I don't think.

22    Q. Okay. Do you know why – what is the basis

23 for the statement that the victim and her parents

24 declined to pursue criminal charges?

25    A. I think they told them onboard they didn't want

Page 102

1  to pursue anything and they also told law enforcement.
2  Law enforcement – because we cooperate with law
3  enforcement fully whenever they need information, we try
4  to give them witnesses or keep people onboard so they
5  can interview them.  They usually tell us what's going
6  on with the case.
7      Q.  Okay.  And what about on July 6, 2013, was
8  that the next incident that was reported?
9      A.  On the Sensation, uh-huh.  And the father of a
10  minor female passenger who was, I believe, about
11  14 years old, he said his daughter was sexually
12  assaulted and raped inside a bathroom by another male
13  passenger, who was 16 years old.  The girl said it was
14  consensual.  It was two teenagers in the bathroom, but
15  the father felt otherwise.
16      Q.  Okay.
17      A.  I don't think it was reported onboard.  I
18  think the father found out about it and called us and
19  told us later.
20      Q.  What is the significance of the fact that the
21  incident was not reported onboard?
22      A.  Generally, you are not the going to have a
23  full security investigative report.  Sometimes they'll
24  just do a security summary shoreside.  The ACSO is not
25  going to do the investigation when everyone is gone.

Page 103

1  The voyage is over, so all the evidence is kind of
2  stale.
3          So you can only kind of retroactively do a
4  summary to find out what you're learning from law
5  enforcement.  I mean, at that point, we would prepare
6  something to get facts to prepare for litigation
7  possibly, but the law enforcement already has it at that
8  point.
9      Q.  Of the 29 prior incidents that you have
10  testified about so far, have you ever reviewed any of
11  the video footage of the CCTV cameras in connection with
12  any of these incidents?
13      A.  There is rarely CCTV coverage of these
14  incidents.
15      Q.  What is your understanding as to why that is?
16      A.  They're just no coverage.  There's no video
17  coverage that actually records in, certainly, inside
18  somebody's cabin.  Occasionally, we'll get footage of a
19  couple walking by or walking on their way to the cabin,
20  and you can see what the circumstances were there.
21          We have had allegations where somebody was,
22  like, dragged and then you find the video footage that
23  she's hand-in-hand walking happily smooching the guy,
24  that type of thing.  But in these particular ones, I
25  don't recall any video footage, but if there was some

Page 104

1  and there was a litigation case, I would have reviewed
2  it.
3      Q.  And isn't it true for most of these incidents
4  that occurred in the passenger cabins, there are no
5  video cameras in the corridors that lead to the cabins?
6      MR. MASE:  Objection to form.
7      THE WITNESS:  Yeah.  There are no cameras in
8  the corridors, generally.  I take that back, there
9  may be on the Australian ships now.  You would have
10  to ask security services if they put them in.
11  BY MR. GERSON:
12      Q.  What is the 30th incident?
13      A.  On the Breeze on 8/20/2013, a female passenger
14  alleged she was sexually assaulted by being touched
15  inappropriately.
16      Q.  Where did that incident occur?
17      A.  I think she didn't report it onboard.  She
18  called in to guest care and I think you have the iCare
19  records.  We got that incident from iCare where she's
20  just said – she was very unspecific.  There's no
21  purported subject.
22      Q.  FBI contact you?
23      A.  The FBI is always going to be contacted on any
24  allegation of crime, so I think we probably reported it
25  once it came to us, and then we reported it to them and

Page 105

1  let them take over to see if they wanted to pursue it.
2      Q.  Okay.  How long have you been – has Carnival
3  been reporting incidents to the FBI about rape and
4  sexual assault crimes?
5      MR. MASE:  Objection to form.
6      THE WITNESS:  You'd have to ask security
7  services when it started, but as long as I've been
8  there for 11 years.  Maybe not always to the FBI, but
9  to local law enforcement, whose ever jurisdiction it
10  is.
11  BY MR. GERSON:
12      Q.  Isn't it true that it's only within the last
13  several years that Carnival has been required to report
14  serious crimes, such as rape and sexual assault, to
15  federal law enforcement?
16      MR. MASE:  Objection to form.
17      THE WITNESS:  I think the CVSSA, which was
18  implemented in 2010, they required it, but we were
19  doing that long before the CVSSA came into existence.
20  BY MR. GERSON:
21      Q.  Okay.  So far as you know, has Carnival always
22  been complying with federal law enforcement's request
23  for investigations into incidents like rapes and sexual
24  assaults that have been occurring or allegedly occurring
25  on the cruise ships?

Page 106

1     A.  I have no idea what you just asked.  You just
2  said federal law enforcement asks us to investigate.
3  They never ask us to investigate.
4     Q.  No.  Is it your testimony that Carnival has
5  always cooperated with the federal law enforcement
6  authorities in connection with rapes and sexual assaults
7  that were occurring prior to the CVSSA?
8     A.  We would always cooperate with law
9  enforcement, sure.
10    Q.  Okay.  Next incident is 31.  What happened
11 there?  What was the date of the next incident?
12    A.  August 24, 2013 onboard the Magic.  A female
13 passenger alleged she was sexually assaulted and raped
14 by a male passenger inside his cabin.  They had sex a
15 few nights prior, and the AUSA declined to prosecute.
16 They were both in their 20s.
17    Q.  Where -- do you know how the passenger --
18 you're claiming that this incident occurred in the male
19 passenger's cabin?
20    A.  Yes.  She said it happened inside his cabin.
21    Q.  Okay.  What are you basing that off of, what
22 records?
23    A.  We have an incident report.  I don't think
24 there was a claim on this, so I'm not really specific on
25 the details.  But I do remember that she had -- I think

Page 107

1  the reason the AUSA didn't pursue it is because they had
2  had consensual relations throughout the cruise and there
3  was some discrepancy of what was going on.  If memory
4  serves -- and I'm not a hundred percent sure -- I think
5  he had sex with somebody else on the cruise, which made
6  her mad.
7     Q.  What are you basing that off of?
8     A.  I'm remembering an incident report --
9     Q.  So this is your recollection?
10    A.  I'm trying to refresh my recollection --
11    Q.  So your recollection is --
12    A.  -- but again, it would be so much easier if
13 you let me look at the incident reports.
14    Q.  I understand.  Your recollection of what
15 occurred on August 24, 2013 is based on the incident
16 report?
17    A.  Right.
18    Q.  Okay.  And you don't know what day of the
19 itinerary that one occurred, do you?
20    A.  I do.  It happened on August 24, 2013
21 according to the victim.  You would have to look up what
22 day of the cruise that was.
23    Q.  Okay.  Would you agree that for the most part,
24 most, if not all these incidents with the exception of a
25 few, all occurred late at night?

Page 108

1     A.  No, not the all of them.  Some of them are --
2     Q.  Well, not all of them, but the majority?
3     A.  A lot.
4     Q.  Between the hours of 12 a.m. and 6 a.m.?
5     A.  I really have never looked at it that way or
6  looked for that data, but I would agree, a lot of them
7  occurred at night.
8     Q.  Okay.  Have you ever been asked to analyze any
9  of the patterns and trends that Carnival is able to
10 identify as a result of being placed on notice of these
11 various incidents?
12    MR. MASE:  Objection to form.
13    THE WITNESS:  I would disagree that there's
14 any pattern or trend.  In this three-year period that
15 we're looking at, fleet-wide we sailed over
16 12 million people on these vessels, so 50-some-odd
17 incidents is really a very, very low number.
18    MR. GERSON:  59.
19    THE WITNESS:  Very low number for 12 million
20 passengers.
21 BY MR. GERSON:
22    Q.  Okay.  So Carnival's view of the 59 total
23 incidents is that this is a very low number?
24    A.  It is certainly not a trend or a pattern.
25 It's a very, very one-off situation.

Page 109

1     Q.  Okay.  Carnival doesn't do anything -- strike
2  that.
3     Based on -- strike that.
4     As the corporate representative of Carnival,
5  since Carnival doesn't believe that there are any
6  patterns or trends, is it safe to say that Carnival does
7  not analyze any patterns or trends since they don't
8  think anything needs to be analyzed with respect to
9  rapes and sexual assaults on the cruise ships?
10    MR. MASE:  Objection to form.
11    THE WITNESS:  I do not think there's a pattern
12 or trend of sexual assaults onboard our vessels.  I
13 think, unfortunately, they are alleged at times to
14 have occurred and the company takes the safety and
15 welfare and well-being of our guests very seriously.
16 So they do -- they have adequate measures to secure
17 everybody onboard, but if you're going to allege that
18 59 incidents out of 12 million passengers is a
19 pattern or trend, I would have to disagree with that
20 assessment.
21 BY MR. GERSON:
22    Q.  Okay.  What about the frequency in which the
23 incidents are occurring?
24    A.  The same.  So the frequency is actually very
25 minimal when you're looking at the passenger load and

Page 110

1  the volume of people that are interacting on 24 vessels
2  each year. Four million people a year, so...
3      Q.  Is this something that falls within the scope
4  of your responsibility at Carnival at all to analyze any
5  patterns and trends of claims such as rapes and sexual
6  assaults that are occurring on Carnival ships?
7      A.  Claims, I would probably if I saw a pattern or
8  a trend in claims, yes, we would. But as far as
9  incidents, that would probably be security services to
10  determine whether there's a security problem or breach.
11      Q.  Okay. So all these prior incidents weren't
12  necessarily claims with your office. Civil claims were
13  not necessarily filed, right?
14      A.  Many of them were just reports onboard and no
15  claims ensued.
16      Q.  And in many of these reports – we don't have
17  to go over them – it's identified where the FBI and
18  local police department were contacted and where they
19  were not?
20      A.  I think they were contacted in every case, and
21  sometimes, they were the ones contacting us on the back
22  end.
23      Q.  Okay. So the last incident that we went over
24  was, I believe, on the Breeze.
25      A.  Okay.

Page 111

1      Q.  No, I'm sorry. The last one was 8/24 on the
2  Magic.
3      A.  Okay.
4      Q.  And that involved, I guess, a passenger in her
5  20s. So roughly, three weeks later, or two and a half
6  weeks later – no, I take that back. Three weeks – no.
7  Two weeks later on September 12, 2013, we have another
8  incident, correct?
9      MR. MASE:  Objection to form.
10      THE WITNESS:  Yes. That's closer to three
11  weeks, but yes, on the Inspiration, a male passenger
12  alleged he was sexually assaulted and raped by
13  another male passenger after voluntarily entering his
14  cabin.
15  BY MR. GERSON:
16      Q.  Okay. After who voluntarily entered whose
17  cabin?
18      A.  From what I remember, he went back to the
19  guy's cabin, they drank a lot. The purported subject
20  claimed they had consensual sex four times. The
21  purported victim said I don't know what happened. I
22  woke up naked and I didn't consent to anything, so we
23  don't know what really occurred.
24      Yes, it says here, "He remembers waking up
25  lying naked next to the man. He had consensual sex four

Page 112

1  times prior to this incident." Actually, I remember the
2  subject in this case saying that night they had
3  consensual relations. That they may have had.
4      Q.  Okay. Most of these – the information that
5  you're providing to us today is based on your
6  recollection of the incident and the events as you
7  remember, right?
8      A.  Well –
9      Q.  I mean, you weren't –
10      A.  The ones that have claims, I have more
11  intimate knowledge of. But, you know, I, again, see a
12  lot of these reports, even when they don't have claims
13  because they come to our office, so they are given to
14  Bob and myself and we review them. You know, we see
15  sometimes claims coming. I don't think this one had a
16  claim, but I kind of remember the incident report.
17      Q.  Okay. And let's go to the next one. How many
18  weeks later was the next one?
19      A.  About two weeks later to two half weeks on the
20  Elation. A female passenger alleged she was raped by a
21  male passenger who was her boyfriend in a shared cabin.
22      Q.  FBI contacted?
23      A.  Yes, and the New Orleans Harbor Police.
24      Q.  Okay.
25      A.  And then the victim declined to pursue

Page 113

1  criminal charges after that.
2      Q.  That's according to your document, right?
3      A.  That's the according to – yeah, the
4  information provided from the document.
5      Q.  All these instances in this case or this
6  deposition so far where you've testified that the victim
7  declined to pursue criminal charges, this is all based
8  on documents that you've reviewed or relied on?
9      MR. MASE:  Objection to form.
10      THE WITNESS:  Some yes, some no. Some Counsel
11  has done it, because we couldn't get an agreement
12  from you as to what I should or shouldn't review, so
13  it just complicated everything. It would have been
14  so much easier to get an agreement that we could
15  review it. You wouldn't have been waiving anything
16  to argue to the magistrate or to the judge that we
17  should produce those later. So some of it's from
18  Counsel, some of it's from my independent knowledge.
19  Doing the best I can with what I've been given.
20      MR. MASE:  But we brought all the incident
21  reports if you would like to recede from your
22  position per Exhibit 1. See that stack right there?
23  I think I estimated when I looked at it as
24  eight inches, but now, I'm looking and it's closer to
25  six inches.

Page 114

1  BY MR. GERSON:
2  Q. What's the next incident? What are we up to?
3  A. Thirty-four.
4  Q. Thirty-four. And --
5  A. About a month later on the Miracle.
6  Q. About three weeks later, right?
7  A. 10/23/13.
8  Q. Right. So the last incident was on 9/30. The
9  next one is three weeks later, 10/23, so about three
10 weeks later, we have another rape/sexual assault on the
11 Miracle?
12 A. Yes.
13 Q. Okay. And then about a month later, we have
14 another one on the Paradise?
15 A. Well, you said rape/sexual assault. The
16 husband was claiming that the wife was attacked by a
17 black male in the laundry room. She disagreed with
18 that, so I don't know what the -- I don't know if she
19 alleges she was raped.
20 Q. Okay.
21 A. But there was a report that some type of
22 assault occurred.
23 Q. Sexual assault.
24 A. Of course, sexual assault. The husband said
25 she was sexually assaulted by a man, correct.

Page 115

1  Q. Okay. And it's your testimony that the female
2  didn't want to report the incident?
3  A. Correct.
4  Q. What is the basis of that remark?
5  A. That is what the incident report revealed,
6  like our investigation, internal investigation.
7  Q. Okay. And was that a -- that unknown male,
8  was that a crew member?
9  A. I don't believe so, no. Just a male
10 passenger.
11 Q. Okay. And according to this exhibit, FBI
12 declined to open formal charges or open a formal
13 investigation?
14 A. Yes.
15 Q. Okay. Then about a month later, we have
16 another incident, Number 35.
17     MR. MASE: Objection to form.
18     THE WITNESS: Yes. A little over a month
19 later on 11/24/2013 onboard the Paradise, a female
20 passenger alleges she was raped by her cabinmate.
21 BY MR. GERSON:
22 Q. Okay.
23 A. They were sharing a cabin. She said they
24 weren't sexual before and she said he...
25 Q. What else?

Page 116

1  A. What else what?
2  Q. Tell me what else you know about that
3  incident.
4  A. She didn't report the incident immediately.
5  She got mad at him. She was in her 20s, he was a bit
6  older. I think he was in his 40s and she just claimed
7  she was -- that he assaulted her inside the cabin. The
8  FBI was notified. All the parties were interviewed
9  and we don't know what happened. I don't think the FBI
10 ever told us one way or the other --
11 Q. You got a report on this one also?
12 A. I think there's a report, yes.
13 Q. Statements?
14 A. Her statement, probably the gentleman. I
15 don't know if there was anybody else. It was just the
16 two of them in the cabin.
17 Q. Okay. And then that same day, there's another
18 incident on the Miracle?
19 A. Yes. Where a minor female passenger alleged
20 she was sexually assaulted and raped by another minor
21 male passenger inside her cabin. She didn't know the
22 exact date of the incident or the identify of the
23 suspect. The case came to light after the victim
24 attended summer camp and told her camp counselor. So
25 although the incident was alleged to have occurred in

Page 117

1  November of 2013, she actually didn't report it until
2  the next summer.
3  Q. Okay. And so what happened in that case? Did
4  Carnival do anything to investigate?
5  A. I think the FBI notified us when she told her
6  camp counselor, and I think there's a brief summary, a
7  shoreside summary, as we discussed. They can't really
8  do a formal security incident report so long after the
9  voyage. So we knew it was in good hands with law
10 enforcement and we, I think, made a one- or two-page
11 shoreside report in anticipation of litigation.
12 Q. Okay. And about six weeks later we have
13 another incident on the Elation?
14 A. Correct.
15 Q. And what happened there?
16 A. A female passenger alleged she was sexually
17 assaulted and raped in her cabin by a male passenger who
18 her cabinmate had left her with while she was
19 unconscious. The victim was heavily intoxicated and on
20 prescription medication. The victim was discovered by
21 her cousin who entered the cabin and saw the male having
22 intercourse with her.
23     The victim was treated in the medical center
24 and wanted to pursue criminal charges. The FBI
25 investigated and advised that they presented the report

Page 118

1 for adjudication of criminal charges against the
2 accused. So it was presented to the AUSA, but I don't
3 know that we ever got a – the AUSA never told us what
4 they did with that case.
5     Q. So in this case, your testimony is that the
6 passenger alleged she was sexually assaulted and raped
7 in her cabin by a male passenger who her cabinmate had
8 left her with while the victim was unconscious?
9     A. Right.
10    Q. How did she know who she was left with if she
11 was unconscious?
12    A. Because her cousin came in and saw him having
13 sex with her while she was unconscious.
14    Q. But how does she know she was left with him?
15    A. I guess she asked her roommate, what the heck,
16 man.
17    Q. Do you know?
18    A. I don't remember exactly.
19    Q. You don't know.
20    A. I'm sure they interviewed the cabinmate.
21    Q. Everything that you're telling me is based off
22 of some sort of investigation that Carnival has
23 conducted, right?
24    MR. MASE: Objection to form.
25    THE WITNESS: Most of them, yes. Except the

Page 119

1 ones that we discussed that the FBI notified us.
2 BY MR. GERSON:
3     Q. Okay. So these would all be based on reports
4 that Carnival employees are preparing and writing,
5 correct?
6     A. Yes. We prepare a report in anticipation of
7 litigation, such as this, and then we assist law
8 enforcement with whatever they need to prosecute any
9 crime.
10    Q. And certainly, all the incidents for which
11 we've talked about where the FBI having been contacted,
12 pursuant to federal law, Carnival would have disclosed
13 their reports to the FBI and all those cases because you
14 are required to?
15    MR. MASE: Objection to form.
16    THE WITNESS: No. We are not required to turn
17 them over, but when they request them, whether we get
18 a subpoena or not, we would assist them with their
19 investigation. So if law enforcement asks us for
20 information, we would comply fully.
21    We're not required to do that under federal
22 law, but it's always been common practice and a
23 courtesy to give law enforcement whatever it is they
24 need to whatever crime might have occurred
25 onboard our ships.

Page 120

1 BY MR. GERSON:
2     Q. Okay. Do you have a way of – of all these
3 incidents where the FBI was contacted, is it your
4 testimony that the FBI did not require you to provide
5 them a copy of your shipboard incident report?
6     MR. MASE: Objection to form.
7     THE WITNESS: No, sir, that's not what I said.
8 What I said is that federal law doesn't require it.
9 You said that federal law requires it. We've always
10 complied fully with any request from law enforcement.
11 When they say, hey, give us your incident report, we
12 are not going to tell the FBI no. We don't really
13 think we have a choice.
14    MR. MASE: Did you get my objection?
15    THE COURT REPORTER: Yes, I did.
16    MR. MASE: Okay, thank you.
17 BY MR. GERSON:
18    Q. Okay. So it's your testimony that every time
19 the FBI is contacted about an incident, that Carnival is
20 not required to provide the FBI with a copy of
21 Carnival's incident reports and statements?
22    MR. MASE: Objection to form.
23    THE WITNESS: By federal law, we are not
24 required, but –
25

Page 121

1 BY MR. GERSON:
2     Q. What about any other laws?
3     A. I mean, if the FBI subpoenas documents or says
4 we need this in order to prosecute a criminal or an
5 alleged rape, yes. We are going to assist fully.
6     Q. I'm not talking about in the event of a
7 subpoena. Let's talk about the incident that we just
8 went over, Number 37. According to this incident on
9 December 6, 2013, the FBI was contacted.
10    A. Yes.
11    Q. And it says the FBI investigated.
12    A. Yes.
13    Q. And were Carnival's reports provided to the
14 FBI?
15    A. I don't know.
16    Q. Okay. Is it your testimony that – and I
17 think – I just want to make sure I understand
18 something. So far what I understand, it's your
19 testimony that any time the FBI is not contacted – or
20 any time the FBI is contacted, Carnival is not required
21 to provide the FBI with a copy of their reports and
22 statements?
23    MR. MASE: Objection. Form. Asked and
24 answered.
25    THE WITNESS: Federal law, to my knowledge,

Page 122

1   does not require us to turn over our internal
2   privileged accident report. However, it would be
3   deemed – we're put between a rock and a hard place
4   at that point when law enforcement says, we exigently
5   need to figure out what happened here because all
6   these people are about to disembark the ship. So we
7   will assist them in any way possible, so if they ask
8   or subpoena a copy of our accident report, we do
9   provide that.
10  BY MR. GERSON:
11     Q.  Okay. What about for all – what about under
12  Panamanian or Bahamian law –
13     A.  I don't know. I'm not an expert on that. I
14  don't know. You would have to ask security services,
15  but I don't think so.
16     Q.  Okay. So is it your testimony that the only
17  time that Carnival is required to provide its shipboard
18  incident reports to the FBI is when it receives a
19  subpoena in response to a rape or criminal or sexual
20  assault?
21     MR. MASE:  Objection to form.
22     THE WITNESS:  You know, I think if the federal
23  government, or even local law enforcement, requests a
24  report with a subpoena or not, it would be bad
25  business practice for a company to not comply with

Page 123

1   that request to assist in prosecuting a potential
2   criminal.
3      So it's my understanding that the CVSSA, we're
4   only required to do the crime allegation logs and the
5   serious allegation logs for the – I think the
6   Bahamian state and the flag state are the same, but
7   again, I'm not an expert on flag state law.
8   BY MR. GERSON:
9      Q.  Okay. What about – I mean, most Carnival
10  ships are either flagged under –
11     A.  Bahamian and Panamanian?
12     Q.  Right. So what is your understanding of what
13  the requirements are under Bahamian law and Panamanian
14  law in terms of reporting rapes or sexual assaults?
15     MR. MASE:  Objection. Lack of qualification
16  and predicate. Go ahead.
17     THE WITNESS:  Yeah. I'm not an expert on flag
18  state law at all. Bahamian, Panamanian, I don't
19  know.
20  BY MR. GERSON:
21     Q.  Well, Carnival – you don't know?
22     A.  I don't know.
23     Q.  Moving to Number 38 on the list.
24     A.  Okay.
25     Q.  What is your understanding of what happened

Page 124

1   there?
2      A.  These were 10- and 11-year-old boys in a
3   public restroom and the 10-year-old boy thought – I
4   think the 11-year-old boy tried to pull down the
5   10-year-old's pants. So he reported it as like an
6   attempted sexual assault. It says, "Minor male
7   passenger alleges he was sexually assaulted by another
8   minor male passenger in a public restroom.
9      "The victim stated when he was in the
10  bathroom, the suspect entered and tried to pull down his
11  pants. The parents refused medical treatment for the
12  victim and did not want to press charges against the
13  other boy. But the FBI were notified as were the
14  Baltimore Harbor Police." And that was onboard the
15  Pride.
16     Q.  Okay, moving along. When was the next
17  incident? We have on the Sunshine on the same day,
18  December 12th?
19     A.  The next day on the Sunshine, a different
20  vessel, and a female passenger alleged that she was
21  raped by a male inside her cabin after she invited him
22  inside and she initially began having consensual sex
23  with him. But then the victim wanted to stop because
24  her child was asleep next to her. She did not notify
25  anyone onboard because she did not want her family to

Page 125

1   find out.
2      Q.  Okay. And was the shipboard incident report
3   provided to the FBI in connection was incident?
4      A.  I don't know.
5      Q.  And it says that according to at least your
6   testimony, or according to the spreadsheet that was
7   provided, that the victim declined to pursue criminal
8   charges in that case?
9      A.  Yes. And then the FBI declined to
10  investigate. I guess because they didn't have a victim.
11     Q.  So it sounds like if I were looking at all of
12  documents and of your testimony right now and
13  I were to summarize of the 39 incidents, the trend that
14  seems to be established is that passengers are alleging
15  initially that they are victims of rapes or sexual
16  assaults and either it turns out that the victim doesn't
17  want to press charges or it turns out that the victim is
18  changing their story and it was consensual?
19     MR. MASE:  Objection to form.
20     THE WITNESS:  I don't think it's a trend. I
21  think every case turns on its facts, so we can sit
22  there and go back and forth again.
23  BY MR. GERSON:
24     Q.  Well, Carnival is not conducting criminal
25  investigations into all of these incidents, are they?

Page 126

1      MR. MASE: Objection to form.

2      THE WITNESS: Yeah. We are not law

3   enforcement. We leave that up to law enforcement.

4   BY MR. GERSON:

5      Q.  Right. But your people are trained to

6   investigate an incident in a particular fashion?

7      A.  Yes.

8      Q.  Okay. Based on the way they are trained by

9   Carnival, right?

10     A.  Yes.

11     Q.  Okay. So they are trained to take a statement

12  of a witness in a particular way?

13     A.  I believe so. Again, that's going to be an

14  area for security services.

15     Q.  Okay. They're trained to document a crime

16  scene in a particular fashion or particular manner?

17     A.  I believe so.

18     Q.  Okay. And – okay, I just wanted to establish

19  that.

20     MR. MASE: What was established?

21     MR. GERSON: So far that there are 39 prior

22  incidents of rapes and sexual assaults and even

23  though that they are alleged to have occurred, as it

24  turns out, none of them seem to have occurred the way

25  they are initially reported.

Page 127

1      MR. MASE: Objection to form.

2   BY MR. GERSON:

3      Q.  Is that Carnival's understanding of the

4   39 incidents so far?

5      MR. MASE: Objection to form.

6      THE WITNESS: No. I didn't ever say any of

7   that. I said every case turns on its facts and if we

8   want to go back over the 39 we've already

9   discussed –

10     MR. MASE: No, do not offer that. I object to

11  my client offering that. Do not say that.

12  BY MR. GERSON:

13     Q.  Okay. Let's talk about the 40th incident.

14  This is a minor female passenger?

15     A.  Yes.

16     Q.  And she alleged that she was sexually

17  assaulted and raped by an unidentified male?

18     A.  No. The father of a missing 16-year-old girl

19  reported her missing. She initially said it was a

20  misunderstanding, she was not assaulted, and then it

21  appears, though, that she probably did have

22  consensual –

23     Q.  Why don't you go ahead and read into the

24  record –

25     A.  Okay. "Minor female passenger alleged she was

Page 128

1   sexually assaulted and raped by an unidentified male.

2   The father first reported the rape to security stating

3   that he thinks his daughter was raped. The victim

4   originally stated onboard she was not raped and had

5   spent the early morning hours in a traveling companion's

6   cabin because her father snores loudly. After they

7   disembarked, the father and daughter contacted their

8   local police department and made the allegations that

9   she was raped."

10     Q.  Okay.

11     A.  It was reported to the FBI and the Port

12  Canaveral Police Department.

13     Q.  Okay. Did Carnival turn over their incident

14  reports to the FBI in connection with this incident?

15     MR. MASE: Objection to form.

16     THE WITNESS: I don't know.

17  BY MR. GERSON:

18     Q.  Okay. How would you go about verifying that?

19     A.  You would have to ask security services what

20  they provided. I know they keep a record of it.

21     Q.  So you wouldn't have any way of knowing

22  whether or not an incident report was turned over to

23  FBI?

24     A.  I could ask security services if they know.

25     Q.  Every time an incident report is documented by

Page 129

1   Carnival, there's a document referred to as a crime

2   allegation log, correct?

3      A.  There is a crime allegation log under the

4   CVSSA, which is separate and apart from these.

5      Q.  The CVSSA – a crime allegation log is

6   required under the CVSSA, right?

7      A.  I believe so, yes.

8      Q.  And you were not required to utilize

9   documents, like the crime allegation log, prior to

10  enactment of the CVSSA?

11     A.  No, I don't think there was any law that

12  required us to do that.

13     Q.  Okay. What is your understanding of the crime

14  allegation log and what information is included in it?

15     A.  All crimes that are listed under the CVSSA,

16  which are enumerated in that stack, they are listed in

17  the allegation log and we are to turn it over to law

18  enforcement whenever they ask for it.

19     Q.  Whenever they ask for it or whenever there's

20  been a crime alleged?

21     MR. MASE: Objection to form.

22     THE WITNESS: Whenever they ask for it, I

23  think, is the way the statute read. You'd have to

24  read the statute. But again, I'm not here today for

25  CVSSA stuff, so I think we are a little outside the

Page 130

1    scope.
2         MR. GERSON:  Well, you have an obligation to
3    answer my questions to the best of your personal
4    knowledge as well, so if you don't know, that's fine.
5    But if you do know then --
6         THE WITNESS:  You'd have to read the language
7    in the statute, but I think it says upon request and
8    I think there are certain crimes that are enumerated
9    that have to be listed on the allegation log.
10   BY MR. GERSON:
11        Q.  What's the next incident?
12        A.  I don't remember where we left off -- oh, the
13   father on the Ecstasy.  The next one was a month later
14   on the Dream.  "A female passenger alleged she was
15   sexually assaulted by a male inside his cabin.  The
16   victim did not report the incident onboard."  And that
17   occurred on February 3, 2014.  The FBI was notified.
18        Oh, and she didn't report it onboard.  She
19   contacted guest care a week after the cruise and that's
20   when we reported it to the FBI.
21        Q.  And when you report something to the FBI, how
22   do you report it?
23        A.  Usually -- and again, you would have to
24   clarify this with security services, but whoever is
25   on-call or whoever the security services shoreside

Page 131

1    employee is will call -- will be in charge of calling
2    law enforcement.
3         Q.  And is it your testimony that once the FBI is
4    notified that you are not required to provide them with
5    any information?
6         A.  When they request it, we are going to help
7    them in anyway that they need, probably.  But again, you
8    will have to talk to Bobby Williams about what the
9    protocols are and how they assist law enforcement.
10        Q.  So for all the incidents where the FBI were
11   contacted and were notified, which is documented in this
12   exhibit, it may be very well so that copies of the
13   shipboard incident reports were provided in these
14   instances, you just don't know?
15        MR. MASE:  Objection to form.
16        THE WITNESS:  I don't know, right.
17   BY MR. GERSON:
18        Q.  What were we on, 40?
19        A.  Forty-one.
20        Q.  Okay, 41 --
21        A.  And just so you know, 41, there probably
22   wasn't an incident report because it was reported late.
23        Q.  Okay.  Does it matter to Carnival if the
24   incident was reported at the time or 30 days later?
25        A.  It's a lot harder to conduct an investigation

Page 132

1    after the fact.  It's obviously -- evidence and witness
2    statements, peoples' recollections change over time.
3    The sooner we know about it, the better I would think
4    for law enforcement and our internal claim handling.
5         Q.  But doesn't it matter just in the sense that
6    this is something that is alleged to have occurred?
7    Doesn't it matter to Carnival that it's at least being
8    alleged to have occurred on its ships, even though they
9    may not be able to conduct a comprehensive investigation
10   as if it was reported contemporaneously as it occurred?
11        MR. MASE:  Objection to form.
12        THE WITNESS:  What was the question there?
13   BY MR. GERSON:
14        Q.  Sure.  Does Carnival consider the fact that an
15   incident was reported at a later point in time?  Does
16   that make any difference to Carnival in the way it
17   prepares or the way that it -- in its analysis of safety
18   and security on its ships?
19        MR. MASE:  Objection to form.
20        THE WITNESS:  No.  I think the analysis, if
21   one was to make it for safety and security would be
22   the same, but it's obviously a lot harder to
23   investigate what actually happened when you are not
24   advised of when it's actually alleged to have
25   occurred.

Page 133

1    BY MR. GERSON:
2         Q.  Okay.  The next incident, 42, occurred about
3    17 days later.
4         A.  On the Triumph.  "A female passenger alleged
5    that she was raped by a male inside her cabin after she
6    voluntarily invited him in."
7         Q.  Uh-huh.
8         A.  "She engaged in consensual oral sex with him
9    while her two minor children were sleeping in the
10   cabin."
11        Q.  So in this case, the female is alleging that
12   she was sexually assaulted, and then you're telling me
13   that she engaged in consensual oral sex?
14        MR. MASE:  Objection to form.
15        THE WITNESS:  So at the time she reported it
16   initially, she said she bought him back to the cabin,
17   her cabin, and that she probably had too much drink
18   and she gave him oral sex.  She remembers all that.
19   The next day, she realized that both her 14-year-old
20   and her 16-year-old were awake during the entire
21   time, and she felt very strongly that he should have
22   known that.
23        And then she got angrier and angrier, I think,
24   with herself and eventually, she filed a claim and
25   said she thinks she might have been drugged because

Page 134

1   she drank just as much the night before as she drank
2   that night and she didn't lose her faculties the
3   night this occurred. So she knew she brought him
4   back and I think she was just intoxicated.
5   BY MR. GERSON:
6      Q. So after your investigation, she -- is this
7   what she alleges really what happened or she changed her
8   story or --
9      A. It's kind of evolved over time. So the
10  incident report says she brought him back, knew she
11  brought him back to her cabin, and she engaged in oral
12  sex on him. And then after he left, she realized that
13  her 14- and 16-year-old were awake.
14     Q. So that's based on your recollection of the
15  incident report?
16     A. Yes.
17     Q. And, in fact, most of these -- just about all
18  of these incidents are based off your recollection of
19  the incident reports?
20     A. Yeah. And then when there's a claim filed,
21  there's a whole lot of other information and this was an
22  active claim.
23     Q. You weren't involved in any of these
24  investigations in these --
25     A. In this one, I certainly was on the back end

Page 135

1   once the claim was filed.
2      Q. Okay. Who brought the claim?
3      A. Her.
4      Q. Well, what type of claim was filed?
5      A. I think it was a lawsuit.
6      Q. Okay. There was a lawsuit filed?
7      A. Yes.
8      Q. Okay. But I thought you told me there was --
9   after an investigation, it was determined she engaged in
10  consensual oral sex?
11     A. No. Her initial statement was she brought him
12  back and she engaged in -- it appeared -- the initial
13  investigation was that it was consensual, but over time,
14  she said I couldn't consent because I was so intoxicated
15  and he should have known my kids, and then she got
16  angrier, and then the lawsuit that was filed was a
17  little different. The lawsuit says that it wasn't
18  consensual, she must have been drugged. He knew that
19  she was drunk.
20     Q. Okay. So in 42, female passenger alleges --
21  is that the one we're on?
22     A. Yes.
23     Q. September -- excuse me. February 28, 2014.
24  "A female passenger alleges she was sexually assaulted
25  and raped by a male passenger inside her cabin after she

Page 136

1   voluntarily invited him inside and engaged in consensual
2   oral sex with him while her two minor children were
3   sleeping in the cabin."
4      A. Right.
5      Q. So this statement doesn't really make sense to
6   me because it sounds like what you're saying is that the
7   female passenger claims that she was sexually assaulted
8   and raped by a male passenger. Then -- and correct me
9   if I'm wrong. Now, Carnival conducts their
10  investigation and Carnival is of the opinion that she
11  engaged in some sort of consensual sex with the male
12  passenger, but the female passenger that made the
13  allegation does not agree and has gone ahead and filed a
14  lawsuit, so you have conflicting stories.
15     A. Correct.
16     Q. Okay. That is very different from what is
17  written in here, at least as far as number 42 is
18  concerned, because the female passenger's allegation
19  remains the same that she was sexually assaulted and
20  raped by another male inside of her room.
21     A. I think I've explained the nature of our
22  investigation and what we revealed to date.
23     Q. Okay. So in this case, Number 42, there's an
24  ongoing lawsuit?
25     A. Is it still ongoing? I think it is.

Page 137

1      MR. MASE: I think it is.
2      THE WITNESS: Yeah.
3   BY MR. GERSON:
4      Q. And does the female passenger allege that she
5   let the male inside her room?
6      A. Yes. But what she claims now is that she was
7   so intoxicated, she didn't really know better and that
8   he should have.
9      Q. Okay. Do you know who the lawyer is that is
10  representing the female passenger?
11     A. I can't remember who the plaintiff's lawyer
12  is. I know who my lawyer is.
13     Q. Okay. I imagine the FBI reports [sic] were
14  turned over to the FBI in that case?
15     A. I do not know.
16     MR. MASE: Objection to form.
17  BY MR. GERSON:
18     Q. Let's go to Number 43. About three weeks
19  later, we have another incident?
20     A. On the Inspiration.
21     Q. And in this case, "A female passenger alleges
22  she was sexually assaulted and raped by five males in
23  their cabin."
24     A. Correct.
25     Q. Okay. In this case, "The victim had bruising

Page 138

1  consistent with having to be forcibly removed from the
2  remove"?
3     A.  Yeah.  I think that's supposed to be cabin.
4        MR. MASE:  Yeah, should be cabin.
5  BY MR. GERSON:
6     Q.  Okay.  Based upon Carnival's investigation,
7  there was no evidence of vaginal, cervix, or anal
8  bleeding.
9     A.  I think that was the medical log.  So what
10  happened was, she was extremely intoxicated and
11  belligerent and her friends claimed that they had to
12  forcibly remove her from the cabin, and she came back
13  and said, no, I was raped by five males.  But her
14  friends said there were no males.  It was very
15  confusing.  Very confusing.
16    Q.  Okay.  So all these summaries that you've been
17  providing us with the 42 prior incidents, now 43, are
18  all based on Carnival's characterization as far as what
19  happened?
20       MR. MASE:  Objection to form.
21       THE WITNESS:  No, sir.  What they are based on
22  are what the witnesses tell us.  Again, Carnival was
23  not present inside the cabin and wasn't present for
24  any of these, so we have to rely on what the
25  witnesses say.  The witnesses were extremely

Page 139

1  divergent in what they said occurred.
2  BY MR. GERSON:
3     Q.  Do you prepare these summaries of the
4  incidents, like what's identified in Number 6?
5     A.  I think that we have explained to you that my
6  lawyer prepared this spreadsheet based on the incident
7  reports that I'm not allowed to refer to.  So I'm
8  remembering because I see a lot of these, so it kind of
9  brings it together for me.
10    Q.  Okay.  Let me ask you this:  Have you ever
11  prepared a spreadsheet similar to this one?
12    A.  No, no.  I don't prepare them.
13    Q.  No?  Okay.
14    A.  I can't say I've never prepared a spreadsheet
15  in the 11 years I've been there, but I never prepared
16  these --
17       MR. MASE:  Similar to this one.
18       THE WITNESS:  Yeah, I don't think so.
19  Usually, we have outside counsel do it.
20       MR. MASE:  Or the opposing counsel agrees to
21  let the witness look at all the reports I brought
22  with me here today, should you change your mind.
23       THE WITNESS:  Right.
24  BY MR. GERSON:
25    Q.  Does the female passenger still allege she was

Page 140

1  raped by five other male passengers in their cabin?
2     A.  I don't think it ever went anywhere.  She, I
3  think, left the ship.  She decided to go home.  She flew
4  out of Mexico and left the cruise early.
5     Q.  The FBI was contacted and there's an FBI case
6  number?
7     A.  The FBI is always going to be contacted
8  whenever there's an allegation of rape, whether it's
9  founded or unfounded.
10    Q.  And you don't know whether or not the
11  shipboard incident reports were provided to the FBI?
12    A.  I do not know.
13    Q.  You don't know whether that's the usual
14  customary procedure for when the FBI is notified of a
15  serious incident like a rape or sexual assault?
16       MR. MASE:  Objection.  Previously asked and
17  answered.
18       THE WITNESS:  You're going to have to speak to
19  security services about how they comply with law
20  enforcement requests.
21  BY MR. GERSON:
22    Q.  What about 44?  We have -- looks like four
23  days later.
24    A.  On the Sensation.  This was a spring break
25  cruise, I think.  "A female passenger presented to the

Page 141

1  medical center for care for a cut above her eye.  She
2  was highly intoxicated and was brought in a wheelchair.
3  She claims she was punched in the eye by an unknown man
4  and digitally penetrated.  The doctor examined her and
5  found an injury abrasion to her private parts.
6        "The next day when the victim was sober, she
7  stated she didn't remember anything other than getting
8  punched in the eye.  She did not remember saying she had
9  been assaulted.  Multiple other witnesses said the
10  victim was highly intoxicated and falling in the dance
11  club and also in her cabin."
12    Q.  Okay.  So she initially reported she was
13  sexually assaulted?
14    A.  Correct, to the doctor, drunk, that she thinks
15  she was digitally penetrated.  Then the next day she
16  receded from it and all -- there were numerous witness
17  in the cabin that said, no -- I'll call her Jane Doe.
18  No, Jane Doe, you were drunk, you fell down, you broke
19  the TV, you did this, you did that, so...
20    Q.  Was a lawsuit filed?
21    A.  No.  I think initially they sent -- somebody
22  sent a claim letter.
23    Q.  So a legal claim was filed or --
24    A.  No, nothing was filed.
25    Q.  -- a legal claim was made?

Page 142

1    A. I think they just dropped it, yeah. Sometimes
2 you get a claim letter -- and I don't remember if I
3 spoke to the lawyer and told them of our investigation
4 and they didn't pursue it, I just don't remember
5 exactly. But no lawsuit was filed, I'm pretty sure.
6    Q. Okay. Next one, 45.
7    A. "On 3/22/2014 onboard the Carnival
8 Imagination, a female passenger says she was sexually
9 assaulted and raped by two minor male passengers inside
10 her cabin and in the presence of her boyfriend and
11 cabinmate. The victim's boyfriend stated the sexual
12 encounter was consensual. She refused medical and tried
13 to decline" -- "and declined to press charges."
14    Q. Okay. If the incident was identified -- or if
15 a female passenger alleged she's sexually assaulted and
16 raped by two minor male passengers, is that why the
17 incident was reported to the FBI?
18    A. Correct, because they usually go on what the
19 initial report is, whether it's found later to be
20 consensual or whether the victim recedes later, we have
21 an allegation of a crime and so we report it so that it
22 can be properly investigated. Again, we do our own
23 internal investigation in anticipation of litigation, so
24 we want to make sure that law enforcement does a
25 criminal investigation.

Page 143

1    Q. So it's your testimony that this female
2 passenger alleged she was sexually raped and assaulted
3 by two minor male passengers and that the victim's
4 boyfriend had a conflicting story?
5    A. Yes. She was 36 and there were two
6 16-year-old boys, and I believe the boyfriend was in the
7 cabin at the time. It's very strange. I don't know. I
8 don't remember offhand.
9    Q. So whose version do you believe?
10    MR. MASE: Objection to form.
11    THE WITNESS: I have no opinion who to
12 believe. It's just bizarre.
13 BY MR. GERSON:
14    Q. What was the outcome of this -- Carnival's
15 investigation?
16    A. I don't know. We don't have outcomes.
17    Q. What were the results of the investigation?
18    A. We gather statements and facts and witness
19 accounts and that's all you can do, really. You can
20 defend yourself in a lawsuit based on that information,
21 which is why we prepare the incident report, but as far
22 as the opinion as to whether a crime has occurred?
23 That's law enforcement. So it was reported to the FBI
24 and Long Beach Harbor Police. The victim refused
25 medical treatment, she refused to identify the suspect,

Page 144

1 and eventually declined to press charges. So the FBI
2 was called in to investigate.
3    Q. Next one, what are we up to, 46?
4    A. Yes.
5    Q. Two days later we have another reported
6 incident in a passenger cabin; is that correct?
7    A. "Minor female passenger alleged she was raped
8 by a male passenger inside his cabin." This was onboard
9 the Ecstasy on March 24, 2014. She told her counselor a
10 year later, a little over a year later.
11    Q. How was Carnival notified?
12    A. The FBI notified us. So she told the school
13 counselor, the school counselor notified the
14 authorities, who notified the FBI, who then called us to
15 let us know.
16    Q. Do you know what the FBI did as a result?
17    A. No.
18    Q. Okay. And then we have another incident about
19 12 -- no, nine days later on the Imagination.
20    A. On the imagination on 4/3/2014. "A female
21 passenger alleged she was raped by a male passenger
22 inside his cabin. She did not want to report the
23 incident while onboard. She went to her local emergency
24 room claiming she had been raped, and they contacted the
25 local police department and FBI."

Page 145

1    Q. Okay.
2    A. So it was reported to us on April 5, 2014 by
3 the FBI.
4    Q. And where did that happen, in the stateroom?
5    A. It says inside his cabin, so, yes.
6    Q. Okay. And then the next incident?
7    A. Was on April 24, 2014 onboard the Carnival
8 Splendor and there, "A female passenger claims she was
9 sexually assaulted by a male passenger inside his
10 cabin." Do you want me to keep reading?
11    Q. Was the FBI contacted? No, it's okay.
12    A. Yes.
13    Q. Okay. And so the initial report was by the
14 passenger that she was sexually assaulted by another
15 male passenger in his cabin?
16    A. Yes.
17    Q. Okay. And you don't know what the outcome of
18 the FBI investigation is in that case?
19    A. I do not know.
20    Q. Okay. And then the following month, we have
21 another incident?
22    A. Yeah. On 5/19/2014, so about a month and a
23 half later on the Carnival Breeze. "A minor female
24 passenger alleged she was sexually assaulted and raped
25 by another minor male passenger. The incident was not

Page 146

1  reported onboard." It was reported to law enforcement,
2  then law enforcement notified us on May 26, 2014.
3     Q. Okay. And that was in the stateroom?
4     A. I'm not sure about this one. Where it
5  occurred, I mean. I just don't remember.
6     Q. What is your understanding of the number of
7  times it has been alleged by a passenger that she has
8  been followed or that other passengers or crew members
9  have forced their way into a stateroom and committed an
10  alleged sex crime?
11    A. That's pretty rare, luckily. More often than
12  not, it's more of a consensual go back to the cabin
13  together and then --
14    Q. So it's your testimony that my client's
15  allegations that male passengers forced their way into
16  her stateroom and raped her is the only time this has
17  occurred in the last three years?
18        MR. MASE: Objection to form.
19        THE WITNESS: The only time? No. I wouldn't
20    say that was the only time that was alleged, but I
21    would say it's rare.
22  BY MR. GERSON:
23    Q. Okay. How many other times are you aware that
24  it has happened prior to my client's incident?
25        MR. MASE: You mean, in the last three years?

Page 147

1        MR. GERSON: The last three years.
2        THE WITNESS: Maybe -- and again, I don't
3    remember many of those being alleged onboard, but
4    when a lawsuit was filed a couple of times, that will
5    become the allegation, that they were either drugged
6    or dragged, maybe twice, three times. I could
7    probably go through this list and research it and
8    find out, but very few.
9  BY MR. GERSON:
10    Q. Okay. So you're aware of at least two or
11  three times where it happened where a passenger, other
12  than my client's claim, where it's been alleged that a
13  passenger or the assailants or criminals forced their
14  way into the room and then either sexually assaulted or
15  raped her?
16        MR. MASE: Objection to form.
17        THE WITNESS: I'd be surprised if it's more
18    than three, but, again, I really don't know if there
19    any others than this. But I would be surprised if
20    it's more than three. There might be one, two, or
21    three in this list. I'd have to go through and think
22    about it.
23  BY MR. GERSON:
24    Q. Okay. Is that --
25    A. Offhand, I really can't recall any other ones,

Page 148

1  but I can't say conclusively that there aren't any.
2     Q. If there were, that is certainly information
3  that would be included in this spreadsheet, would it
4  not?
5        MR. MASE: Objection to form.
6        THE WITNESS: Probably. It depends on -- I
7    don't know. I mean, I certainly didn't know it was a
8    focus of anything you wanted to know, so I'd be happy
9    to look it up for you.
10  BY MR. GERSON:
11    Q. So this spreadsheet, Exhibit 6, may not
12  contain all of the factual information about how an
13  alleged criminal got their way into a passenger's
14  stateroom?
15        MR. MASE: Objection to form.
16        THE WITNESS: Correct. We could provide that
17    information for you if you asked for it, yes.
18  BY MR. GERSON:
19    Q. Okay. Let's go to the next one.
20    A. I'm sorry, what number are we on?
21    Q. I believe we are up to Number 50.
22        So seven days later, May 26, 2014, we have a
23    female passenger that alleged she was sexually assaulted
24  and digitally penetrated by another male passenger?
25    A. Yes. That was onboard the Conquest, and the

Page 149

1  FBI and the Royal Bahamian Police Force were notified.
2     Q. Okay. The next one we have is about a week
3  later, and that states that "Two female passengers
4  stated they were raped by a male passenger"?
5     A. Since they did not report the incident onboard
6  the Sensation, they reported the matter to local police
7  department.
8     Q. Okay. And what local police department?
9     A. I'd have to look it up. I don't recall
10  offhand, but then what happens is, the local police
11  usually contacts the FBI and then they notify us.
12    Q. Okay. And does it say in here who the male
13  passenger is and how he got into the room?
14    A. I don't remember this one offhand.
15    Q. This was also on the Sensation in June of
16  2014?
17    A. Yes, June 3, 2014 on the Sensation.
18    Q. And it's your testimony that in this case the
19  female passenger did not report this incident at the
20  time that the incident occurred?
21    A. Right.
22    Q. So if she didn't report the incident at the
23  time the incident occurred, then the nurse who was on
24  the ship would have no way of knowing that the incident
25  occurred, right?

Page 150

1    A. The nurse?
2    Q. Yeah.
3        MR. MASE: Objection to form.
4        THE WITNESS: I don't know.
5  BY MR. GERSON:
6    Q. Okay. But it's your testimony and based on
7  your review of the records and reports -- let me ask you
8  this: If it wasn't reported, how did you become aware
9  of this?
10   A. Usually, local law enforcement will call us or
11 the FBI will call us to say it was reported late, after
12 the fact.
13   Q. Nevis police case. What is Nevis?
14       MR. MASE: It's an island.
15       THE WITNESS: We were on 51? You switched to
16 52, so now, I'm confused. We were on 51 with the two
17 passengers saying they didn't report it onboard.
18       MR. GERSON: Yes, sorry about that.
19 BY MR. GERSON:
20   Q. Okay. So we're back on June 3, 2014, the
21 Sensation.
22   A. Right.
23   Q. So that's the same vessel my client is making
24 a claim against.
25   A. Right. Okay. Fine.

Page 151

1    Q. And so this would have been about three months
2  before my client's incident.
3    A. Okay.
4    Q. And in this instance, two female passengers
5  stated they were rape by a male passenger.
6    A. Okay.
7    Q. That's right?
8    A. That's what it says, yes.
9    Q. And the FBI were contacted?
10   A. I think they contacted us. Again, I would
11 have to --
12   Q. There's no FBI report number?
13   A. Because the FBI is probably not going to
14 prosecute it, but they would notify us because that's
15 how the work flow goes. Law enforcement is notified,
16 they are going to open a case, see if they've got
17 anything, see if they have jurisdiction. They would
18 report it the FBI, the FBI would report it to us. And
19 I'm just saying in a hypothetical situation that's what
20 happens. I can't say conclusively for 51 that is what
21 happened here because -- I apologize, but I don't
22 remember this one offhand.
23   Q. Okay. So this June 3, 2014, it's your
24 testimony that it was not reported to Carnival at the
25 time the incident occurred?

Page 152

1        MR. MASE: Objection to form.
2        THE WITNESS: That's what it says, that they
3  came home and reported it to local law enforcement.
4  BY MR. GERSON:
5    Q. And by the way, when did you prepare this
6  Exhibit No. 6?
7        MR. MASE: Objection to form.
8        THE WITNESS: I didn't prepare it.
9  BY MR. GERSON:
10   Q. Or when was it prepared; do you know?
11   A. I think it was prepared last night. I got it
12 e-mailed to me like at 9:30. That was just a little jab
13 because I'm tired.
14       MR. MASE: I'm not sure if that's directed at
15 me.
16       THE WITNESS: I'm kidding.
17 BY MR. GERSON:
18   Q. Three days later, there was an incident on the
19 Valor?
20   A. On the Valor on 6/6/2014. "A female passenger
21 alleged she was raped by male inside his cabin. She
22 claims that the male carried her into his cabin and
23 forcefully penetrated her vagina with his penis. It was
24 reported to the FBI and the Royal St. Christopher and
25 Nevis Police Force."

Page 153

1    Q. Okay. The next one?
2    A. So this answers our question for what we were
3  just talking about. The 52nd and 53rd look like a
4  forcible, you know, incident.
5    Q. So what happened about a month later?
6    A. "On the Freedom, July 3, 2014, the mother of a
7  minor female passenger alleged she was sexually
8  assaulted and raped by an unknown male passenger. The
9  victim claims she was forced into the suspect's cabin
10 and raped. She did not report the incident while
11 onboard. She told her mother when they were home and
12 the local police department was contacted.
13       "The FBI was notified, but unable to contact
14 the victim or her mother because the victim's mother
15 provided the wrong contact information. It was reported
16 to the FBI, Broward County Sheriff's office, but it
17 was not reported during the cruise. The victim notified
18 BSO and BSO notified Carnival on 7/7/2014."
19   Q. Which incident was that?
20   A. Number 53 onboard the Freedom.
21   Q. Let's go back one. Ms. Vazquez, going back to
22 the June 6, 2014 incident, that's an incident that
23 happened on the Carnival Valor, right?
24   A. Yes.
25   Q. And the description that you wrote in here, or

Page 154

1  that's provided and Carnival is relying on, "A female
2  passenger alleges she was raped by a male inside his
3  cabin and that the passenger claimed that the male
4  carried her into his cabin and forcibly penetrated her
5  vagina with his penis" –
6     A.  Yes.
7     Q.  – do you see that?
8     A.  Uh-huh.
9     Q.  Okay.  So Carnival's understanding, as in a
10 lot of these other cases, is that in this case, that the
11 male carried her into his cabin?
12    A.  That's what it says.
13    Q.  Okay.  And where was his cabin?
14    A.  I don't know.  I would have to look it up.
15    Q.  Okay.  Who was this?  Was this a male
16 passenger, crew member, who was it?
17    A.  I honestly really don't remember.
18    Q.  You don't remember?
19    A.  No.
20       MR. MASE:  Let her look at the incident
21 reports.  She would be happy to give you –
22       THE WITNESS:  Right.  We'd give you every bit
23 of detail you desire.
24       MR. GERSON:  Well, you've produced a document
25 that –

Page 155

1       THE WITNESS:  No.  We didn't want to produce
2  it.  It's just my cheat sheet because I can't
3  remember 59 incidents.
4  BY MR. GERSON:
5     Q.  Okay.  So the cheat sheet you've got, which
6  you're using this cheat sheet throughout this deposition
7  testimony as a representative for Carnival with the most
8  knowledge of all these incidents, right?
9       MR. MASE:  No, that's not true.  Not only is
10 that not true, I don't believe she's required – I
11 object to the characterization.  Rule 30(b)(6) does
12 not require the production of the individual with the
13 most knowledge.  More importantly, as I explained to
14 you at the outset, this document is simply intended
15 to refresh her recollection.  Ms. Vazquez has looked
16 through the information, she's looked at the incident
17 reports, but you can't remember 50 – how many are
18 there?  50 whatever it is.
19       It's nothing more than a document to refresh
20 her recollection.  So she's using this document,
21 which you've attached as Exhibit whatever, as a means
22 of refreshing her recollection.  It's a
23 counsel-generated document to attempt to comply with
24 the requirement that Carnival produce someone with
25 knowledge of these things, period.

Page 156

1       MR. GERSON:  Okay.
2       MR. MASE:  I feel better now, thank you.
3  BY MR. GERSON:
4     Q.  Ms. Vazquez, going back to this June 6, 2014
5  incident, this passenger claimed that she was – when I
6  said "she claims," the passenger claimed, is what you're
7  telling me, is that the male carried into her into his
8  cabin?
9     A.  We've read this in the record now twice.  I
10 don't know anymore than this says because I don't
11 remember.  I really don't remember this incident.  So
12 yes, I will agree with you that's what it says.
13    Q.  Okay.  So you would agree that this
14 June 6, 2014 incident is – at least according to your
15 testimony – factually dissimilar from the allegations
16 that are being brought by my client?
17    A.  Factually dissimilar, yes.
18    Q.  Okay.  Because in my client's case, my client
19 has alleged that a male passenger – or male passengers
20 forced their way into her cabin and according to you, as
21 a representative for Carnival, in this case, the female
22 is alleging that she was raped by a male passenger after
23 she was carried into his room by that person, so –
24    A.  So what?
25    Q.  – I just want to make sure we're crystal

Page 157

1  clear that the two instances, the June 6, 2014
2  representation that you're making now, as opposed to
3  what my client is claiming, are accurate and different
4  in the way that I have already explained.
5       MR. MASE:  Objection to form.
6       THE WITNESS:  In which way are they the same
7  and in which way are they different?
8  BY MR. GERSON:
9     Q.  I just want to make sure there's nothing
10 unclear that Carnival is telling us that this female
11 passenger was raped by a male passenger inside his
12 cabin, and that she did not make any other allegations
13 inconsistent with what you are testifying to.
14       MR. MASE:  Objection to form.
15       THE WITNESS:  Again, I don't know because I
16 don't remember this particular incident report.  I
17 don't remember this particular investigation.  I
18 would have to refresh my recollection again.
19 BY MR. GERSON:
20    Q.  Okay.
21    A.  It's not jogging my memory on this
22 description.
23    Q.  Okay.
24    A.  I don't remember reading an incident report
25 where somebody was physically carried.

Page 158

```
1      Q.  Do you know whether or not this incident was
2   reported contemporaneously?  Meaning, when it occurred.
3      MR. MASE:  Objection to form.
4      THE WITNESS:  It appears to have been, but
5   again, I don't know any more than is listed on the
6   document you're looking at because I don't remember
7   this incident.  So you can ask me any question you
8   want about it, I don't remember this particular one.
9   It's not like the others where there was a claim or
10  remember, I have intimate knowledge, I just don't.  I
11  don't remember, sorry.
12  BY MR. GERSON:
13     Q.  You don't know whether it involved a passenger
14  or a crew member?
15     A.  I don't know.  How many times do I have to
16  say, I don't remember?
17     Q.  Okay, moving along.  July 3, 2014, we went
18  over that one.  This is an another incident with the
19  mother of a minor female passenger alleges that her
20  daughter was sexually assaulted and raped by an unknown
21  male passenger, correct?
22     A.  Right.
23     Q.  And the victim claims she was forced into the
24  suspect's cabin and raped?
25     A.  Yes.
```

Page 159

```
1      Q.  And that was on the Freedom?
2      A.  Yes.
3      Q.  And FBI were contacted along with Broward
4   County Sheriff's Office?
5      A.  Yes.  I don't think it was reported initially
6   to us.  I think it was reported to BSO.
7      Q.  And then 13 days later we have another
8   incident on the Victory?
9      A.  Yes.  "A female passenger alleges she was
10  sexually assaulted and raped by a male passenger.  The
11  incident was not reported while onboard the ship.  So
12  again, it was reported to, I think, the guest care team.
13  And then the guest care team reported it to security who
14  contacted law enforcement.
15     Q.  How do you know that Miami-Dade Police
16  Department were notified?
17     A.  I -- most likely it's in our security summary,
18  what security did once they were notified by guest care.
19  So guest care would have called security services to
20  say, are you aware of this incident, and then they would
21  have called local law enforcement.
22     Q.  Okay.  In the spreadsheet that we marked as
23  Exhibit 5 and 6, for every incident where there is --
24  the FBI or the local police department is identified,
25  such as Miami-Dade Police Department, Carnival would
```

Page 160

```
1   have a record of those report numbers, would they not?
2      A.  Which report numbers, the FBI?
3      Q.  Yes.
4      A.  It depends on what they give us back.
5      Q.  A report number?
6      A.  It depends.  So it's only as good as the
7   relationship between the FBI agent or the local law
8   enforcement agent and our shoreside security team, so
9   they don't have any obligation to give us their report
10  numbers.  They don't have an obligation to doing anything
11  once they take over the case.  Many times, they might
12  not want to, but generally speaking, I think our
13  security team shoreside has a good rapport and a good
14  working relationship with all local enforcement and FBI
15  and there's a quid pro quo.  And, of course, if they
16  need information from us, we'll provide it.
17     Q.  Okay.  So this July 16, 2014 incident, there's
18  no police -- Miami-Dade Police Department report number?
19     A.  No.  Right, because guest care got the phone
20  call from either the mom or the girl, so we get it from
21  our customers that this happened.  We then -- the guest
22  care team, which is our shoreside call center,
23  basically, would notify our security services team and
24  some other people who then notify enforcement.  What law
25  enforcement does from there is up to them.
```

Page 161

```
1      Q.  Understood.  Do you know what kind of
2   investigation was conducted by Carnival?
3      A.  I think there's a security summary.  We
4   discussed this before that there might not be a formal
5   report.  I think on this one there's like a two-page
6   shoreside security summary that we got this from guest
7   care, we contacted so-and-so at the FBI, we contacted
8   so-and-so at the Metro Dade Police Department.  There's
9   just a summary of what they did and there might be some
10  attempts to contact the victims after that.  It depends.
11  It's case specific.
12     Q.  Okay.  Ten days later we have another
13  incident, correct?
14     A.  On the Dream.
15     Q.  And what happen there?
16     A.  "On July 26, 2014, a female passenger alleged
17  she was sexually assaulted by an unknown male while
18  sleeping inside her cabin next to her husband and her
19  daughter and her daughter's friend.  She claims the male
20  passenger pulled down her panties and rubbed her labia
21  on two occasions.  He then fled the cabin."  This is the
22  one we had alluded to earlier.  That was really bizarre.
23     Q.  Okay.  And no one was able to identify who the
24  male that fled the cabin was?
25     A.  She just said she thought he was Asian with
```

Page 162

1 spiky hair. He was wearing shorts and a T-shirt.
2     Q. No one was ever able to identify who this
3 passenger – or who this Asian person was?
4     A. Yeah. The doors were locked. The Link Lock
5 readings had no entry at all since her daughter had come
6 home at 11:00 and they were all awake when the daughter
7 and the friend came home. So I think she hallucinated
8 it, personally, I don't know. She claims this happened
9 to her.
10    Q. While she hallucinated, she claims she was
11 sexually assaulted?
12    A. She claims that she woke up and first she
13 thought it was her husband who was sleeping next to her,
14 but then she realized that it must have been this man,
15 who at the time she woke up, he was leaning over her
16 daughter. Like, she didn't wake up while he was
17 actually doing it. She kind of remembered it was
18 happening thinking it was her husband and she woke up,
19 she realized her husband wasn't there and there was a
20 male leaning over her daughter. Then when he saw her,
21 he fled the cabin. That was generally her story.
22    Q. And Carnival wasn't able to look at any video
23 footage from the corridors of the staterooms on the
24 Dream because there are no video cameras located there,
25 right?

Page 163

1     A. We could tell that the door wasn't opened or
2 closed so that made no sense. You would have a Link
3 Lock reading that the door opened at a particular time,
4 for him to come into the cabin and for him to escape the
5 cabin. So those records reveal that no one had entered
6 the cabin, which was very strange.
7     Q. So Carnival disputes that the incident
8 occurred?
9     MR. MASE: Objection to form.
10    THE WITNESS: It's really not up to me to
11 determine what did or did not happen.
12 BY MR. GERSON:
13    Q. Well, you characterized it as bizarre.
14    A. It is bizarre. It's a very bizarre story and
15 they did interview as many Asian crew members and as
16 many Asian passengers as they could. The tried to
17 figure it out.
18    Q. Okay. Then we have about three weeks later on
19 the Magic –
20    A. On August 10th.
21    Q. – on August 10, 2014, a minor male passenger
22 and another minor male passenger alleged they were
23 sexually assaulted by another male passenger; is that
24 correct?
25    A. Yes.

Page 164

1     Q. And there was – this was a sexual assault?
2     A. It was – yeah. "Two minor male passengers
3 alleged they were assaulted by another male passenger."
4     Q. Okay. And the other male passenger, was that
5 a Carnival crew member or just another – well, I think
6 you said a passenger?
7     A. Yeah. I think they were all passengers.
8     Q. Okay. And do you know how the passenger got
9 into the room?
10    A. I don't remember on that one.
11    Q. This was reported to the FBI and the Galveston
12 Police Department?
13    A. Yes.
14    Q. And there's no FBI report number or
15 investigation number, but that's information that could
16 be provided, right?
17    A. There's a Galveston Police case number. You
18 see that number, 20140585?
19    Q. And you know that the FBI were contacted
20 because you've reviewed some record or document that
21 would indicate that?
22    A. It – yeah. In the report, it says who we
23 contacted and it usually has the agent, et cetera.
24    Q. So to the extent that all these incidents, the
25 59 incidents, don't have FBI report numbers, that's

Page 165

1 something that you could supplement if you wanted to?
2     MR. MASE: Objection to form.
3     THE WITNESS: Again, it depends. Like I said,
4     the information sometimes flows one way as to them
5     and they don't have an obligation to provide us with
6     anything. So if we ask, they might give it to us,
7     they might not. And it may be in our file, but it
8     may not.
9 BY MR. GERSON:
10    Q. Is it your understanding you are not required
11 to give us the case numbers for each incident?
12    MR. MASE: Objection to form.
13 BY MR. GERSON:
14    Q. Or Carnival is not required to give the police
15 number for – or FBI number or the law enforcement case
16 number for each incident?
17    MR. MASE: Objection to form. I believe we've
18    already done that where we had law enforcement
19    number, in Exhibit A in response to the
20    interrogatories. In particular, Carnival Cruise
21    notice of serving supplemental response for
22    Interrogatory Number 4, Plaintiff's second amended
23    first set of interrogatories dated June 5, 2013. I
24    believe in Exhibit A, we served specifically with
25    reference to this matter, date, vessel, type of

Page 166

1   incident, a law enforcement notified or reporting,
2   and a law enforcement case number. So I believe –
3   what you must appreciate, Mr. Gerson, is the document
4   that Ms. Vazquez has in front of us is prepared by
5   Counsel to help assist and refresh her recollection.
6   We've already formally served in discovery documents
7   providing and attesting to what we have and don't
8   have.
9       THE WITNESS: Okay, good. I didn't realize
10  that.
11      MR. MASE: I know. That's why I'm here.
12      THE WITNESS: So it looks like where we had
13  it, we provided it already.
14      MR. MASE: And I will tell you, Mr. Gerson, if
15  we had it, we most certainly would not have held it
16  back in responding to discovery. Document Exhibit 6
17  is in discovery.
18  BY MR. GERSON:
19      Q.  Okay. What's the next incident?
20      A.  Onboard the Freedom. It doesn't have a date,
21  so let me look and see if we have a date.
22      Q.  I think you missed one.
23      A.  No, it's here. 8/10/2014. "Minor male
24  passenger alleged he was sexually assaulted by a male
25  passenger. The victim claims that the suspect licked

Page 167

1   his neck, slid his hand in his underwear, and grabbed
2   his buttocks while exposing his penis." It was reported
3   to FBI and the Broward County Sheriff's office as well
4   as the Nassau Police Force, and we did provide the
5   Broward County Sheriff's case number.
6       Q.  Okay. What's the next one?
7       A.  On the Conquest on August 18, 2014. "A female
8   passenger alleged she was sexually assaulted and
9   digitally penetrated by a male passenger while she was
10  lying on the hallway floor outside her cabin due to
11  intoxication."
12      Q.  FBI were contacted?
13      A.  Yes, as well as the Miami-Dade Police
14  Department and there is a Miami-Dade Police Department
15  case number.
16      Q.  Any idea what the female was doing lying on
17  the hallway floor?
18      A.  She was passed out drunk.
19      Q.  Okay.
20      A.  According to her, she couldn't get into her
21  cabin or was missing her key maybe, and she was a little
22  fuzzy on the details.
23      Q.  Was a lawsuit or claim filed in that?
24      A.  I think there's a claim letter. I don't know
25  if there's been a lawsuit filed.

Page 168

1       Q.  Do you know who the lawyer is who is
2   representing the plaintiff?
3       A.  I don't. I can look it up, but I don't
4   remember it offhand. You would have it if there was.
5   So I don't think so, actually, sorry. Cheating here. I
6   think maybe she just didn't pursue, but I did have a
7   claim letter.
8       Q.  Okay. And then on September 3, 2014?
9       A.  On the Magic. "A minor male passenger alleged
10  he was sexually assaulted by two male passengers after
11  he voluntarily entered their cabin. The victim said he
12  took up poppers and the suspect performed oral sex on
13  him. He resisted both suspects, got dressed, and left
14  the cabin. FBI was notified."
15      Q.  Okay. So again, this is another case in which
16  you're claiming that a minor male passenger alleges he
17  was sexually assaulted by two males after who
18  voluntarily entered their cabin?
19      A.  After the minor victim.
20      Q.  That's just based on the spreadsheet that was
21  provided to – or that you're referring to, right?
22      A.  Well, they didn't make it up from thin air.
23  They would have gotten it from the victim's account of
24  the situation.
25      Q.  Okay. And that would be for all the incidents

Page 169

1   that we're talking about. None of these were made up
2   from thin air?
3       A.  Correct.
4       Q.  All of this is supported by factual data and
5   information to the best of your knowledge?
6       A.  I don't know about factual information and
7   data. I would say witness accounts. A lot of these
8   really hinge on what all the witnesses say and what the
9   evidence shows, but yes.
10      Q.  Okay. So does – as part of your duties and
11  responsibilities as the director of legal claims, you
12  mentioned or made reference to the fact that if there
13  were patterns or trends in connection with incidents,
14  such as rapes and sexual assaults on Carnival ships,
15  that you would be involved in that analysis; is that
16  correct?
17      A.  I think traditionally our department – and
18  there's other departments that do this as well. They
19  evaluate reoccurrences of accidents and incidents. For
20  claims, if I notice something that I felt was either a
21  security breach or a chronic problem, like you call a
22  trend or something, then yes. I would certainly try to
23  bring it to somebody's attention, depending on the
24  department. If that's security services team, I would
25  bring it to their attention.

Page 170

1    Q.  Okay.
2    A.  But again, they know about this more
3    intimately than anyone.
4    Q.  Do you know how many allegations of rape or
5    sexual assaults have been made against Carnival on a
6    Carnival vessel in the last 12 months?
7        MR. MASE:  Objection to form.
8        THE WITNESS:  No.
9    BY MR. GERSON:
10   Q.  Do you know how many – whether that number
11   has gone up or down in the last 12 months?
12   A.  I don't know.
13   Q.  Okay.  What about in the last two years?  Do
14   you know whether that number has gone up or down in the
15   last two years?
16   A.  Claims or incidents?
17   Q.  Incidents.
18   A.  I don't know.
19   Q.  So far as you know has – well, you at least
20   have never done anything to investigate whether or not
21   the number of reported incidents has gone up or down in
22   the last two years?
23       MR. MASE:  Objection to form.
24       THE WITNESS:  In the last two years for
25   incidents?  Me personally?  No.

Page 171

1    BY MR. GERSON:
2    Q.  Okay.  Now, in these incidents that we've
3    talked about, the 59 incidents, does Carnival make this
4    information available to its crew?
5        MR. MASE:  Objection to form.
6        THE WITNESS:  What do you mean make it
7    available?
8    BY MR. GERSON:
9    Q.  Sure.  Does Carnival, so far as you know, make
10   the disclosed number of reported incidents on its ships
11   available to its crew members?
12       MR. MASE:  Objection to form.
13       THE WITNESS:  It depends on which crew
14   members.  Obviously, the security staff would know,
15   but I don't know if it's used for training purposes
16   for crew members.  I'm not aware of that.
17   BY MR. GERSON:
18   Q.  That's something that your director of
19   security would be able to address?
20   A.  Or the director or vice president of
21   overseeing shipboard training.
22   Q.  Okay.  Out of all the 59 incidents, out of how
23   many of these have resulted in a successful conviction
24   or conviction?
25       MR. MASE:  Repeatedly asked and answered.

Page 172

1        MR. GERSON:  I asked up until the first 25, I
2    think.  So now that I've completed going over these
3    prior incidents, do you know how many of them have
4    resulted in a successful conviction or a conviction?
5        MR. MASE:  Objection to form.
6        THE WITNESS:  So I know there's one and then
7    there's obviously the acquittal.  I believe there was
8    another acquittal too, so three prosecutions.  But
9    many of them we don't know unless they notify us on
10   the back end, you know, requesting documents for
11   trial and tell us what's going on, so...
12   BY MR. GERSON:
13   Q.  Okay.  What about – let's talk about your
14   tenure at Carnival.  You know all we've asked so far is
15   the number of incidents in the last three years for rape
16   and sexual assaults that have occurred on Carnival
17   vessels.
18   A.  Right.
19   Q.  Okay.  In your tenure at Carnival, can you
20   tell me of any successful convictions that you're aware
21   of?
22   A.  A few.  There's probably between two or three.
23   Q.  In the last –
24   A.  In the maybe, I think – I mean, I've been
25   there 11 years, so there's been a few.  There have been

Page 173

1    also a few acquittals.  There's been trials and
2    acquittals.
3        MR. MASE:  And there have been a number of
4    people who've pled.  They go in, and start, and they
5    plead, so it kind of varies.
6        THE WITNESS:  Right.
7        MR. GERSON:  Mr. Mase, if you would just let
8    the witness answer, I would appreciate.
9        MR. MASE:  Objection to form.
10       THE WITNESS:  Well, you asked for successful
11   prosecutions.
12       MR. GERSON:  Convictions.  Convictions.
13   BY MR. GERSON:
14   Q.  So out of the 59 prior incidents in the last
15   three years, you are only aware of one –
16   A.  I'm aware of one acquittal and one, I think,
17   it's a guilty plea, but I'm not sure if he went to
18   trial, but I know he's in jail.
19   Q.  Which one was the guilty plea?
20   A.  I don't know if it's a guilty plea or trial,
21   again, but Number 14.
22   Q.  Okay.  And in Number 14, if we go back to
23   that, that was an incident on the Sensation?
24   A.  Yes.
25   Q.  And the squib that you have here is, "A minor

Page 174

1 female alleged she was sexually assaulted and raped by a
2 male passenger after voluntarily entering his cabin"?
3    A. Yes.
4    Q. Okay. And so it's your understanding there
5 was a trial in that case?
6    A. Again, I'm not sure that there was a trial. I
7 know he was prosecuted. I know he was facing charges.
8 I do not recall the outcome, whether he pled or he went
9 to trial.
10    MR. GERSON: I've been marking up this one,
11 but this is actually the exhibit.
12    THE WITNESS: I have it.
13    MR. GERSON: This is Number 5. This is a
14 different exhibit, so you point out something.
15 BY MR. GERSON:
16    Q. Exhibit 5 was produced officially by Carnival
17 in this case?
18    A. I believe it's a supplemental answer to
19 interrogatories.
20    Q. Right. And Exhibit 6 is a document that was
21 prepared by Counsel and provided to you last night in
22 preparation of today's deposition?
23    A. Right. It takes Exhibit A and adds some
24 factual details so that I can recall.
25    Q. Do you know the basis for the information in

Page 175

1 Number 6? Do you know where that information comes
2 from?
3    A. Probably the incident reports, the security
4 summaries, possibly the fact that Mr. Mase's office
5 handles all of our sexual assault claims, so they would
6 have that.
7    Q. Okay. The incident report on —
8    MR. GERSON: I'll take you up on one of them.
9    MR. MASE: Which one?
10    MR. GERSON: Let's go to June 6, 2014.
11    MR. MASE: What number?
12    MR. MASE: That is 52.
13    MR. MASE: So when you say you'll take me up
14 on one of them, you're agreeing to the terms of
15 Exhibit 1?
16    MR. GERSON: I'm saying I'll agree to —
17    THE WITNESS: To disagree.
18    MR. MASE: Exhibit 1 entails what my offer was
19 to you, so all you have to say is, I agree to
20 Exhibit 1.
21    MR. GERSON: I'm agreeing that I — that your
22 claims of privilege as to Exhibit 1 will be
23 maintained.
24    MR. MASE: So as to —
25    MR. GERSON: Just as to 52.

Page 176

1    MR. MASE: As to 52 — as to 52 my privilege
2 is maintained? Fine.
3 BY MR. GERSON:
4    Q. Okay so —
5    MR. MASE: Give her a moment to take a look at
6 something here.
7    MR. GERSON: Sure.
8 BY MR. GERSON:
9    Q. Taking a look at Exhibit 1, was the FBI
10 contacted?
11    A. Yes. Special Agent Michael Day.
12    Q. Okay.
13    A. In St. Thomas.
14    Q. And according to the ship investigation, it's
15 my understanding of that, the female passenger was raped
16 by a male passenger inside his cabin?
17    A. Actually, it wasn't a passenger. It was a
18 contractor that was on board doing some work, I think.
19 A contractor.
20    Q. So —
21    MR. MASE: If you look at 52 —
22    MR. GERSON: Hold on. I'd really prefer if
23 you just not spoke since I've got a question pending
24 and I don't think it's appropriate for you to —
25    MR. MASE: Well, I think she answered your

Page 177

1 question, but go ahead.
2    MR. GERSON: Okay.
3 BY MR. GERSON:
4    Q. The FBI were contacted?
5    A. Yes.
6    Q. And the shipboard incident reports were sent,
7 were they not?
8    A. I don't know that. I'd have to look.
9    Q. I think you have the crime allegations log.
10 It would be included in that, correct?
11    A. I don't know. Are you asking if the crime
12 allegations log was given to the FBI?
13    Q. Well, there would be a crime allegations log
14 for this incident, right?
15    A. So the log is actually a running log that the
16 crimes are reported on, and we're supposed to have it
17 onboard at all times so that law enforcement, FBI, or
18 the flagship state, whoever wants to look at it, can get
19 their hands on it and look at it any time, right. So
20 the incident report is separate from the crime
21 allegations log.
22    MR. MASE: And let's — I'm just going to
23 tell you about this. You won't get upset by this. I
24 think when we gave you the crime allegations log in
25 relation to this, we only gave you the entry for

Page 178

1   Ms. Horne, so that may be confusing to you. Just so
2   you know there's a running log like Ms. Vazquez
3   described.
4   BY MR. GERSON:
5       Q. Okay. And I'll take you up on one more. The
6   incident that occurred on --
7       A. What number?
8       Q. I'll tell you in one second. On the Sensation
9   on -- I guess it's 51.
10      MR. MASE: Same agreement?
11      MR. GERSON: Yes.
12      MR. MASE: Thank you.
13      THE WITNESS: Okay.
14  BY MR. GERSON:
15      Q. Was this incident reported to the FBI?
16      A. I think they reported it to us, right? They
17  reported the matter to local police. We received --
18  let's see.
19      MR. GERSON: Curtis, I'm going to ask you to
20  not coach. You're pointing to the witness and I'm
21  asking her a question and you're pointing to her in
22  the document.
23      MR. MASE: Then give her a chance to read the
24  document.
25      MR. GERSON: Okay.

Page 179

1       THE WITNESS: So on September 12, 2014, one of
2   our security guys received a phone call from the FBI
3   requesting a memorandum of understanding saying that
4   Port Canaveral was the home port of the Sensation.
5   We sent that letter. On October 21st -- a letter
6   confirming that Carnival -- since March 22, 2006.
7   Then that letter was forwarded to the FBI.
8       MR. MASE: Let her finish her answer.
9       THE WITNESS: I don't remember this one. So
10  the FBI told us about it, basically. The FBI was
11  investigating it. They sent a letter trying to
12  figure out jurisdiction, where the home port was, and
13  we were still in the dark and later, they let us know
14  what the allegations were.
15  BY MR. GERSON:
16      Q. Okay. And where did this incident occur?
17      A. It says "The exact time of the incident
18  unknown," and it occurred prior to the captain's party.
19  "Was not reported by anyone."
20      Q. Did it happen in the stateroom?
21      A. I'm looking. It doesn't say. Again, the
22  girls didn't report it onboard. They told the FBI and
23  we don't know. It doesn't say here, strangely.
24      Q. So is there a crime allegations log included
25  in those documents?

Page 180

1       A. No.
2       Q. Does it say how the passenger -- or how the
3   male got into the passengers' room?
4       A. No. Nor does it say if they voluntarily went
5   to his room.
6       Q. Okay. So does it identify a stateroom?
7       A. Nope. It just says, "The female guests
8   alleged they were sexually assaulted/raped by male guest
9   on the evening of June 3, 2014. Special agent advised
10  that the exact time of the incident was unknown" --
11  "wasn't known, but it occurred prior to the captain's
12  party. It was not reported onboard by either victim."
13      Q. Does it say what time?
14      A. "Reporting investigator requested the special
15  agent of the FBI to provide details of incident so
16  reporting requirements under the CVSSA could be
17  fulfilled. Parrish said he would notify the prosecuting
18  attorney, AUSA Leah McEwen, at their request and" --
19  okay -- "and this guy was indicted."
20      Q. And the person was indicted?
21      A. Correct.
22      Q. So do you have an FBI case number?
23      A. No. There's no follow-up. I guess we asked
24  for that, but they didn't give it to us.
25      Q. So this was on the Sensation?

Page 181

1       A. Yes.
2       Q. Okay. And its your testimony that someone was
3   indicted for this?
4       A. According to the special agent of the FBI,
5   yes.
6       Q. And who is the special agent of the FBI?
7       A. Parrish. His name is --
8       Q. Who prepared the report?
9       A. Bobby Williams. Robert Williams.
10      Q. And who was the assistant chief security
11  officer on duty at that time?
12      A. We don't know. I was it. It wasn't reported onboard.
13  We don't have a shipboard incident. It wasn't reported
14  onboard. It was reported to us a year letter from the
15  FBI when they were prosecuting that.
16      Q. Now, how do you know he was indicted or
17  someone -- there was an indictment?
18      A. Special Agent Parrish told Bobby Williams that
19  per Bobby Williams' report.
20      Q. And other than what you told me, it doesn't
21  say what stateroom this incident occurred in?
22      A. Or if it even occurred in the stateroom.
23      MR. GERSON: Give me a minute or two, okay?
24      THE WITNESS: Okay.
25      (A recess was taken.)

Page 182

1     MR. GERSON: I think you've got somewhere to
2  be at 2:30?
3     MR. MASE: No. I've got until 2:30. I have
4  to be somewhere at 4:00, so you can finish up.
5     MR. GERSON: Okay.
6  BY MR. GERSON:
7     Q. I just want to –
8     MR. GERSON: Where are the rest of the
9  exhibits? I have Exhibits 1, 2, 3, 4, 5 and what
10  about 6?
11     MR. MASE: Who has 6?
12     THE WITNESS: I don't have 6.
13     MR. MASE: I have it.
14  BY MR. GERSON:
15     Q. Ms. Vazquez, have you reviewed or listened to
16  any of the statements that were taken as part of
17  Exhibit 4, which was produced to us today by your
18  counsel's office?
19     A. I have not listened to the statements. I've
20  skimmed and reviewed the transcription – or not really
21  transcription, but the – or maybe it is a full
22  transcription. But I reviewed the law enforcement
23  summaries of the statements. I think they are
24  summaries.
25     Q. You reviewed the transcription of the

Page 183

1  summaries?
2     A. I've reviewed the summaries. I'm not sure
3  that they are transcriptions. I think they are just
4  narratives.
5     Q. Did you review the photographs?
6     A. I skimmed them. I didn't look at all of them
7  very detailed.
8     Q. Have you reviewed the statements that were
9  taken as part of Carnival's investigation as to what
10  took place?
11     A. Not really for today's purposes, but when the
12  incident occurred, and I got your claim letter, I read
13  through the interim report, including the witnesses'
14  statements.
15     Q. Okay. Now, who is being designated – talking
16  about the rape kit?
17     MR. MASE: What do you want to discuss? In
18  other words, when you say talk about the rape kit,
19  the actual – the rape kit was taken by the doctor.
20     MR. GERSON: Right. We were just provided a
21  bunch of documents today by your office.
22     MR. MASE: You were provided with a copy of
23  the file that was subpoenaed from or obtained from
24  Brevard County. So I guess my question is, when you
25  "talk about the rape kit," the results are in those

Page 184

1  documents being given to you, but Carnival doesn't
2  know that, except for the fact that the file was
3  given to us.
4     So I don't think there's going to be anyone
5  who's going to be able, at Carnival, to comment on
6  the results of the sexual assault kit. I believe the
7  only thing Carnival can testify to is the doctor
8  administered it and gave it to law enforcement. So
9  if you want, you can talk to Dr. Gardner or
10  Ms. Vazquez can say that for you.
11     THE WITNESS: Is it Gardner or Martin?
12     MR. MASE: You're right, I'm sorry. It's
13  Martin. I'm getting that confused.
14  BY MR. GERSON:
15     Q. What is Carnival's understanding as far as the
16  sequence of events that was reported to law enforcement
17  by Ms. Horne?
18     MR. MASE: Objection to form. Asked and
19  considered.
20     THE WITNESS: So there's varied versions of
21  what happened and when, but it appears at some time
22  around 3:00 in the morning after the Kaleidoscope
23  Disco closed, Ms. Horne and her traveling companion
24  and another woman they met onboard went up to the
25  pizzeria. Two black males that they had met earlier

Page 185

1  in the cruise were with them up at the pizzeria. The
2  girls decided to go back to their cabin.
3     Two of the girls needed to use the restroom
4  and couldn't wait until they got back to the cabin to
5  do so, so they went to the restroom. Ms. Horne
6  proceeded to the cabin by herself where she then
7  encountered the two males again, the black males, who
8  she said followed her to her cabin and either pushed
9  their way in or followed her into the cabin. And she
10  claims that she was assaulted in there by at least
11  one, if not both of the men.
12  BY MR. GERSON:
13     Q. Okay. And it's your understanding that
14  Ms. Horne, when she was interviewed by the FBI, that she
15  reported that the males pushed their way into her cabin
16  as she was opening the door?
17     A. I think that's right.
18     Q. And you are not aware of any statements that
19  were taken in this case that indicated that Ms. Horne
20  invited these people into her room, did she?
21     MR. MASE: Objection to form.
22     THE WITNESS: Yes, there are those statements.
23  Both the suspects claim that.
24
25  BY MR. GERSON:

Page 186

1  Q.  Okay.  And isn't it true that the suspects
2  have also changed their stories as to what happened?
3  A.  Everyone seems to have changed their stories
4  slightly.
5  Q.  And --
6  A.  Sometimes --
7  Q.  Sorry, go ahead.
8  A.  Except I think Erica and Ms. Horne's traveling
9  companion were pretty consistent of what they saw
10 happen.  They were confused as to which man was in the
11 bathroom and which man was in the door, but it seems
12 they straightened that out.
13 Q.  Based on your -- strike that.
14     What is your understanding of how the -- or
15 I'll just use their names, Troy Randal and
16 Lamarcus James.  What is your understanding of how they
17 changed their stories?
18 A.  I can't remember the various details, but one
19 of them claims -- both of them claim they were invited
20 by her, and it's really strange because when you read
21 both of their statements, it's almost like halfway
22 through they flip.  James become Randal and Randal
23 becomes James, so I'm not sure which one had gold teeth,
24 which would help me a little bit, but there are varying
25 accounts.

Page 187

1      They claim she invited them individually, that
2  one of them came down individually to the cabin and
3  Lamarcus James claims he engaged in consensual sexual
4  relations with her -- I believe oral sex -- and that
5  then Randal knocked on the door and came later.
6  Q.  And so was it Randal or James that gave a
7  different -- that gave more than one statement?
8  A.  James.  Lamarcus James.
9  Q.  And you read both versions of his statement?
10 A.  There's lot of inconsistencies, so to speak.
11 I think everyone was a little intoxicated, so I guess
12 that's understandable, but yeah, I skimmed through them.
13 Q.  Okay.  And what is your understanding of the
14 sequence of events as it relates to James' statements
15 that was taken, his first statement that was taken in
16 this case?
17 A.  He came the following night -- or that night,
18 I guess, because it was 4:00 in the morning, so later
19 that night.  He came to give another statement and said
20 I was there.
21 Q.  Okay.  So the first statement that James gave,
22 what is your understanding of the first statement?
23 A.  I don't remember what he initially said.  I
24 think he initially said he -- I don't know.  I'd have to
25 read them again.  I can't remember what his first

Page 188

1  statement was.
2  Q.  So it's your understanding that James --
3  A.  I think he denied everything, initially.
4  Q.  So it's your understanding that James gave a
5  statement first denying everything?
6  MR. MASE:  Objection to form.
7  THE WITNESS:  I guess I can look it up.
8  MR. MASE:  I mean, the documents speak for
9  itself.
10 THE WITNESS:  Right.  Right.
11 BY MR. GERSON:
12 Q.  Well, what is Carnival's understanding as far
13 as how many hours went by between the time in which
14 James gave his first statement and the time in which
15 James gave his second statement?
16 MR. MASE:  The documents speak for themselves.
17 THE WITNESS:  Yeah.  And I don't remember when
18 his first statement was taken.  I think it was 9:30
19 the next night or that night because it was so early
20 in the morning that night that he came to security
21 and wanted to give a different statement.
22 BY MR. GERSON:
23 Q.  And do you know who the security officer that
24 accompanied him to the office to provide a second
25 statement was?

Page 189

1  A.  I don't remember.  I'd have to look it up.
2  Q.  Would that be John Manuel?
3  A.  I don't know.  But don't you have a copy of
4  the incident report and the FBI records?
5  Q.  Yeah, I do.  I'm just asking what your
6  knowledge is.
7  A.  It's a pretty thick log.
8  Q.  Okay.  There's a CD containing part 1 and
9  part 2 of Ms. Horne's interview.
10 A.  I haven't listened to it.
11 Q.  Do you know if any of your security personnel
12 were present for that statement?
13 A.  No.  I think that was done by law enforcement,
14 and I don't know if anybody else was present.  I don't
15 know where it was done or even when.
16 MR. GERSON:  I apologize.  I've just been
17 handed a stack of documents today and this is the
18 first that I've seen some of these, so that's the
19 delay here.
20 BY MR. GERSON:
21 Q.  So Carnival never received a copy of the
22 results of the sexual assault kit?
23 MR. MASE:  Well, as counsel for Carnival and
24 their agent in questioning matters concerning the
25 prosecution of this case, I received a copy.

Page 190

1      MR. GERSON: Okay. And that's been provided
2 to us?
3      MR. MASE: It's in there.
4      MR. GERSON: Okay.
5      MR. MASE: But to the extent that Carnival has
6 received that or learned of it actually is going to
7 be privileged communication.
8      THE WITNESS: I'm just learning about it now.
9      MR. MASE: Mr. Gerson, would you like me to
10 show you where it is?
11      MR. GERSON: Sure.
12      MR. MASE: I believe I can find it. I hope I
13 can. I hope I'm not confusing this with another
14 case. So Mr. Gerson, I'm turning in your documents
15 to a page, which is labeled Selmar Forensics and I
16 believe -- unless I'm mistaken -- there's a
17 three-page report in the sexual assault kit that I'll
18 set aside so you can look at it.
19      MR. GERSON: Okay, thanks.
20      MR. MASE: My pleasure.
21 BY MR. GERSON:
22      Q. Are you aware of any written correspondence
23 regarding anyone that was involved in this incident,
24 other than the letters that were sent by my office?
25      MR. MASE: Or letters that were sent by mine?

Page 191

1      MR. GERSON: Let me start again.
2 BY MR. GERSON:
3      Q. Are you aware of any correspondence between
4 any of the victims -- and by "victims," I mean Erica,
5 Kayla, or Lindsey Horne -- to Carnival about what
6 happened?
7      A. Only yours, I think. There may have been a
8 phone call or two into guest care. I would have to look
9 at iCare records, but we produced those so you can see
10 for yourself, but I don't remember any others.
11 BY MR. GERSON:
12      Q. Okay. Now, the incidents that -- the prior
13 incidents that we've gone over, the 59, that's only for
14 Carnival ships?
15      A. The 24 vessels in Carnival's fleet.
16      Q. Okay. That doesn't include all of the other
17 cruise lines that are operated by Carnival under
18 different brand names?
19      MR. MASE: Objection to form.
20      THE WITNESS: And they are not operated by
21 Carnival. They have independent operating companies.
22 BY MR. GERSON:
23      Q. Okay. Are you involved in any legal claims
24 regarding any of the other brands?
25      A. No, not legal claims. No.

Page 192

1      Q. What is your involvement with the other lines?
2 And why don't you just tell me what they are?
3      A. None, really.
4      Q. Is there -- tell me what some of the other
5 brands are?
6      A. Seabourn, Princess, Costa, Holland America.
7      Q. So there's a director of claims for Seabourn
8 legal claims?
9      A. I don't know if there's that title.
10      Q. All right. Is -- do you have any -- have you
11 ever reviewed any of the prior incidents for any of the
12 other brands?
13      A. No.
14      Q. No?
15      A. No. Not any more so than would be reported on
16 our corporate website or the Coast Guard's website.
17      Q. Okay. And who's responsible for updating or
18 providing the information about prior incidents as
19 required under the CVSSA?
20      MR. MASE: Objection to form.
21      THE WITNESS: Yeah. I'm not the person to
22 discuss the reporting with. I think that would
23 probably be security services. But to the extent
24 that I know, the FBI reports to the Coast Guard, I'm
25 pretty sure. We report to FBI, FBI reports to the

Page 193

1 Coast Guard.
2      MR. MASE: Mr. Williams can address that.
3      THE WITNESS: Yeah.
4 BY MR. GERSON:
5      Q. Who, other than Mr. Mase, did you talk to in
6 preparation of your deposition testimony today?
7      A. Just his law firm.
8      Q. Just his law firm?
9      A. Members of his law firm.
10      Q. Okay. And how many times have you met with
11 members of Mr. Mase's law firm in preparation for your
12 deposition testimony?
13      A. Once.
14      Q. And how long ago?
15      A. Friday.
16      Q. Prior to then, you had never met with
17 Mr. Mase or any other lawyers from his office?
18      A. We talked on the phone. I don't recall
19 meeting in person. I mean, I see members of his law
20 firm almost daily, but I don't know if we spoke about it
21 briefly or something, but nothing substantive.
22      Q. And just so we're clear, Exhibit 6 is a
23 document that was prepared by Mr. Mase?
24      A. Correct.
25      Q. And you --

Page 194

1       MR. MASE:  Not me, personally.

2       THE WITNESS:  His office.

3       MR. GERSON:  By Mr. Mase's office?

4       MR. MASE:  Yes, correct.

5       THE WITNESS:  Correct.

6   BY MR. GERSON:

7       Q.  Okay.  And you've been relying on what's in

8   Exhibit 6 for your -- as Carnival's official testimony

9   as to the prior incidents?

10      MR. MASE:  Objection to form.

11      THE WITNESS:  It was just to refresh my

12   recollection as best I could, given the overwhelming

13   volume of paper in this case so far.

14   BY MR. GERSON:

15      Q.  Did you go through Exhibit 6 to make sure it

16   was accurate and thorough and complete?

17      A.  Well, see my hands are kind of tied because I

18   have my independent recollection of things, but I'm not

19   really supposed to be looking at the incident reports

20   because it might -- you wouldn't agree to let me, you

21   know what I mean?  So it was little tricky.  It was

22   tricky.

23      So yeah, I did the best I could to both comply

24   with your request and the Court's order and give the

25   information without waiving our privileged accident

Page 195

1   reports -- incident reports, sorry.

2       MR. GERSON:  Okay.  I don't have anything

3   further for you.

4       MR. MASE:  Great.  We'll read.

5       THE COURT REPORTER:  Did you want to order the

6   transcript?

7       MR. GERSON:  He said he would read.

8       THE COURT REPORTER:  Not everyone who reads,

9   orders.

10      MR. MASE:  When it's ordered, we'll read.

11      MR. GERSON:  We won't need this now.

12      (The deposition was concluded at 2:30 p.m.

13   Signature and formalities were not waived.)

14          - - -

15

16

17

18

19

20

21

22

23

24

25          CERTIFICATE OF OATH

Page 196

1

2  STATE OF FLORIDA    )

3  COUNTY OF MIAMI-DADE )

4

5       I, John Paul Cano, FPR, Notary Public, State of

6  Florida, certify that Suzanne Brown Vazquez personally

7  appeared before me on October 26, 2015 and was duly

8  sworn.

9

10      WITNESS my hand and official seal this 18th day

11  of November, 2015.

12

13

14      _____

15          John Paul Cano, FPR

16      Notary Public, State of Florida

17      My Commission # FF39725

18      Expires November 20, 2017

19

20

21

22

23

24

25

Page 197

1       CERTIFICATE OF REPORTER

2

THE STATE OF FLORIDA  )

3

COUNTY OF MIAMI-DADE  )

4

5       I, John Paul Cano, FPR, Notary Public in and

6  for the State of Florida at Large, do hereby certify

   that I was authorized to and did stenographically report

7  the deposition of Suzanne Brown Vazquez, pages from 1 to

   199, that a review of the transcript was requested and

8  that the transcript is a true record of my stenographic

   notes.

9

10      I further certify that I am not a relative,

   employee, attorney, or counsel of any of the parties,

11  nor am I a relative or employee of any of the parties'

   attorneys or counsel connected with the action, nor am I

12  financially interested in the action.

13

   DATED this 18th day of November, 2015.

14

15

16      _____

       John Paul Cano, FPR

17

18

19

20

21

22

23

24

25

Page 198

1       WITNESS NOTIFICATION LETTER
2

November 18, 2015
3
  Suzanne Brown Vazquez
4  c/o Curtis Mase, Esquire
  Mase Lara, P.A.
5  2601 South Bayshore Drive
  Suite 800
6  Miami, Florida 33133
7  Re:  Lindsey Horne vs. Carnival Cruise Lines
     Deposition taken October 26, 2015
8       U.S. Legal Support Job No. 1339322
9  The transcript of the above-referenced proceeding has
  been prepared and is being provided to your office for
10  review by the witness.
11   We respectfully request that the witness complete their
  review within 30 days and return the errata sheet to our
12  office.
13
  Very truly yours,
14
15  John Paul Cano, FPR
  U.S. Legal Support, Inc.
16  One Southeast Third Avenue, Suite 1250
  Miami, FL 33131
17  (305) 373-8404
18
  CC via transcript:
19
  Nicholas Gerson, Esquire
20
21
22
23
24
25

Page 199

1       ERRATA SHEET
2       DO NOT WRITE ON THE TRANSCRIPT
       ENTER CHANGES ON THIS PAGE
3
       IN RE: Lindsey Horne vs. Carnival Cruise Lines
4       Suzanne Brown Vazquez
       Deposition taken October 26, 2015
5       U.S. Legal Support Job No. 1339322
6  PAGE #   LINE #   CHANGE            REASON
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  Under penalties of perjury, I declare that I have read
  the foregoing document and that the facts stated in it
23  are true.
24
  DATE:_____  SIGNATURE OF DEPONENT:_____
25       Suzanne Brown Vazquez



**One Southeast Third Avenue * Suite 1250 * Miami, Florida 33131**
**Phone: 305-373-8404**
**www.uslegalsupport.com**

---

**CASE:  Lindsey Horne vs. Carnival Cruise Lines**

**WITNESS: Suzanne Vazquez    DATE: 10/26/2015**

**U.S. LEGAL REFERENCE NO.:  1339322**

**EXHIBIT NUMBER(S):        0001-0006**

---

**The above exhibit is not attached to this transcript because it was not received by the court reporter prior to completion and shipping of this transcript.**

**Said exhibit will be forwarded to all ordering parties upon receipt by the reporter and/or our offices.**

**Please contact our Production Department with any questions, at:**

**Phone:    305-373-8404**
**Email:    MiamiProduction@uslegalsupport.com**

**Thank you,**

**U.S. Legal Support, Inc.**